**PUBLIC**

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**

| |
|---|
| **CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION**<br><br>     Plaintiffs,<br><br>     and<br><br>**DATONG JUQIANG ACTIVATED CARBON CO.. LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMENT ACTIVATED CARBON CO., LTD., AND DATONG MUNICIPAL YUNGGUANG ACTIVATED CARBON CO. LTD.**<br><br>     Consolidated Plaintiffs,<br><br>     v.<br><br>**UNITED STATES,**<br>          Defendant,<br><br>     and<br><br>**CALGON CARBON CORPORATION AND NORIT AMERICAS, INC.,**<br><br>     Defendant-Intervenors. |

**Consol. Court No. 22-00017**

<u>**CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

John M. Peterson
Richard F. O'Neill
Patrick B. Klein
NEVILLE PETERSON LLP
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

September 7, 2022

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... iii

CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED
CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RULE
56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD..............................1

RULE 56.2 STATEMENT ..............................................................................................2

I.      Administrative Determination Under Review ...................................................2

II.     Issues Presented and Summary of Argument. ...................................................3

        A.      Whether the Department's determination to base financial ratios on the
                surrogate value calculation on data reported by Malaysian producers Century is
                supported by substantial evidence and is otherwise in accordance with the law?
                ...................................................................................................................3

        B.      Whether the Commerce's determination to value carbonized material for
                purposes of the surrogate value calculation by using Malaysian subheading
                4402.91.1000, HTS, is supported by substantial evidence and is otherwise in
                accordance with the law? ...........................................................................4

        C.      Whether the Department's determination to value coal tar for purposes of the
                surrogate value calculation using Malaysian data for subheading 2706.00, HTS,
                or subheading 2708.10, HTS, is supported by substantial evidence and is
                otherwise in accordance with the law? ......................................................4

        D.      Whether Commerce's determination to value hydrochloric acid ("HCl") for
                purposes of the surrogate value calculation by using Malaysian subheading
                2806.10, HTS, data, is supported by substantial evidence and is otherwise in
                accordance with the law? ...........................................................................5

        E.      Whether the Department's determination to value steam for purposes of the
                surrogate value calculation by using subheading 2711.11, HTS, data for
                liquefied natural gas is supported by substantial evidence and is otherwise in
                accordance with the law? ...........................................................................5

        F.      Whether the Department's determination to value ocean freight on the basis of
                Maersk Line freight charge quotes is supported by substantial evidence and is
                otherwise in accordance with the law? ......................................................5

ARGUMENT ...................................................................................................................8

I.      Commerce Unlawfully Calculated Surrogate Financial Ratios. ........................8

        A.      Relevant Facts. ..........................................................................................8

        B.      The Century Chemical and Bravo Green Financial Statements Do Not
                Sufficiently Disaggregate Costs to Provide Reliable Financial Ratios.................21

        C.      The Romcarbon Financial Ratio Data is Superior to that used by Commerce. ......24

PUBLIC

II.     The Departments' Decision to Value Carbonized Material For Purposes of the SV
        Calculation By Using Malaysian Subheading 4402.91.1000, HTS is Unsupported By
        Substantial Evidence on the Record and is Not in Accordance With the Law.................26

III.    The Departments' Decision to Value Coal Tar For Purposes of the SV Calculation
        Using Malaysian Data for Malaysian Subheading 2706.00, HTS, or Malaysian
        Subheading 2708.10, HTS is Unsupported By Substantial Evidence on the Record and
        is Not in Accordance With the Law....................................................................................32

        A.      Malaysian Import Prices of Coal Tar are Unreliable and Distorted. ....................33

        B.      Substantial Evidence Supports Utilizing Malaysian Domestic Prices of Coal
                Tar and These Prices Should Be Used By the Department in Calculating the
                SV. .........................................................................................................................35

        C.      In the Alternative, Should the Department Continue to Rely On Import Data to
                Value Coal Tar, Russian Import Data for Subheading 2706.00, HTS, Affords
                the Best Alternative SV Choice for Coal Tar. .......................................................35

IV.     The Departments' Decision to Value Hydrochloric Acid ("HCl") For Purposes of the
        SV Calculation By Using Malaysian Subheading 2806.10, HTS, Data is Unsupported
        By Substantial Evidence and is Not in Accordance With the Law....................................36

        A.      There is a Lack of Substantial Evidence in Support of the Department's
                Surrogate Valuation of Hydrochloric Acid (HCl) Inputs Using Malaysian
                Import Data. ...........................................................................................................36

        B.      Commerce Should Value the Aqueous HCl Using Brazilian Imports Under HTS
                2806.10.20 at 0.061 USD/kg...................................................................................38

V.      The Departments' Decision to Value Steam for Purposes of the SV Calculation By
        Using Subheading 2711.11, HTS, Data For Liquefied Natural Gas, is Unsupported By
        Substantial Evidence and is Not in Accordance With the Law. ........................................39

VI.     The Department's Decision to Value Ocean Freight on the Basis of Boilerplate Maersk
        Line Freight Charge Quotes is Unsupported By Substantial Evidence and Not in
        Accordance With the Law. ................................................................................................43

PUBLIC

# TABLE OF AUTHORITIES

**Cases**

*Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ........................................... 7

*Calgon Carbon Corp. v. United States*, 2017 WL 384685 (Ct. Int'l Tr. 2017) ..................... 33, 37

*Carbon Activated Tianjin Co. Ltd. v. United States*, Court No. 21-131, Slip Op. 22-89
(August 8, 2022) ..................................................................................................... passim

*Carbon Activated Tianjin Co. v. United States*, 503 F. Supp. 3d 1278 (Ct. Int'l Tr 2021) .. 20, 21,
23

*Catfish Farmers of Am. v. United States*, 37 C.I.T. 717 (2013) ..................................................... 24

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837 (1984). ...................... 8, 20

*Cleo Inc. v. United States*, 501 F.3d 1291 (Fed. Cir. 2007) .............................................................. 8

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Tr. 2006) ..................................... 10

*Elkay Mfg. Co. v. United States*, 180 F. Supp. 3d 1245 (Ct. Int'l Tr. 2016) ................................ 40

*Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313 (Ct. Int'l Tr. 2015). ....... 10

*Gallant Ocean (Thailand) Co. v. United States*, 602 F.3d 1319 (Fed. Cir. 2010). ......................... 7

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 C.I.T. 288 (2005) ..... 35, 36, 37

*Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323 (Ct. Int'l Tr. 2019). ........ 9, 13, 14, 19

*Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1308 (Ct. Int'l Tr. 2019) ......................... 15

*Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992 (Fed. Cir. 2015) ................................ 32

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289 (Fed. Cir. 2016) .................. 9

*Peer Bearing Co. – Changshan v. United States*, 752 F. Supp.2d 1353 (Ct. Int'l Tr. 2011) ....... 33

*Queen's Flowers de Colombia v. United States*, 21 C.I.T. 968 (1997) ........................................ 25

*Russ Berrie & Co., Inc. v. United States*, 57 F. Supp. 2d 1184 (Ct. Int'l Tr. 1999). ..................... 8

*Shantou Red Garden Foodstuff Co. v. United States*, 880 F. Supp. 2d 1332 (Ct. Int'l Tr.
2012). ...................................................................................................................................... 33

*U.S. Steel Corp. v. United States*, 621 F.3d 1351 (Fed. Cir. 2020). .............................................. 7

*United States. v. Haggar Apparel Co*., 525 U.S. 380,394 (1999). .................................................. 8

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ................................................................ 8

*Weishan Hongda Aquatic Food Co. Inc. v. United States*, 917 F.3d 1353 (Fed. Cir. 2019) ........ 26

*Yantai Oriental Juice Co. v. United States*, 26 C.I.T. 605 (2002). .............................................. 42

**Statutes**

19 U.S.C. § 1516a ...................................................................................................................... 2, 7

19 U.S.C. § 1677b .............................................................................................................. 19, 20, 21

**Other Authorities**

*Activated Carbon from China*, 83 Fed. Reg. 53,214 (Oct. 22, 2018) ........................................... 37

*Certain Activated Carbon from the People's Republic of China*, 78 Fed. Reg. 70,553
(Nov. 20, 2013) ...................................................................................................................... 31

*Certain Activated Carbon from the People's Republic of China: Final Results of
Antidumping Duty Administrative Review; and Final Determination of No. Shipments;
2019- 2020*, 86 Fed. Reg. 73,731 (Dec. 28, 2021) ............................................................ 2, 3, 7

*Certain Activated Carbon from the People's Republic of China: Preliminary Results of
Antidumping Duty Administrative Review and Preliminary Determination of No
Shipments, 2017-18*, 84 Fed. Reg. 27,758 (June 14, 2019) ................................................ 20

*Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2019–2020*, 86 Fed. Reg. 33,988 (June 28, 2021) ................................. 6, 9

*Certain Activated Carbon from the People's Republic of China; Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments and Final Rescission of Administrative* Review, *in Part, 2018-19*, 86 Fed. Reg. 10,539 (February 22, 2021), ................................................................................................. 27

*Crystalline Silicon Photovoltaic Cells from China*, 80 Fed. Reg. 40,998 (July 7, 2015)............. 43

*Fresh Garlic from China*, 76 Fed. Reg. 36,168 (July 17, 2013)................................................. 26

*Freshwater Crawfish Tail Meat from China*, 78 Fed. Reg. 22,228 (Oct. 9, 2012)...................... 26

H.R. Rep. No. 100-576 (1988)................................................................................................. 10

*Hardwood and Decorative Plywood from China*, 78 Fed. Reg. 58.723 (September 23, 2013) ..................................................................................................................................... 19

*Helical Spring Lock Washers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 4175 (January 15, 2008) ................. 39

*Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1344 (Ct. Int'l Tr 2019) ........................ 19

*Polytetrafluoroethylene Resin from China*, 83 Fed. Reg. 20,039 (Apr. 30, 2018)...................... 43

U.S. Dep't of Commerce, *Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1* (2004)............................................................................................ passim

*Wooden Bedroom Furniture from China*, 73 Fed. Reg. 49,162 (Aug. 20, 2008)........................ 40

PUBLIC

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**

| |
|---|
| **CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION**<br><br>**Plaintiffs,**<br><br>**and**<br><br>**DATONG JUQIANG ACTIVATED CARBON CO.. LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMENT ACTIVATED CARBON CO., LTD., AND DATONG MUNICIPAL YUNGGUANG ACTIVATED CARBON CO. LTD.**<br><br>**Consolidated Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br>                              **Defendant,**<br><br>    **and**<br><br>**CALGON CARBON CORPORATION AND NORIT AMERICAS, INC.,**<br><br>**Defendant-Intervenors.** |

**Consol. Court No. 22-00017**

## CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

In accordance with Rules 7, 56.2, 73.2, and 81(h) of the United States Court of International Trade ("USCIT R."), and this Court's Scheduling Order of August 18, 2022 (ECF No. 29), Plaintiffs Carbon Activated Tianjin Co., Ltd. ("CAT"), and Carbon Activated Corporation ("CAC"), hereby submit this memorandum of law in support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record.

Plaintiffs have moved for judgment on the agency record pursuant to USCIT R. 56.2, challenging as unsupported by substantial evidence and otherwise not in accordance with law the final determination of the U.S. Department of Commerce (the "Department" or "Commerce") in *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*; a*nd Final Determination of No. Shipments; 2019- 2020*, Case No. A-570-904, as published in the Federal Register. *See* 86 Fed. Reg. 73,731 (Dec. 28, 2021) ("Final Determination") (PR 314). Pursuant to sections 516A(a)(2)(A)(i)(I) and 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended (the "Act"), 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and 1516a(a)(2)(B)(iii), Plaintiffs brings this action to contest, as unreasonable and unsupported by substantial record evidence, Commerce's Final Determination. Particularly, Plaintiffs challenge Commerce's decision:

(i)   to base financial ratios in the surrogate value calculation on data reported by Malaysian producers Century and Bravo;

(ii)  valuing carbonized material for purposes of the surrogate value calculation by using Malaysian imported statistics subheading 4402.91.1000 of that country's tariff schedule;

(iii) valuing coal tar for purposes of the surrogate value calculation using Malaysian subheading 2706.00, Harmonized Tariff Schedule ("HTS"), or Malaysian subheading 2708.10, HTS;

(iv)  valuing hydrochloric acid ("HCl") for purposes of the surrogate value calculation by using Malaysian subheading 2806.10, HTS;

(v)   valuing steam for purposes of the surrogate value calculation by using subheading 2711.11, HTS for liquefied natural gas; and

(vi)  valuing ocean freight on the basis of boilerplate Maersk Line freight charge quotes.

## RULE 56.2 STATEMENT

## I.   Administrative Determination Under Review

This action involves a challenge to certain aspects of Commerce's final determination in *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*; a*nd Final Determination of No. Shipments; 2019- 2020*, Case No. A-

570-904, as published in the Federal Register. *See* 86 Fed. Reg. 73,731 (Dec. 28, 2021) (Public Record ("PR") 314); *see also, Issues and Decision Memorandum for the Final Results of the Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Thirteenth Antidumping Duty Administrative Review* (Dec. 17, 2021) ("I&D Memo") (PR 308).

## II.   Issues Presented and Summary of Argument.

### A.   Whether the Department's determination to base financial ratios on the surrogate value calculation on data reported by Malaysian producers Century is supported by substantial evidence and is otherwise in accordance with the law?

No. Commerce erred because its decision to base financial ratios in the surrogate value calculation on data reported by Malaysian producers Century and Bravo is unsupported by substantial evidence on the record, is arbitrary and capricious, and does not satisfy the statutory requirement that Commerce make determinations on the basis of the best available information. The Century and Bravo financial statements were improperly relied on by Commerce and unsuitable because they did not present disaggregated information, resulting in Commerce's adoption of distorted overhead and sales, general expense and administrative expenses ("SGA") and distorted financial ratios. Commerce's rejection of financial data on the record from Romanian producer Romcarbon was not in accordance with law, as was Commerce's determination that Romania was not a significant producer of comparable merchandise. The Romcarbon data was the best available information, as it was disaggregated and provides more accurate financial ratios. In the alternative, Commerce erred by not considering and using information from the financial statements of Russian product JSC Sorbent to value financial ratios in the surrogate value calculation.

**B.      Whether the Commerce's determination to value carbonized material for purposes of the surrogate value calculation by using Malaysian subheading 4402.91.1000, HTS, is supported by substantial evidence and is otherwise in accordance with the law?**

No. Commerce erred by not including data from subheading 4402.90.9000, HTS, which covers for wood-based carbon, and by using import statistics from Malaysian tariff subheading 4402.91.1000, HTS which covers coconut shell imports. The coal activated carbon used to make respondents merchandise has characteristics comparable to both wood and coconut shell based materials, and data covering both products should have been used because Malaysian data under subheading 4402.90, HTS for the period of review was demonstrably unreliable and impeached by domestic price data, Commerce erred in not using reliable subheading 4402.90, HTS, data from a secondary surrogate country, Turkey. Commerce's failure to do this left its Final Results concerning this factor of production unsupported by substantial evidence on the record and contrary to law.

**C.      Whether the Department's determination to value coal tar for purposes of the surrogate value calculation using Malaysian data for subheading 2706.00, HTS, or subheading 2708.10, HTS, is supported by substantial evidence and is otherwise in accordance with the law?**

No. Commerce erred because the data relied upon by the agency was unreliable and aberrant, reporting higher AUVs for a basic product (i.e., coal tar) than for a value-added product (i.e., pitch). The Malaysian data was also aberrant as shown by Malaysian and Spanish domestic market prices and Spanish export and import prices. Coal tar should appropriately have been valued based on either the Malaysian domestic market price of \$0.216/kg or the Russian subheading 2706.00, HTS, AUV of \$0.172/kg, either of which are for more reflective of the value of pitch in a comparable market economy country. Commerce's failure to properly value coal tar

renders the Final Results unsupported by substantial evidence on the record and not in accordance with the law.

> **D.** **Whether Commerce's determination to value hydrochloric acid ("HCl") for purposes of the surrogate value calculation by using Malaysian subheading 2806.10, HTS, data, is supported by substantial evidence and is otherwise in accordance with the law?**

No. Commerce erred in valuing hydrochloric acid ("HCl") for purposes of the surrogate value calculation by using Malaysian subheading 2806.10, HTS, data, which was not specific to the input, and which contained values for both pure HCl and HCl in aqueous form, the type used in making the imported activated carbon. Commerce should have valued this factor of production using Brazilian subheading 2806.10.20, HTS, data which specifically covered HCl in aqueous solution.

> **E.** **Whether the Department's determination to value steam for purposes of the surrogate value calculation by using subheading 2711.11, HTS, data for liquefied natural gas is supported by substantial evidence and is otherwise in accordance with the law?**

No. Commerce erred because subheading 2711.11, HTS, data for liquefied natural gas, is not product specific to steam. To make its determination according to the best information available, the Department should have valued steam with reference to the value for natural gas in a gaseous state, as reported in subheading 2711.21, HTS.

> **F.** **Whether the Department's determination to value ocean freight on the basis of Maersk Line freight charge quotes is supported by substantial evidence and is otherwise in accordance with the law?**

No. Commerce erred because the boilerplate Maersk Line freight charge quotes are unreliable and do not represent consummated transactions. By contrast, Descartes data on the record showed the value of actual freight (chemical) movements between China and the United States, and represented the best information available.

## STATEMENT OF FACTS

The antidumping ("AD") Order on Certain Activated Carbon from the People's Republic of China was originally imposed in 2007. See 72 Fed. Reg. 20,988 (April 27, 2007) (the "AD Order"). On June 8, 2020, the Department initiated the 2019-2020 annual review, the 13th annual review of the AD Order. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*. See 85 Fed. Reg. 35068 (June 8, 2020) (PR 61).

On June 28, 2021, the Department published the preliminary results of the 13th annual review of the AD Order. *See Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2019– 2020*, 86 Fed. Reg. 33,988 (June 28, 2021) (PR 278).

On September 27, 2021, Plaintiffs submitted their Case Brief to the Department in the 13th Administrative Review of the AD Order challenging, inter alia: (i) the Department's use of financial statements of Malaysian firms, Century and Bravo, to calculate financial ratios as part of its surrogate value calculation of normal values; (ii) the Department's valuation of Plaintiffs' carbonized material using Malaysian import data for "coconut shell charcoal" classified under subheading 4402.90.10000 of the Harmonized Tariff Schedule ("HTS") as part of the surrogate value construction; (iii) the Department's valuation of coal tar in the surrogate value calculation based on data reported under Malaysian subheading 2706.00, HTS, which data was unreliable and inexplicably showed a higher average unit value ("AUV") for coal tar than for pitch, a value-added product with a higher pitch concentration than coal tar; (iv) the Department's use of Malaysian subheading 2806.10, HTS, import data to value hydrochloric acid ("HC1") in the surrogate value calculation, on the ground that such data captured both pure HCl and HCl in aqueous solution; (v) the Department's use of Malaysian subheading 2711.11, HTS, to value steam in the surrogate value context at 14.52% of natural gas prices, because that subheading provided for liquefied

natural gas, while gas should be valued at the values shown in Malaysian subheading 2711.21, HTS, for natural gas in the gaseous state; and (vi) the Department's use of Maersk Line freight quotes to value ocean freight instead of Descartes data showing actual consummated transportation movements. *See* Respondents' Case Brief (PR 295, 296, Confidential Record ("CR") 214, CR 215).

The Department's Final Results rejected Plaintiffs' comments on all of the points noted above, and instead based the final AD margin calculations on flawed data, rather than on the basis of substantial evidence on the record. Commerce's final determination were published in *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*; a*nd Final Determination of No. Shipments; 2019- 2020*, Case No. A-570-904, as published in the Federal Register. *See* 86 Fed. Reg. 73,731 (Dec. 28, 2021) (PR 314).

## STANDARD OF REVIEW

Commerce's determination will be sustained unless it is unsupported by substantial evidence on the record, or otherwise not in accordance with law. 19 U.S.C. § 1516a(b)(1)(B)(i). When evaluating factual determinations, the Court must sustain Commerce's final results, unless they are "unsupported by substantial evidence on the record." *U.S. Steel Corp. v. United States*, 621 F.3d 1351, 1357 (Fed. Cir. 2020). "Substantial evidence on the agency record means more than a mere scintilla and 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' taking into account the entire record, including whatever fairly detracts from the substantiality of the evidence." *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984); *see also, Gallant Ocean* (*Thailand*) *Co. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010). A determination is supported by substantial evidence if the record contains "evidence that a reasonable mind might accept as adequate to support a conclusion*." Cleo Inc. v. United States*, 501 F.3d 1291, 1296 (Fed. Cir. 2007) (citing *Universal Camera Corp. v. NLRB*, 340

U.S. 474, 477 (1951)). "[S]ubstantial evidence supporting an agency determination must be based on the whole record. The 'whole record' means that the Court must consider both sides of the record. It is not sufficient to examine merely the evidence that sustains the agency's conclusion." *Russ Berrie & Co., Inc. v. United States*, 57 F. Supp. 2d 1184, 1187 (Ct. Int'l. Tr. 1999).

In reviewing Commerce's interpretation of the statute or Commerce's regulations, the first question is whether the statutory language is clear and unambiguous as to the precise question at issue. If so, that is the end of the matter as the clear intent of Congress must be applied. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837, 842 (1984). If, however, the statute is silent or ambiguous with respect to the specific issue, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id*. at 843. Thus, the court will uphold such statutory interpretations by Commerce if they are reasonable. *Koyo Seiko Co. v. United States*, 20 F3d. 1160, 1167 (Fed. Cir. 1994). The *Chevron* standard has been extended to administrative regulations. *United States. v. Haggar Apparel Co*., 525 U.S. 380,394 (1999).

## <u>ARGUMENT</u>

**I.    Commerce Unlawfully Calculated Surrogate Financial Ratios.**

**A.    Relevant Facts.**

Commerce employs a four-step approach to selecting a primary surrogate country. Pursuant thereto:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the [non-market economy] country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)-(3), Commerce will select the country with the best factors data.

*Jiaxing Brother Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1293 (Fed. Cir. 2016) (citation omitted); *see also*: U.S. Dep't of Commerce, *Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1* (2004), http://enforcement.trade.gov/policy/bull04-1.html ("Policy Bulletin 04.1").[1] This policy was used to select the surrogate country in this review. *See Letter from USDOC to Interested Parties Pertaining to Interested Parties Surrogate Value Comments Request* (Jan. 19, 2020) (PR 93); I&D Memo at FN 221 (PR 308).

In this review, financial statements from multiple countries were submitted by interested parties for Commerce's use in calculating surrogate financial ratios for AR13. Commerce, in its preliminary and final determinations, "used the financial statements of two Malaysian producers of identical or comparable merchandise (*i.e.*, Century Chemical Works Sendirian Berhad and Bravo Gree Sdn. Bhd.)."[2] Although the record included the contemporaneous financial statement of Romcarbon, a Romanian producer, Commerce rejected this information based on its finding that Romania was not a significant producer of comparable merchandise," electing to restrict its determination of "significant producers" to those countries which, during the POR, were "net exporters" of activated carbon. I&D Memo at 33-35 (PR 308).

Commerce noted that the statute does not define the concept of a surrogate country that is a "significant producer of comparable merchandise,"[3] and relied on other sources, including the agency's Policy Bulletin 04.1, which explains that "Commerce should define 'significant producer' in relation to world production and trade (subject to availability of data on these

---

[1] *See also, Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323, 1328-1329 (Ct. Int'l Tr. 2019).

[2] United States Department of Commerce, Decision Memorandum accompanying Preliminary Results, 86 Fed. Reg. 33,988 (June 21, 2021) (hereinafter, "Prelim. Decision Memo.") (PR 273).

[3] I&D Memo at 31 (PR 308).

characteristics,"[4] and which noted that "the legislative history provides that the term "significant producer" includes any country that is a "net exporter" of identical or comparable merchandise."[5] Asserting that the term is "inherently ambiguous,"[6] Commerce asserted that it was not required to define "significant producer" in any particular manner.[7] The agency concluded that, since Malaysia was the only "net exporter" of activated carbon during the POR, it could disregard financial statements from other countries. In so doing, Commerce thus disregarded record evidence showing significant exports during the POR by other countries, to wit:[8]

| COUNTRY | EXPORTS |
|---------|---------|
| Brazil | 663, 604 kg. |
| Malaysia | 19,991.330.95 kg |
| Mexico | 11,193,828 kg |
| Romania | 20,485 kg |
| Russia | 1,650,814.89 kg |
| Turkey | 213,649 kg |

See I&D Memo at 28 (PR 308); Respondent's Case Brief at 16-17 (PR 295).

By exercising this "administrative short cut," of focusing solely on "net exports," Commerce absolved itself from any responsibility to consider financial statements from producers of comparable merchandise in countries other than Malaysia, the principal surrogate country. Admitting that the financial statements from the two Malaysian companies used to derive financial ratios were "not as detailed as commerce prefers in that none of them have separate line items breaking out the cost of raw material, labor and energy,"[9] Commerce chose to use them because

---

[4] Id. (quoting Policy Bulletin 04.1).

[5] H.R. Rep. No. 100-576 (1988) at 590 (conf. report).

[6] I&D Memo at 31 at FN 210 (PR 308); citing Fresh Garlic Producers Ass'n v. United States, 121 F. Supp. 3d 1313 (Ct. Int'l Tr. 2015).

[7]Id. at FN 211 (citing Dorbest Ltd. v. United States, 462 F. Supp. 2d 1262 (Ct. Int'l Tr. 2006)).

[8] Respondent's Case Brief at 16-17 (PR 295).

[9] I&D Memo at p.34 (PR 308).

PUBLIC

(1) the reports were from producers in the "principal surrogate country," Malaysia, and (2) by relying solely on the "net exporter" criterion for determining who is a "significant producer," Commerce had shielded itself from having to consider the on-record (and superior) financial statements of Romanian producer Romcarbon and Russian producer JSC Sorbent.

Commerce's election to willfully blind itself by unreasonably restricting the definition of "significant producer" of comparable material and disregarding the superior quality of financial data in the Romcarbon report was not supported by substantial evidence and must be overturned.

### A. Identifying "Significant Producers" of Comparable Merchandise for Purposes of SV Data Selection Requires Commerce to Consider Multiple Factors.

Commerce's own policy prohibits the agency from apply fixed criteria (such as whether a country is a "net exporter" of merchandise in determining the "significant producer" status of a surrogate country. Policy Bulletin 04.1 requires the agency to evaluate the "net exporter" criterion in conjunction with other factors, including the nature of the finished product, the nature of the inputs being valued and the data quality of the surrogate value.

In selecting a surrogate value—including financial statements—Policy Bulletin 04.1 stresses that Commerce's paramount concern is "the best available information."[10] The Policy stresses:

> Data quality is a critical consideration affecting surrogate country selection. After all a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate **if crucial factor price data from that country are inadequate or unavailable.**[11]

Referring to Commerce's surrogate value regulation, 19 C.F.R. §351.408, Policy Bulletin 04.1 further notes that:

---

[10] Policy Bulletin 04.1; quoting 19 U.S.C. § 1677b(c)(1)(B).

[11] Policy Bulletin 04.1.

[The regulation] also makes clear that the relative weight attached to each of the two selection criteria, described above, is unspecified because the relative importance that the Department sttaches to each will necessarily vary depending on the specific facts of each case …

The statute does not require that the Department use a surrogate country that is at a level of economic development most comparable to the NME country and that is the most significant producers of comparable merchandise. The statute requires only that the Department use a surrogate market economy country that is at a level of economic development comparable to that of the NME country and that is a significant producer of comparable merchandise. Even these requirements are not binding as the statute requires they be met only to the extent possible.

Thus, Commerce, in selecting financial statements from which to compute financial ratios, is required to analyze the factors of economic comparability and significant production with the paramount objective of achieving the most accurate financial ratios. It follows that a surrogate country having superior quality surrogate value data would not be required to meet the same level of significant production as a country lacking in such data. To this end, Commerce sought from interested parties in the administrative proceeding "availability and quality of data for the major factors of production ("FOP"); and "availability and quality of financial statements."[12] But Commerce erred in not considering the quality of the Romanian financial statements in this case in making its determination of "significant producer" status.

In this case, Commerce's rigid application of the "net exporter" test is contrary to the agency's own policy and practice, which indicates that "[t]he extent to which a country is a significant producer should not be judged against the NME country's production level or comparative production of the five or six countries on the OP's surrogate country list." Policy Bulletin 04.1. The Policy further indicates that "Because the meaning of "significant producer"

---

[12] *Letter from USDOC to Interested Parties Pertaining to Interested Parties Surrogate Value Comments Request* (January 19, 2021) at 1-2 (PR 93).

can differ significantly from case to case, fixed standards such as "one of the top five producers" have not been adopted." *Id*.

Moreover, Commerce's Policy indicates that the criterion of "significant producer of comparable merchandise" is generally emphasized only in those cases that "involve subject merchandise that is unusual or unique (with correspondingly unusual or unique inputs or other unique aspects of the cost of production), e.g., crawfish, which is produced by only a few countries … " Policy Bulletin 04.1. The "significant producer" criterion is important in those cases because Commerce "wants to avoid selecting a surrogate country in which the relative scarcity (either through domestic sources or through imports) of a major non- or little-traded input precludes the country from being a competitive producer of comparable merchandise." *Id.*

In a case such as this, where the subject merchandise and its inputs are unexceptional, Commerce is required to apply a sliding scale and apply an attenuated product requirement when examining potential surrogate countries. The agency has shown no reason why it was required to adhere rigidly to the net exporter criterion. Commerce's reliance on the "net exporter" criterion to determine that "Malaysia is the only significant producer of activated carbon among the OP list countries"[13] is not supported by substantial evidence.

This Court has previously rejected Commerce's fixation on the "net exporter" criterion as the basis for selecting a surrogate value. In *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323 (Ct. Int'l Tr. 2019), the Court rejected Commerce's repeated attempts to select Thailand as the primary surrogate country in an annual review of this same antidumping order against Activated Carbon from China, holding:

> With respect to net exports, Commerce asserted that "[a] country's status as a net exporter supports a finding of significant production because, as noted above, we

---

[13] I&D Memo at 31-32 (PR 308).

13

interpret 'significant' to mean a noticeably or measurably large amount." *Id.* at 7. Precisely why Commerce considers this to be the case here is unclear. **While Commerce has defined "significant" as "noticeably or measurably large," Commerce has not explained why having net exports signifies significant production.** Commerce further asserted that "when a country is a net exporter, the assumption is that it produces more than it imports and consumes," id.; however, the extent to which this is relevant to finding significant production depends, in part, on the amount of domestic consumption. Here, Commerce has failed to identify record evidence of Thailand's domestic consumption, if there is any. **The pertinent question then, is whether significant production may reasonably be inferred from Thailand's net export quantity for the relevant period**, which was 1,172,897 kg. *See id*. at 7 & n.31 (citation omitted).

To that end, Commerce asserted that record evidence enabled a comparison of the net exports of Thailand, the Philippines, and Indonesia. *Id*. at 7. Commerce noted that Thailand, the Philippines, and Indonesia had net export quantities of 1,172,897 kg, 60,662,341 kg, and 11,112,825 kg, respectively. *Id*. at 7-8. But without actually analyzing the information, Commerce simply asserted that Policy Bulletin 04.1 provides that being "a net exporter satisfies the statutory requirement," and declared all three countries to be significant producers without addressing the disparities between their net export quantities. *Id*. at 8 (emphasis added). **In fact, the Policy Bulletin states that although "'significant producer' could mean a country that is a net exporter," Commerce should avoid "fixed standards" in favor of case-specific assessments dependent upon the available data, indicating that an analysis of this data is required.** Policy Bulletin 04.1 at 3 (emphasis added).10 **The court has previously rejected Commerce's conclusory reliance on net exports *per se* and is compelled to do so again here.** Jacobi (AR7) II, 313 F. Supp. 3d at 1327-28.11

*Id.* at 1333-34 (emphasis added). A similar result was reached in *Jacobi Carbons AB v. United States*, 365 F. Supp. 1344 (Ct. Int'l Tr. 2019).

Following remand in those cases, Commerce selected Indonesia and Malaysia, respectively, as the primary surrogate countries, in the seventh and eighth administrative reviews of the order.[14]

In the instant case, Commerce's selection of Malaysia as principal surrogate country was equally cursory and unsupported by substantial evidence.

---

[14] *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1308, 1311 (Ct. Int'l Tr. 2019); *Jacobi Carbons AB v. United States*, 422 F. Supp. 3d 1318, 1321 (Ct. Int'l Tr. 2019).

This Court recently emphasized the need to avoid conclusory determination in surrogate selection in *Carbon Activated Tianjin Co. Ltd. v. United States*, Court No. 21-131, Slip Op. 22-89 (August 8, 2022) ("Slip Op. 22-89"), which involved the twelfth administrative review of the instant order. There, as here, Commerce selected Malaysia as the surrogate and valued financial ratios using the statements of Bravo Green, one of the Malaysian firms whose financial records are used in this case. There, as here, Commerce determined that the Bravo Green statements were "not as detailed as Commerce prefers,"[15] and indicated that its selection of Malaysia was based on a single prioritized criterion, the contemporaneity of the Bravo Green statements. This Court remanded, noting that:

> Commerce's choice of Bravo Green's 2018 financial statements over the non-Malaysian alternatives was conclusory, however. Commerce itself acknowledged that Bravo Green's 2018 statements were "not as detailed as Commerce prefers," I&D Mem. At 33, but did not explain why the less-than-ideal Bravo Green statements were better than the alternatives. See *Mid Continent Steel & Wire Inc. v. United States*, 45 CIT __, 551 F. Supp. 3d 1360 (2021)(remanding for failure to fully compare two imperfect sets of financial statements for calculation of surrogate value profit); *CP Kelco US Inc*., 2016 WL 1403657 at *2; *Catfish Farmers of Am. v. United States*, 37 CIT 717, 743 (2013). Commerce rejected the non-Malaysian data without considering its potential merits, in favor of data from the primary surrogate country – even though the data from the primary surrogate country was less disaggregated and detailed than preferred. The agency's entire answer to respondents' arguments that JSC Sorbent or Romcarbon's financial statements should be used was: "We disagree. The record contains give financial statements from the primary surrogate country, Malaysia. Of the five financial statements, four are from producers of identical or comparable merchandise . . .  ." It appears that Commerce did not consider JSC Sorbent or Romcarbon for the sole reason that they were not from Malaysia but did not explain why association with the primary surrogate country outweighed other considerations or criteria.

Slip Op. 22-89, at p. 39-40.

---

[15] Slip Op. 22-89, at p. 39.

Similarly, in the instant review, Commerce declined to consider the Romcarbon or JSC Sorbent financial statements merely because they were not from Malaysia, the primary surrogate country, which Commerce had (incorrectly) identified as the only "significant producer" of comparable merchandise. Its rejection of the Romcarbon and JSC Sorbent financial reports is based on the circular reasoning that "in the *Preliminary Results*, Commerce analyzed the 2019 Romcabon statements in the context of analyzing the "significant producer of comparable merchandise" criterion for the selection of the primary surrogate country and determined that the [sic] Romcarbon's production experience is not as similar to the mandatory respondents production experience as the production experience of the two Malaysian producers of activated carbon (*i.e.,* Century Chemical and Bravo Green)."[16] However, the difference in production experience was not related to production of activated carbon, but the fact that Romcarbon produced other goods as well.[17]

Commerce effectively conceded that the Malaysian financial statements it selected were inferior to Romcarbon and JSC Sorbent statements. Having previously concluded that Malaysian statements lacked disaggregation and thus lacked "usable financial data"[18], Commerce nonetheless has used these statements for the purposes of calculating surrogate financial ratios.[19]  The determination is conclusory and should be remanded for further detailed explanation or the selection of other surrogate value data.

### B.  Romania and Other OP Countries are "Significant Producers."

---

[16] I&D Memo. at 33 (PR 308).

[17] *Id.* at FN 227.

[18] *Id.* at 34.

[19] *Id.* at 35.

As noted above, Commerce wrongly disqualified Romania as a "significant producer" of activated carbon solely because the agency limited its definition of "significant producers" to countries which were "net exporters" of this material. However, the record contains "direct evidence of production of identical, and therefore comparable merchandise" in Romania during the POR.[20] Country-wide production and consumption data from Romania for 2019 (which overlaps with 9 of the 12 months of the POR). Romcarbon's financial statement indicates that the company's Activated Carbon workshop (CP 2) produced activated carbon having a value of 2,111,661 Lei ($506,799, at 1 Lei = $0.24)[21], which accounted for 7% of Romania's domestic market production. This indicates that total Romanian production of activated carbon during 2019 was approximately $7.24 million.[22] Moreover, another Romcarbon workshop, CP1, produced automobilie and industrial filters, which share a filtration use and are comparable to activated carbon. CP1's production, valued at 2,579,380 Lei ($619,051) accounted for 2% of the Romanian domestic market, indicating that total domestic production of these filters in Romania during 2019 was $30.9 million.[23]

During the period of review, then, Romanian production of goods identical or comparable to the subject merchandise totaled about $38.19 million, indicating that Romania satisfies the "significant producer" criterion. This record evidence demonstrates that Commerce's finding that Romania was not a significant producer is not supported by substantial evidence on the record. The agency's analysis was also unlawful because Commerce is constructed by statute to select

---

[20] Prelim. Decision Memo. at 16 (PR 273).

[21] Respondents' First Surrogate Value Submission, Exhibit 14B (March 4, 2021) (PR 128 at 2, 4).

[22] *Id.*

[23] *Id.*

**PUBLIC**

"one or more market economy countries of comparable merchandise" "to the extent possible." 19 U.S.C. § 1677b(c)(4).

In this case, instead of selecting "one or more" significant producer countries, Commerce aimed at selecting only one country, the single "most significant producer country" – contrary to the policy stated in Policy Bulletin 04.1. Second, Commerce's determination was based on a comparison of production data in Romania and Malaysia – again contrary to the direction of Policy Bulletin 04.1, which states that the "significant producer" criterion "should not be judged against . . . the comparative production of the five or six countries on OP's surrogate country list." Policy Bulletin 04.1.  Instead of making a country-specific assessment that is "consistent with the characteristics of world production of, and trade in, comparable merchandise," *id.*, Commerce improperly compared one OP List country against another, to artificially achieve a result that selected Malaysia and eliminated other OP countries, including Romania. This is an approach Commerce itself has rejected in the past. *See Hardwood and Decorative Plywood from China*, 78 Fed. Reg. 58.723 (September 23, 2013) (final determination), I&D Memo at 45-46 n.19:

> [W]ith regard to parties' argument that Bulgaria's production is insignificant when compared to other countries on the list, the Policy Bulletin clearly negates such analysis and states that "[t]he extent to which a country is a significant producer should not be judged against the NME country's production level **or the comparative production of the five or six countries on OP's surrogate country list**."

(Emphasis added).

In this review, Commerce improperly relied on net exports as a proxy for production – a practice specifically disallowed in *Jacobi Carbons AB v. United States,* 365 F. Supp. 3d 1323 (Ct. Int'l Tr. 2019) and *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1344 (Ct. Int'l Tr 2019) – and ignored its acknowledged policy of "*not* determining significance relative to the comparative production of the potential surrogate countries." *Id.*

Commerce also improperly narrowed the statutory requirement that surrogate countries be "one or more countries … that are significant producers of comparable merchandise," in disregard of the language in 19 U.S.C. § 1677b(c)(4), to one where it selected the one country having the maximum number of companies producing identical merchandise.[24]   Because Congress has already spoken to the issue of identifying countries for surrogate selection, Commerce's interpretation is not entitled to deference from the Court. *See, e.g, Chevron USA Inc. v. Nat. Resource Defense Council*, 467 U.S. 837, 842 (1984).

Similar findings in prior reviews of this antidumping order have been overturned by this Court. In *Carbon Activated Tianjin Co. v. United States*, 503 F. Supp. 3d 1278 (Ct. Int'l Tr. 2021), the Court considered the 11th annual review of the antidumping order against *Activated Carbon from the People's Republic of China.* During that review, the OP compiled a list of six countries which had significant exports of comparable material.[25]  As in this case, Commerce said that the existence of a financial statement on the record from a Romanian company, Romcarbon, "is not evidence of 'significant production' especially as compared to the three financial statements from Malaysian activated carbon producers on record."[26]

---

[24] Prelim. Decision Memo. at 16 (PR 273) (Malaysia "provides more direct evidence of the production of identical, and therefore comparable merchandise in the form of financial statements from more than one Malaysian company").

[25] In AR 11, the exports from the six listed OP countries were:

- ➢ Malaysia       16,475,976 kg.
- ➢ Mexico          8,778,259 kg.
- ➢ Russia            849,850 kg.
- ➢ Brazil          1,308,000 kg
- ➢ Romania          34,000 kg
- ➢ Kazakhstan     612,474 kg

*Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments, 2017-18*, 84 Fed. Reg. 27.758 (June 14, 2019), Prelim. Decision Memo at 14 (PR 295 at 16-17).

[26] *Certain Activated Carbon from the People's Republic of China; Final Results of Antidumping Duty Administrative Review; 2017-18*, 84 Fed. Reg. 68,881 (December 17, 2019), I& D Memo at cmt.1 (PR 295 at 17, FN 6).

This Court vacated and remanded that determination, holding:

> Commerce's statements regarding Malaysian production of identical merchandise
> does not save its determination. Commerce's "explanation must reasonably tie the
> determination under review to the governing statutory standard and to the record
> evidence by indicating what statutory interpretations the agency is adopting and
> what facts the agency is finding." *CS Wind Vietnam Co. v. United States*, 832 F.3d
> 1367, 1376 (Fed. Cir. 2016). Section 1677b(c)(4)(B) "does not distinguish between
> identical and comparable merchandise" for purposes of identifying significant
> producer countries. *Foshan Shunde Yongjian Housewares & Hardwares Co. v.
> United States*, 896 F. Supp. 2d 1313, 1322, SLIP OP. 2013-24 (2013). Commerce's
> conclusion that "Malaysia provides the best available information ... because it is
> the only country on the OP List that is a significant producer of identical
> merchandise" suggests, however, that the agency favored the production of
> identical merchandise when selecting a primary surrogate country. I&D Mem. at 8
> (emphasis added). Commerce failed to explain why any such preference comports
> with the plain statutory language or constitutes a permissible interpretation
> thereof.8 Commerce also did not explain why production of identical merchandise
> by three companies was "significant" pursuant to section 1677b(c)(4). *See id.; cf.*
> Policy Bulletin 04.1 (explaining that Commerce's decision "should be made
> consistent with the characteristics of world production of, and trade in, comparable
> merchandise (subject to the availability of data on these characteristics)").

*Carbon Activated Tianjin Co., Ltd. v. United States*, 503 F. Supp. 3d 1278, 1286 (Ct. Int'l Tr.

2021).

On remand, Commerce reversed itself, and found all OP list countries, including Romania,

to be significant producers. It also found that Romcarbon's Profit Center 2, the "Active Coal

Workshop" was dedicated to production of activated carbon, and found that Romcarbon's financial

statement on the record provided evidence of domestic production under 19 U.S.C. § 1677b(c)(4).

This compelling precedent indicates that Commerce's selection of Malaysia as the only

"significant producer" of comparable merchandise in this instance is similarly flawed.[27]

---

[27] Exports of comparable merchandise for the 13th review involved in this case were comparable to those in
the 11th review:

> ➢ Brazil          663,604 kg
> ➢ Malaysia 19,991,330.95 kg
> ➢ Mexico    11,193,828 kg
> ➢ Russia      1,650,814.89 kg
> ➢ Romania       20,485 kg

Commerce's rejection of the Romcarbon data must be held unsupported by substantial evidence, vacated and remanded to the agency for further consideration.

### B. The Century Chemical and Bravo Green Financial Statements Do Not Sufficiently Disaggregate Costs to Provide Reliable Financial Ratios.

Commerce, in its Final Determination, admits that "the two Malaysian financial statements are not as detailed as Commerce prefers in that none of them have separate line items breaking out the cost of raw material, labor and energy."[28] Yet, the agency asserts that the Malaysian statements contain sufficient information to calculate surrogate ratios for factory overhead costs, SG&A expenses, and profit. However, Commerce does not indicate how this can be so, or how such ratios can be calculated from financial statements which do not even break out raw materials costs as a separate item. Rather, Commerce's justification is that they are taken from producers from Malaysia, "the only country among the OP List countries determined to be a significant producer of comparable merchandise." As noted previously, Commerce's identification of Malaysia as the only significant producer of comparable merchandise is based on a flawed analysis which has been rejected by this Court on previous occasions.

While Commerce asserts that it prefers to use financial data from the primary surrogate country "unless those statements are unavailable or unreliable"[29], it also acknowledges that in previous reviews of this order, it selected Romanian financial statements over Malaysian financial statements precisely because those Malaysian financial statements "lack[ed] usable financial data in that none of them have separate line items breaking down the cost of raw materials and energy[30],

---

> ➢     Turkey       213,649 kg

*See* I&D Memo at 28 (PR 308); Case Brief at 16-17 (PR 295).

[28] I&D Memo at 34 (PR 308).

[29] *Id.*

[30] *Id.*

and when Commerce switched back to Malaysian financial data in the 12th review, that decision was disallowed by this Court. *See Carbon Activated Tianjin Co. v. United States*, 503 F. Supp. 3d 1278 (Ct. Int'l Tr. 2021).

The Malaysian financial reports do not sufficiently disaggregate data to allow for calculation of financial ratios. Both the Century and Bravo Green financial statements itemize a basket category, "Cost of Sales," which is said to represent the sum of the following cost elements:

- ➢ Raw materials;
- ➢ Labor;
- ➢ Energy;
- ➢ Manufacturing overheads;
- ➢ Change in finished goods inventory; and
- ➢ Traded goods.

However, Commerce, without explanation, allocated the entire amount of the "cost of sales" line to "raw materials." This allocation has direct consequences on the resulting financial ratios.

For example, under "manufacturing overhead expenses," Commerce allocated only depreciation-related line items. Both Malaysian financial statements fail to break out costs of non-depreciation manufacturing overheads, such as the costs of consumables and the cost of repairs. Since both companies "costs of sales" likely includes a portion of manufacturing overheads, they do not identify an accurate amount of manufacturing overhead expenses. These firms' financial ratios are thus distorted.

In addition, Commerce allocated the total amount reported in a Bravo Green basket category item, "Operating expenses" solely to SG&A. In Century's ratio calculation, Commerce allocated the total amount reported as "Administrative expense" to SGA. Given the absence of any enumeration of transportation expenses, it is likely that this attribution include such ordinarily excludable expenses as transportation expenses. Century's and Bravo's potentially distorted overhead and SGA ratios, in turn, likely distort the profit calculation. While Commerce contended

these statements "provide sufficient information to calculate surrogate ratios for factory overhead costs, SGA expenses and profit,"[31] this is not the case. Commerce is taking a "shot in the dark." However, by failing to consider evidence which detracts from its conclusion, Commerce's analysis is marred, and falls short of being undergirded by substantial evidence. *See, e.g., Catfish Farmers of Am. v. United States*, 37 C.I.T. 717, 742 (2013).

Commerce's final determination is at odds with the agency's own practice of rejecting insufficiently disaggregated financial statements which contain basket category cost items. Indeed the agency has specifically rejected financial statements which do not contain separate reporting of raw materials and energy costs[32], and noted that financial statements which "do not break out raw material costs" result in a "large gap of unknown costs,"[33] and that where financials do not separately break out "factory overhead," it is "impossible to calculate any of the financial ratios."[34]

Indeed, flaws of this kind were precisely why the agency rejected Malaysian financial statements in the 11th review of this antidumping order.[35] While Commerce asserts that each annual review of an antidumping order represents a separate exercise of the agency's power, on a unique record[36], it is well-established that "an agency must either conform itself to its prior decisions or explain the reasons for its departure," *Queen's Flowers de Colombia v. United States*, 21 C.I.T. 968, 976-77 (1997)("The rule … prohibit[s] the agency from adopting significantly inconsistent policies that result in the creation of 'conflicting lines of precedent governing the identical

---

[31] *Id.* at p. 35.

[32] *See, e.g., Chlorinated Isocyanurates from China*, 80 Fed. Reg. 4539 (I& D Memo, Comment 2) (PR 295 at 20-21).

[33] *Tapered Roller Bearings from China*, 77 Fed. Reg. 65668 (October 30, 2012), I&D Memo, Comment 4 (PR 295 at 21).

[34] *Citric Acid from China*, 74 Fed. Reg. 16,838 (April 13, 2009) (I&D  Memo, Comment 1) (PR 295 at 21).

[35] *Activated Carbon from China*, 84 Fed. Reg. 68,881 (December 17, 2019) (PR 295 at 21-22).

[36] I&D Memo. at 34 (PR 295).

situation'.") That is precisely what happened here. The unexplained change in agency practice renders Commerce's decision unsupported.

### C.      The Romcarbon Financial Ratio Data is Superior to that used by Commerce.

While Commerce rejected Romcarbon's financial statements without making a determination of data quality, the record evidence indicates that, for purposes of calculating surrogate financial ratios, Romcarbon's financial are vastly superior in quality to those of Century Chemical and Bravo Green. Commerce's failure to select it is contrary to the agency's obligation to select the "best available information" from an appropriate "market economy country."

Romcarbon's financials provide discrete breakouts for all significant cost elements—raw materials, energy and labor—that are used to calculate the ratios, but also excludes items like truck freight, to avoid double counting.[37] Romcarbon's financials separately enumerate detailed breakouts for overheads, distinguishing "expenses with consumables" from "expenses with repairs." Its enumeration of "costs of sales" includes breakouts for "costs of traded goods" and "change in inventories." Because of this superior disaggregation, Romcarbon's 2019 financial statement provides accurate, undistorted and reliable overhead and SG&A ratios.

As noted above, Romania is an economically comparable OP list country and qualifies as a significant producer of comparable merchandise. Its use would comport with Commerce's well-established practice to prefer superior quality data from a secondary surrogate country over inferior quality data from a primary surrogate country.[38]

---

[37] Respondents' First Surrogate Value Submission, Exhibit 14B (March 4, 2021), PR 128; PR 129.

[38] *See, e.g, Fresh Garlic from China*, 76 Fed. Reg. 36,168, 36,170 (July 17, 2013) I&D Memo, Comment 9) (PR 295, 24-25); *see also Freshwater Crawfish Tail Meat from China*, 78 Fed. Reg. 22,228 (Oct. 9, 2012) I&D Memo. at 2, 9-10, *Id.*

The Court of Appeals for the Federal Circuit has approved Commerce's use of superior quality financial statements from a secondary surrogate country over inferior financial statements from the primary surrogate. In *Weishan Hongda Aquatic Food Co. Inc. v. United States*, 917 F.3d 1353, 1366 (Fed. Cir. 2019), the Court stated:

> Commerce apparently relied on the Oceana Report as preferable to the Thai financial statements. Unlike the Thai financial statements, the Oceana report enabled Commerce to use its "normal methodology" to calculate the manufacturing overhead ratio by including energy costs in the denominator of the calculation … Had Commerce not employed normal methodology, it would not have been able to calculate surrogate values for the Chinese "[r]espondents' energy input" due to concerns of "double counting energy costs" in the surrogate financial ratios.

Use of the Century Chemical and Bravo Green financial statements in the instant review creates risks that the financials ratios calculated therefrom are inaccurate and distorted. The use of the Romcarbon financials eliminates this risk. Commerce recognized this in prior reviews of this antidumping order. It has not sufficiently explained its departure from prior practice.  Commerce erred by using the Malaysian financial statements rather than the Romanian one.

Alternatively, JSC Sorbent's 2019 financial statement offers the second best option for deriving surrogate financial ratio. This Russian producer's financial is on the record of the review[39], and sufficiently disaggregates the costs of raw materials and labor. It separately reports, the costs of raw materials, labor and energy It separately itemizes the cost of traded goods from other "costs of sales." Commerce has previously confirmed that JSC is a producer of identical and comparable merchandise.[40] As discussed above, Russia is an economically compatible OP List country and qualifies as a significant producer of comparable merchandise.

---

[39] Respondents' Final SV Submission, May 19, 2021, Exhibit 5A (PR 116-17).

[40] *Certain Activated Carbon from the People's Republic of China; Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments and Final Rescission of Administrative* Review, *in Part, 2018-19,* 86 Fed. Reg. 10,539 (February 22, 2021), I&D Memo at 27 (PR 295).

In conclusion, the Court should set aside Commerce's use of the Century Chemical and Bravo Green financial statements and direct Commerce to use the financials from Romcarbon, or alternatively, JSC Sorbent.

**II.     The Departments' Decision to Value Carbonized Material For Purposes of the SV Calculation By Using Malaysian Subheading 4402.91.1000, HTS is Unsupported By Substantial Evidence on the Record and is Not in Accordance With the Law.**

Commerce's decision to value carbonized material using Malaysian import data for coconut shell charcoal classified under subheading 4402.90.10, HTS was not supported by substantial evidence.   The data which Commerce selected was not contemporaneous with the period of review ("POR"), and was not an appropriate basis for valuing the coal-based carbonized material actually used by the respondents.

Malaysian import data for subheading 4402.90.10, HTS was not available for this 13th administrative review of the antidumping order against *Certain Activated Carbon from the People's Republic of China.*  Rather, Commerce used the Malaysian subheading 4402.90.10, HTS from the 12th review and "inflated the value to make it POR-contemporaneous." Initially, we note that Commerce's selection of Malaysian coconut shell charcoal data for the 12th review was recently found by this Court to be unsupported by substantial evidence. *Carbon Activated Tianjin Co. Ltd. v. United States*, Slip Op. 22-89 (Ct. Int'l Tr. August 8, 2022), at p. 34-36. As detailed below, those same flaws apply, *mutatis mutandis*, to this case. But further weakening the use of that data is its lack of contemporaneity.

It is Commerce's stated practice to use "prices that are contemporaneous with the review" in selecting surrogate values. *See* Policy Bulletin 04.1.  Inflating stale values, as was done here, is a "last resort," to be done only when product-specific contemporaneous data to value to the input

is completely unavailable in any surrogate country. In this case, Commerce had superior and contemporaneous data which could, and should, have been used to value carbonized materials.

Policy Bulletin 04.1 states that Commerce's surrogate valuation practice is to use "prices specific to the input in question." In this case, Commerce's selection of import data for coconut-shell charcoal is anomalous, since both mandatory respondents reporting using "coal-based" inputs.[41]   Record evidence, however, indicates that not only is coal-based carbonized material distinct from coconut shell material, but possesses characteristics that place it between coconut shell charcoal and wood-based charcoal.  A Kalpaka Chemicals publication placed on the record entitled "Coconut Activated Carbon [vs.] Coal Activated Carbon [vs] Wood Activated Carbon"[42] demonstrates that Coal Activated Carbon sits at a midpoint between Wood Activated Carbon and Coconut Shell Activated Carbon with respect to various characteristics, including:

- ➢ Density;

- ➢ Hardness;

- ➢ Ash content;

- ➢ Porosity;

- ➢ Wettability;

- ➢ Heavy metals content;

- ➢ Back washing (material loss); and

- ➢ Operation cost.

The products also differ in uses, with coal-activated carbon being most suitable for odor removal (effluent treatment), while coconut shell charcoal is typically used for dechlorination

---

[41] Respondents' Final SV submission, May 19, 2021, Exhibit 1 (PR 230-PR232).

[42] Respondents' Final SV submission, May 19, 2021, Exhibit 1-C (PR 230); *see also* Respondents Case Brief, September 27, 2021, Attachment 3 (PR 295)

(water treatment). Wood-activated charcoal is principally used for decolorization. Record evidence demonstrates that coal-based charcoal, such as used by the respondents, has larger pores than other types of activated carbon, making them less able to strain out smaller particulates. By contrast, coconut-based charcoal has a much higher density of micro-pores than other forms of activated carbon, giving it more surface area and more general porosity. Wood-based charcoal has a different type of porosity, made of meso-and macro-pores, that create a low density.[43]

Another authoritative source confirms that coconut-based carbonized materials are of superior quality:[44]

> Carbon filtration systems utilizing coconut-based raw materials offer high-efficiency filtration for the oil and gas industry. This is due to the fact that up to 90% of the surface area of coconut-based activated carbon consists of micro pores. These minuscule micro pores are approximately the same size as many contaminants, which naturally advances the ability of coconut-based activated carbon to capture contaminants. . . .

> Though less efficient than coconut-based activated carbon, charcoal activated carbon filtration still provides a substantial micro pore surface area. . . .

> While providing superb filtration, peat- or wood-based activated carbon systems are the least efficient when drawing comparisons between coconut raw materials and charcoal. Wood-based activated carbon characteristics consist of primarily meso and macro pores, which are better suited for capturing larger molecules.

There is also overlap among the properties of wood, coal and coconut-based carbons with respect to parameters such as surface area, iodine content, methylene blue content and moisture.[45]

It was therefore incorrect for Commerce to value respondents' coal-based carbonized material using solely import data for coconut shell material under Malaysian HTS 4402.90.10. A more appropriate approach would be to value the goods at the six-digit subheading level, 4402.90,

---

[43] Respondents' Final SV Submission, May 19, 2021, Exhibit 1E (PR230).

[44] Respondents' Final SV Submission, May 19, 2021, Exhibit 1I at 2/7-3/7 (PR230).

[45] *Id.*, Exhibit 1E and Exhibit 1-I (PR230).

since that subheading encompasses both coconut shell-based and wood-based materials. This type of hybrid valuation is compelled by extensive evidence which shows that coal-based activated carbon shares certain characteristics which overlap those of both wood and coconut-shell-based carbonized materials.

Price differences between different types of carbonized materials also favor valuing this input at the six-digit subheading 4402.90 level. Pricing data indicates that prices for coal-based charcoal overlap prices for wood based charcoal (at the lower end) and coconut shell charcoal (at the higher end):[46]

| Type of Charcoal | Activated Carbon Price Range (USD/MT) |
|---|---|
| Wood | 500-1865 |
| Coal | 500-2500 |
| Coconut shell | 1550-2150 |

In previous reviews of this antidumping order, Commerce confirmed that wood-based charcoal could, like coconut-based charcoal, be used to produce activated carbon[47]. In the fourth administrative review of the order, Commerce valued coal-based carbonized material based on data from HTS Heading 4402, averaging both wood-based and shell-based charcoal, and that determination was affirmed by the Court of Appeals for the Federal Circuit:

> In [prior reviews], Commerce was choosing between coconut shell charcoal and the HTS category "Other Cokes of Coal" to find a comparable surrogate for coal-based carbonized material. Commerce's determination that coconut shell charcoal is better than "Other Cokes of Coal" does not mean that coconut shell data is better than wood charcoal. Wood charcoal is also a type of charcoal and can also be used to create the subject merchandise. Thus for the same reasons articulated by Commerce in the earlier periods of review, wood charcoal would be a better surrogate than "Other Cokes of Coal." There are no express findings or

---

[46] Respondents' First SV Submission (March 4, 2021) Exhibit 3D, PR114.

[47] *Certain Activated Carbon from the People's Republic of China*, 78 Fed. Reg. 70,553 (Nov. 20, 2013) I&D Memo, Comment 6 (PR295 at FN 73).

comparisons between wood charcoal and coconut shell charcoal, and this record does not establish any such conclusions.

While coconut shell charcoal is more specific than "Other Cokes of Coal," the record does not compare coconut shell charcoal and wood charcoal. Commerce's past practice does not demonstrate that coconut shell charcoal is a better match for coal-based carbonized material than the broader Philippine import data category, which includes wood charcoal and coconut shell charcoal.

*       *       *

Conclusion

Here, the material input in question is carbonized material made of coal . . . With regard to the carbonized material made of coal, which constitutes the bulk of the subject merchandise, there is no evidence on this record comparing wood charcoal and coconut shell charcoal. **There are no findings nor have we been presented with record evidence that coconut shell charcoal is a better surrogate for coal-based carbonized material than wood charcoal. Thus for the bulk of the imports at issue, there is no proof that coconut shell charcoal is a better surrogate.** Neither of these data sources is specific to carbonized material made of coal and Commerce's past selection of coconut shell charcoal as the best available surrogate was based on a comparison with "Other Cokes of Coal," not wood charcoal. … We cannot conclude on this record that Commerce's decision that both data sources were specific to the inputs in question was not supported by substantial evidence.

*Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992, 999 (Fed. Cir. 2015) (emphasis added).

Recently, in *Carbon Activated Tianjin Co. Ltd. v. United States*, Slip Op. 22-89 (Ct. Int'l Tr. August 8, 2022), this Court rejected Commerce's use of Malaysian data for HTS subheading 4402.90.10 to determine the surrogate value of carbonized material in the 12th annual review of the *Activated Carbon from China* antidumping order. The Court found that "the agency's choice of a specific subcategory [4402.90.10] over a basket category [4402.90] in the valuation of carbonized material is not supported by Commerce's explanation." *Id*. at p. 34.

Specifically, Commerce had found no evidence that the respondents in that review used wood or nut charcoal in making the subject merchandise, and thus rejected the use of data from HTS item 4402.90.9000, "other wood charcoal." But the Court found that:

> Commerce made no analogous finding as to whether Carbon Activated's suppliers purchased carbonized material made from coconut shell charcoal I&D Mem. At 43. Thus, the problem Commerce identified with respect to wood-based charcoal also appears to apply to coconut shell charcoal. Absent evidence that Respondents used coconut shell charcoal, Commerce's selection of one subheading (coconut shell charcoal) over another (other wood charcoal) is unsupported by substantial evidence and reasoned explanation.

Slip Op. 22-89, at p. 35.

While noting that "Commerce is within its discretion to choose among imperfect datasets," this Court held that Commerce's decisions "must take into account the facts on the record and reflect a well reasoned application of its methodology to the situation." Commerce's failure to explain its choice between two imperfect datasets in the instant proceeding renders the agency's surrogate value selection for carbonized material equally unsupported by substantial evidence.

Finally, the lack of usable contemporaneous data from the principal surrogate country, Malaysia, suggests that this input should be valued using available data from a second surrogate country. This Court has recognized that Commerce does so where "better data were available from another country that qualified as a surrogate country." *Shantou Red Garden Foodstuff Co. v. United States*, 880 F. Supp. 2d 1332, 1334 (Ct. Int'l Tr. 2012). While the agency's preference for using data from the primary surrogate country might support a choice between "fairly equal" data sets, *Peer Bearing Co. – Changshan v. United States*, 752 F. Supp.2d 1353, 1373 (Ct. Int'l Tr. 2011), resort to a second surrogate country to value an input is required when the data sets are not equal.

For the POR in this case, Malaysian import data for HTS subheading 4402.90 showed very little import activity, with no imports at all under subheading 4402.90.10, and a mere 57,165 kg. under subheading 4402.90.90, most of which did not appear to be sold at commercial levels.[48]  The

---

[48] Respondent's First SV Submission, March 4, 2021, Exhibit 3A (PR114).

PUBLIC

Malaysian figures are thus not representative of a broader market average. Indeed, to the extent they suggested that the average import price for wood-based charcoal, $US0.513/kg AUV, is up to five times higher than the prices at which the same material is available domestically[

], the data's accuracy and reliability is suspect.[49]

In such cases, Commerce's practice has been to look to data from another identified surrogate country to value the input.[50] In this instant case, the record shows that Turkey has the highest import volume of carbonized materials during the period of review. This data is based on imports from 39 countries, 37 of which appear to have shipped in commercial quantities, at stable, consistent prices.[51]

The Court should set aside Commerce's finding with respect to the surrogate valuation of carbonized materials, and remand the matter with instructions for the agency to select a better surrogate value.

### III. The Departments' Decision to Value Coal Tar For Purposes of the SV Calculation Using Malaysian Data for Malaysian Subheading 2706.00, HTS, or Malaysian Subheading 2708.10, HTS is Unsupported By Substantial Evidence on the Record and is Not in Accordance With the Law.

The Department's decision to value "coal tar" for purposes of the surrogate value calculation using Malaysian data for Malaysian subheading 2706.00, HTS, or Malaysian subheading 2708.10, HTS, is unsupported by substantial evidence on the record and is not in accordance with the law.

---

[49] Respondent's Final SV Submission, May 19, 2021, Exhibit 1U (PR 115-PR 116)..

[50] *Calgon Carbon Corp. v. United States,* 2017 WL 384685, *2 (Ct. Int'l Tr. 2017).

[51] Respondent's First SV Submission, March 4, 2021, Exhibit 3A (PR 114).

A.    **Malaysian Import Prices of Coal Tar are Unreliable and Distorted.**

Malaysian import prices of goods entered under the Malaysian subheading 2706.00, HTS, are unreliable and distorted. The Department did not consider substantial evidence on the record supporting respondents' claim that the Malaysian import data is unreliable.

First, the average unit values (AUV) for Malaysian subheading 2706.00, HTS, are much higher than that of Malaysian subheading 2708.10, HTS. Record evidence shows that the coal tar's preliminary SV of 6.49 RM/kg ($1.56/kg) based on Malaysian HTS 2706.00 imports significantly exceeds the average price of pitch - 4.15 RM/kg ($1.00/kg) - as reported under Malaysian HTS 2708.10 imports.

This is nonsensical since "pitch"—which is the predominant constituent of "coal tar"—is a value-added product, and "coal tar" is not.[52] One would reasonably expect a value-added product like "pitch" to have an AUV higher than a "coal tar" product because that product is not subject to further value-added manufacturing operations. The Department, without support, adopted the petitioners' argument that other factors may be involved with pricing apart from the cost of manufacturing that impact a product's value and may cause a value-added product like "pitch" to exceed the value of "coal tar." Substantial evidence supporting this portion of the Department's determination is absent from the record.

In *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States,* 29 C.I.T. 288, 300 (2005) ("*Hebei Metals II*"), the Court held that import prices which vastly exceed domestic prices are unreliable, stating:

---

[52] Respondents' coal tar has a pitch content range of [          ]. It is axiomatic that the fully distilled form of "coal tar"—*i.e.,* "pitch"—would have a direct economic correlation with its fully distilled form, pure pitch.

[T]he preference for domestic data is most appropriate where the circumstances indicate that a producer in a hypothetical market would be unlikely to use an imported factor in its production process.

Here, Malaysian import prices for coal tar are 620% higher than Malaysian domestic prices, as reflected in the following chart:

| Country | Product | Domestic Market Price (USS/Ton) | Malaysian Import Price (USA/Ton) | Difference |
|---------|---------|--------------------------------|----------------------------------|------------|
| **Malaysia** | Coal tar and partially Distilled Coal Tar Average (Calculated) | 216.3 | 1558 | 620% |
| **Malaysia** | Pure Pitch | 468.0 | 996 | 113% |
| **Spain** | Coal tar and partially Distilled Coal Tar Average (Calculated) | 246.4 | 1226 | 398% |
| **Spain** | Pure Pitch | 418.4 | 957 | 129% |

Case Brief at 60 (PR 295). Stark disparities are obvious in the above-data between the domestic market and Malaysian import prices for both Malaysia and Spain. For coal tar, the average Malaysian import price of $1558/MT exceeds the average domestic market price of only $216.3/MT by an astronomical 620%. Likewise, the average import price from Spain of $1226/MT exceeds the Spanish average domestic market price of $246.4/MT by a slightly lesser astronomical 398%. Of course, no importer would pay such a premium for a commodity product that is available in the domestic market. Subheading 2706.00, HTS, data from Malaysia is clearly unreliable; and the data must likely include products beyond coal tar. This is the most likely explanation due to the likely confusion and conflation of "coal tar" and "pitch" products upon entry into Malaysia.

Offering further support, the Malaysian import price for coal tar vastly exceed the domestic prices in several other market economies (*e.g.,* United States, Russia, Mexico, and Brazil). *See* Case Brief at 61 (PR 295).

Pursuant to *Hebei Metals II,* 29 C.I.T. 300 (2005), such import prices that vastly exceed the domestic market prices are held unreliable.

**B.    Substantial Evidence Supports Utilizing Malaysian Domestic Prices of Coal Tar and These Prices Should Be Used By the Department in Calculating the SV.**

Substantial evidence on the record supports the use of Malaysian domestic prices of coal tar—*i.e.,* Malaysian domestic market price of $0.216/kg—and these prices should have been used by the Department in calculating SV. The Malaysian domestic price of $216.3/MT published by independent publication—*i.e.,* Global Coal Tar and Coal Tar Pitch Market Analysis & Forecast 2017-2027—affords a reliable SV data for valuing coal tar.

In *Hebei Metals II*, the Court confirmed the preference for domestic prices as a source of SV data, providing:

> In addition to being a Commerce policy in accordance with precedent, the **conditional preference for domestic data is a logical starting point** for achieving the objective set by Congress. In a hypothetical world of a NME country as a market economy country from which taxes, duties, and other governmental interference have been excluded, it is reasonable to assume that a domestic price reflects the value of a factor of production more accurately than an import price. This assumption may be undermined by record evidence showing how an import price more accurately reflects the actual costs incurred by a producer of the relevant product, but this must be explained reasonably by Commerce.

*Id.* at 300, (emphasis added). As indicated above, because the Malaysian subheading 2706.00, HTS, import prices of $1558/MT are unreliable, there is no doubt that within the primary surrogate country, the Malaysian domestic market price of coal tar at $216.3/MT is the best SV choice.

**C.    In the Alternative, Should the Department Continue to Rely On Import Data to Value Coal Tar, Russian Import Data for Subheading 2706.00, HTS, Affords the Best Alternative SV Choice for Coal Tar.**

Alternatively, should the Department determine to rely on import data to value coal tar, the SV selection should be based on the largest quantity of imports under subheading 2706.00, HTS, from a second surrogate country, which for the applicable POR was Russia. Indeed, evaluation of HTS 2706.00 import data reveals that during the POR, the maximum quantity of imports in HTS

PUBLIC

2706.00 was reported in Russia (79.6 million tons).[53] As Russian imports under HTS 2706.00 are overwhelmingly the largest volume of coal tar during the POR, and considering the Department's preference for using import data representing the largest volume,[54] the most probative and reliable SV for coal tar is Russian import data for subheading 2706.00, HTS, which provides a SV of $0.172/kg.

**IV.    The Departments' Decision to Value Hydrochloric Acid ("HCl") For Purposes of the SV Calculation By Using Malaysian Subheading 2806.10, HTS, Data is Unsupported By Substantial Evidence and is Not in Accordance With the Law.**

**A.    There is a Lack of Substantial Evidence in Support of the Department's Surrogate Valuation of Hydrochloric Acid (HCl) Inputs Using Malaysian Import Data.**

Commerce utilized a surrogate value that is not specific to the input when it relied on Carbon Activated's supplier, [                                                              ].[55] Commerce failed to give adequate weight to the fact that the mandatory respondents utilized " aqueous forms" of HCl, and its decision to value HCl input using the Malaysian import value for merchandise classified under subheading 2806.10, HTS,[56] is unsupported by substantial evidence on the record.

---

[53] *See* Respondents' First SV Submission (Mar. 4, 2021), Exhibit 4A (PR 115).

[54] *See Activated Carbon from China*, 83 Fed. Reg. 53,214 (Oct. 22, 2018) (final results), I&D Cmt.. 2 (PR 295 at 63 FN 111); *see also*, *Calgon Carbon Corp. v. United States*, 2017 WL 384685, *2 ( Ct. Int'l Tr. 2017).

[55] *Letter from Grunfeld Desiderio Lebowitz Silverman Llestadt, LLP ("GDSLK") to Sec. of Commerce Pertaining to Carbon Activated req. for FOP Reporting Exclusion* (July 24, 2020) (CR 12).

[56] Subheading 2806.10, HTS, provides:

    2806            Hydrogen chloride (hydrochloric acid); chlorosulfuric acid:

    2806.10        Hydrogen Chloride (hydrochloric acid)

[          ] reported that its "Hydrochloric acid (scientific formula is HCl) is … an aqueous solution of acid, and its concentration is in the range of [                    ]."[57] HCl with purity levels less than 100% are considered aqueous solutions. HCl exists in two forms: (i) anhydrous or liquid form (without added water); and (ii) aqueous solution (with added water).[58] The latter form is expressed with concentration or purity levels. The HCl consumed by[          ] and later supplied to Carbon Activated had a concentration level ranging from[                    ], and this necessarily means that it was in an aqueous solution with [                    ] added water.

As record evidence shows that Carbon Activated utilized an aqueous solution of HCl, the Department should have performed an apples-to-apples comparison. It did not. Instead, Commerce's SV choice for aqueous HCl—*i.e.,* HCl with a purity less than 100%--was distorted by the inclusion of non-specific, 100% pure liquid HCl. The Malaysian HTS 2806.10 data is therefore not specific to the diluted aqueous HCl consumed by Carbon Activated's supplier, [          ].

Malaysian subheading 2806.10, HTS, is a basket tariff provision, and not specific to the input at issue here—aqueous form of HCl. Indeed, subheading 2806.10, HTS, describes "Hydrogen Chloride (hydrochloric acid)," and this language covers both anhydrous and aqueous forms of HCl. Here, record evidence demonstrates that the mandatory respondents utilized an aqueous form of HCl.[59]

---

[57] *Carbon Activated Section D Supplemental Questionnaire Response (Part I)*, (May 13, 2021), Exhibit SD-10.1. (CR 87).

[58] *See* Respondents' Final SV Submission (Mar. 4, 2021), Exhibit 6D (42/74) (PR120).

[59] *See* Respondents' Case Brief at 64 (PR295).

Commerce's decision to overlook other country data which offers specific data with regard to aqueous forms of HCl is unsupported by substantial evidence on the record and is otherwise not in accordance with the law.

Commerce's past practices have recognized the form of HCl utilized by a particular mandatory respondent. In *Helical Spring Lock Washers from China*, Commerce recognized the mandatory respondent "used a {HCl} solution that was 31-percent {HCl} and 69-percent water" because the evidence, "supported that it used 31-percent concentrated {HCl}."[60] Commerce should continue its practice of using a more specific HTS and replace the Malaysian data.

### B. Commerce Should Value the Aqueous HCl Using Brazilian Imports Under HTS 2806.10.20 at 0.061 USD/kg.

It is well-settled that the Department "prefer[s] data that has greater specificity to the input it is valuing." *Elkay Mfg. Co. v. United States*, 180 F. Supp. 3d 1245, 1253 (Ct. Int'l Tr. 2016). When the primary surrogate country fails to afford a product-specific or reliable surrogate value, the Department routinely employs "a secondary surrogate for purposes of valuing inputs ... where {that secondary country's} HTS category is more specific." *Wooden Bedroom Furniture from China*, 73 Fed. Reg. 49,162 (Aug. 20, 2008) (final results), IDM Comment 12 (emphasis added). (PR 295, at 65).

The Department ignored the fact that only Brazil disaggregates HCl imports into two separate and clearly defined categories—pure and aqueous solution. As such, the Brazilian subheading 28061020, HTS, affords product specific import data to value the specific grade— aqueous HCl—utilized by the respondent. The Brazilian imports of a sufficiently large quantity of

---

[60] *See* Respondents' Case Brief at 64 (citing *Helical Spring Lock Washers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*, 73 Fed. Reg. 4175 (January 15, 2008) (*Helical Spring Lock Washers from China*), and accompanying IDM at Comment 4) (PR 295 at 64-65).

16.5 million tons are representative of a broad market average. For these reasons, the resulting surrogate value of $0.061/kg is reliable.

Moreover, on remand, the Department should not adjust the Brazilian prices for any other international movement charges because a preponderant majority of imports—99.74%[61]—originated from the two countries, Argentina and Uruguay, both of whom share a land border with Brazil. Because it is reasonable to infer that an overwhelming majority of trade in goods among MERCOSUR countries would run through land border crossings, FOB Argentina or FOB Uruguay is equivalent to CIF Brazil. This obviates addition of any extra charges to the AUV obtained from Brazil subheading 2806.1020, HTS.

Substantial evidence supports valuing aqueous solution of [                    ] purity based on Brazilian subheading 2806.1010, HTS, SV of $0.061/kg. Commerce's preference for using a single surrogate country pursuant to 19 C.F.R. § 352.408(c)(2) failed to appreciate the fact that the broad Malaysian data is unreliable because it is not input specific. The narrower Brazilian data is input specific and should have been considered.

**V.  The Departments' Decision to Value Steam for Purposes of the SV Calculation By Using Subheading 2711.11, HTS, Data For Liquefied Natural Gas, is Unsupported By Substantial Evidence and is Not in Accordance With the Law.**

The Department erred in valuing steam for purposes of the surrogate value calculation by using subheading 2711.11, HTS, data for liquefied natural gas, which is not product specific to steam. To make its determination according to the best information available, the Department should have valued steam with reference to the value for natural gas in a gaseous state, as reported in subheading 2711.21, HTS.  "In selecting surrogate values for the factors of production,

---

[61] Sum total of imports from Argentina (6,858,000 Kg) and Uruguay (9,646,500 Kg) is 16,504,500 Kg, which is 99.74% of the total usable imports of 16,546,912 Kg. *See* Respondents' First SV Submission (Mar. 4, 2021), Exhibit 6A (PR 119).

Commerce must, 'to the extent possible,' use 'the best available information' from a market economy country or countries that are economically comparable to the nonmarket economy country and are 'significant producers of comparable merchandise.'" *Carbon Activated Tianjin Co. v. United States*, Slip Op. 22-89 at 7.

In this case, subheading 2711.11, HTS, data for liquefied natural gas does not constitute the best available information on the record because it is the tariff code is not specific to steam. Instead, Commerce should have used the best available information on the record which is subheading 2711.21, HTS, for natural gas in a gaseous state.

During its responses to Commerce in the administrative proceedings CAT reported the use of steam, in a gaseous form defined as "water in the form of an invisible gas of vapor" to Commerce. Case Brief at 68 (PR 295). In supporting its decision to use to LNG surrogate value, Commerce stated "we find that the Malaysian import data under heading 2711.11, HTS, are the more appropriate source to value the steam input, because the data represent a significantly larger volume of imports (*i.e.*, 2,876,439,699 kg) from multiple countries (*i.e.*, Singapore, Brunei, and Australia), covering nearly the entirety of the POR, whereas the import data under HTS 2711.21 represent a smaller volume of imports (*i.e.,* 872,136.95 kg) from only one country (*i.e.*, Brunei) … " I &D at 49-50 (PR 308). "Therefore, for the final results, because Malaysian HTS 2711.11 represents a broader market average and a larger import volume than Malaysian HTS 2711.21" *Id.* at 50. However, this does not fix the issue with choosing a non-representative input, LNG, as a surrogate value for a gaseous input.

This Court must remand Commerce's determination because the agency had not adequately explained why LNG is an appropriate substitute over natural gas in the gaseous state. "Commerce nowhere explains how the use of seemingly more expensive imported … data is the best available

information establishing the actual costs incurred by … producers. *Yantai Oriental Juice Co. v. United States*, 26 C.I.T. 605, 617 (2002). Similarly in this case, Commerce failed to explain how the use of LNG explains the cost incurred by plaintiffs when they did not use a liquid to produce steam, and instead used natural gas in a gaseous state. Commerce's position regarding the larger volume and broader market average of the Malaysian HTS 2711 fails to explain why the LNG data is a better alternative against the gaseous tariff data, the form in which the product was actually consumed in production. The agency has failed to explain its position.

Commerce's determinations also are not supported by substantial evidence because record evidence of natural gas domestic prices in Malaysia contradicts, the $US0.53/kg AUV from Malaysian HTS 2711.11 import data for LNG used as a basis to value respondents' steam. Commerce noted in the preliminary results memo, the valuation of steam is directly correlated with 'the cost of natural gas required to generate steam[,]" but then disregarded this correlation in the Final Results. Prelim SV Memo at 6 (PR 273). The record contains commercial, industrial, and residential domestic prices of natural gas in Malaysia. The data covers six different sources, situated at various levels of trade. The average price is between $0.295/kg and $0.413/kg. Respondents' Final SV Submission (May 19, 2021), Exhibit 4A (PR 239). Such contemporaneous Malaysian domestic market prices of natural gas detract from the reliability of the significantly higher $0.53 /kg AUV of liquefied natural gas in Malaysian HTS 2711.11. Malaysian producers are therefore unlikely to have purchased imported natural gas at $0.53 /kg, when the same product was available in the domestic market at significantly lower prices. Therefore, Commerce's SV of $0.53kg based on HTS 2711.11 import data—besides being not product specific for valuing steam—was also unreliable.

Subheading, 2711.21, HTS, represents the best available information on the record because it is product specific as it describes natural gas in a gaseous state. Commerce has, in the past, "us[ed] the GTA data for HTS subheading 2711.11 or 2711.21, depending on whether the natural gas was purchased in gaseous or liquefied state." *Polytetrafluoroethylene Resin from China*, 83 Fed. Reg. 20,039 (Apr. 30, 2018) (preliminary results), Decision Memorandum § VII.M.2 (PR 295, at 68); *Crystalline Silicon Photovoltaic Cells from China*, 80 Fed. Reg. 40,998 (July 7, 2015) I&D Comment 19 (PR 295 at 68). Heading 2711.21, HTS is therefore product specific, under Commerce's past practices, because it describes natural gas in a gaseous state. Subheading 2711.21, HTS, is therefore product specific, under Commerce's past practices, because it describes natural gas in a gaseous state.

In addition, the department failed to address CAT's argument that "[t]he Malaysian price is corroborated by record evidence of Mexican natural gas prices. Mexico had the largest natural gas imports of the OP List countries at an AUV of 0.109 USD/kg which is consistent with average Mexican domestic natural gas prices at 0.157 USD/kg." I&D at 47 (PR 308). There is no mention of why the Mexican data fails to corroborate the Malaysian prices in Commerce's I&D memo.

As such, Commerce has failed to adequately explain its position why LNG under subheading 2711.11, HTS is a better surrogate value then natural gas in gaseous state under heading, 2711.21. The agency has therefore failed to use the best available information on the record this Court should remand the agencies surrogate value determinations for steam to the agency for further consideration or explanation.

42

PUBLIC

**VI.**   **The Department's Decision to Value Ocean Freight on the Basis of Boilerplate Maersk Line Freight Charge Quotes is Unsupported By Substantial Evidence and Not in Accordance With the Law.**

The Department erred because the boilerplate Maersk Line freight charge quotes are unreliable and do not represent consummated transactions. Again the department failed to "use 'the best available information' from a market economy country or countries that are economically comparable to the nonmarket economy country and are 'significant producers of comparable merchandise." *Carbon Activated Tianjin Co. v. United States*, Slip Op. 22-89 at 7. By contrast, Descartes data on the record showed the value of actual freight movements between China and the United States, and represented the best information available.

Commerce stated in its preliminary results "[w]e valued international freight from NME carriers using the ocean freight quotes from Maersk line, placed on the record by the petitioners … ." (PR 273 at 8). Plaintiffs filed an administrative case brief requesting that the Department use particular surrogate value data to value FOPs, including carbonized material, coal tar, steam, ocean freight. (PR 295 at 71-75). However in the I&D memo Commerce determined that the "Maersk data are the best available information on the record to value the mandatory respondents' ocean freight expenses, and as such, will continue to use these data for the final results." I&D Memo at 42 (PR 308). Commerce noted that "the Descartes data contain ocean freight charges that represent actual consummated transactions" and "the Descartes data explicitly indicate that the rates are "Estimates of freight charges," "furnished as a convenience to the shipping public and represent nothing more than an approximation of freight charges which is not binding either on the carrier or shipper[,]" while "the Maersk rates represent actual tariffs, not mere approximations." *Id.* at 43.

Plaintiff's noted in their case briefs that the price quotes from Maersk are "generated through online research by inputting various unknown shipment parameters." Case Brief at 72 (PR 295). "This fact, at a minimum, raises doubt about the reliability of the Maersk price quotes." *Id.* Plaintiff's noted that the Maersk quotes included language such as:

> **Lookup Details**
> . . . .
> Please notice! **This look up is not covered by a service contract, therefore tariff rates have been applied**
>
> . . . . .
> **Rate information is an indication only and Maersk rates are subject to our terms and conditions.**

*Id.* (emphasis added). These notations prove that the data relied upon by Commerce does not represent actual shipments, but instead is based upon quotes. The uniform remarks across all of the Maersk price quotes confirm that all of these price quotes are generated through online research by inputting various unknown shipment parameters Therefore, Commerce's determinations that the Maersk rates represent actual tariffs, not mere approximations is unsupported by substantial evidence.

Second, Maersk price quotes are also unreliable because of how static the prices were over the POR. The basic ocean freight for Xingang (Tianjin)-Houston remained static at $6,575.147. Petitioners' SV Submission (Mar. 4, 2021), Exhibit 6C (PR 177). For the other three port combinations, the basic ocean freight remained static from April 2019 through December 2019 and thereafter changed to a new rate which then remained static from January through March 2020. *Id.* It is inexplicable that in the context of international commerce, where there are endemic variations of transportation cost, the basic ocean freight would have remained static over such an extended time period. There is no record evidence that explains this implausible and untenable outcome.

PUBLIC

The Descartes data is the best available information on the record because it contains ocean freight charges that represent actual transactions. Commerce favors actual transaction-based price data over price quotes. This constitutes a sufficient standalone basis to support rejection of the Maersk price quotes in favor of the Descartes actual transaction-based price data. The Descartes data, contains 24 contemporaneous Descartes transaction price data sheets for various China-U.S. port combinations for shipments of comparable merchandise—chemical products—in 20 ft. and 40 ft. container loads, similar to those used by the respondents. Respondents First SV Submission (Mar. 4, 2021), Exhibit 13B (PR 127-28). And these data cover all 12 months of the POR. All U.S. ports on the Descartes price sheets—New York and Los Angeles—are those that were used by DJAC and CAC.

Commerce's determination to use the Maersk Line freight charges as the basis for surrogate valuation is not supported by substantial evidence because Commerce should have instead used Descartes data on the record, which showed the value of actual freight (chemical) movements between China and the United States, and represented the best information available.

## **CONCLUSION**

For the reasons set forth herein, Plaintiffs, Carbon Activated Tianjin Co., Ltd., and Carbon Activated Corporation, respectfully submits that Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record should be granted, and this Court should remand the administrative review back to Commerce for further reconsideration or explanation.

Respectfully submitted,

NEVILLE PETERSON LLP

/s/ John M. Peterson
John M. Peterson
Richard F. O'Neill
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated: September 7, 2022

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**

| | |
|---|---|
| **CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION**<br><br>        **Plaintiffs,**<br><br>    **and**<br><br>**DATONG JUQIANG ACTIVATED CARBON CO.. LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMENT ACTIVATED CARBON CO., LTD., AND DATONG MUNICIPAL YUNGGUANG ACTIVATED CARBON CO. LTD.**<br><br>        **Consolidated Plaintiffs,**<br><br>    **v.**<br><br>**UNITED STATES,**<br>        **Defendant,**<br><br>    **and**<br><br>**CALGON CARBON CORPORATION AND NORIT AMERICAS, INC.,**<br><br>        **Defendant-Intervenors.** | **Consol. Court No. 22-00017** |

## CERTIFICATE OF COMPLIANCE

I, John M. Peterson, a partner in the New York City office of Neville Peterson LLP, who is responsible for the instant Memorandum of Law in Opposition to Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record, certify that it complies with the word count limitation under the Court's Standard Chambers Procedures and contains 13,497 words.

/s/ John M. Peterson
John M. Peterson

Dated: September 7, 2022

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**

| |
|---|
| **CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION**<br><br>**Plaintiffs,**<br><br>   **and**<br><br>**DATONG JUQIANG ACTIVATED CARBON CO.. LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMENT ACTIVATED CARBON CO., LTD., AND DATONG MUNICIPAL YUNGGUANG ACTIVATED CARBON CO. LTD.**<br><br>**Consolidated Plaintiffs,**<br><br>   **v.**<br><br>**UNITED STATES,**<br>               **Defendant,**<br><br>   **and**<br><br>**CALGON CARBON CORPORATION AND NORIT AMERICAS, INC.,**<br><br>**Defendant-Intervenors.** |

**Consol. Court No. 22-00017**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Plaintiffs, Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation's Memorandum of Law in opposition to Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record was served electronically by this Court's CM/ECF on September 7, 2022.

/s/ John M. Peterson
John M. Peterson

1