IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| _____ )<br>CARBON ACTIVATED TIANJIN CO., LTD., )<br>and CARBON ACTIVATED CORPORATION, )<br>)<br>Plaintiffs, )<br>)<br>and )<br>)<br>DATONG JUQIANG ACTIVATED CARBON )<br>CO., LTD., DATONG JUQIANG ACTIVATED )<br>CARBON USA, LLC, NINGXIA GUANGHUA )<br>CHERISHMENT ACTIVATED CARBON CO., )<br>LTD., and DATONG MUNICIPAL YUNGGUANG)<br>ACTIVATED CARBON CO. LTD., )<br>)<br>Consolidated Plaintiffs, )<br>)<br>v. )<br>)<br>UNITED STATES, )<br>)<br>Defendant, )<br>)<br>and )<br>)<br>CALGON CARBON CORPORATION and )<br>CABOT NORIT AMERICAS, INC., )<br>)<br>Defendant-Intervenors. )<br>_____ ) | Consol. Court No. 22-00017 |

## **ORDER**

Upon consideration of plaintiffs', consolidated plaintiffs', and consolidated

plaintiffs'/defendant-intervenors' Rule 56.2 motions for judgment upon the agency record;

defendant's response thereto; plaintiffs', consolidated plaintiffs', and consolidated

plaintiffs'/defendant-intervenors' replies; the administrative record; and all other pertinent

papers, it is hereby

      **ORDERED** that plaintiffs', consolidated plaintiffs', and consolidated

plaintiffs'/defendant-intervenors' motions are **DENIED**; and it is further

      **ORDERED** that the Department of Commerce's determination is sustained in all

respects; and it is further

      **ORDERED** that judgment will be entered in favor of the United States.


Dated: _____, 2023
      New York, NY                       _____
                                             CHIEF JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| _____ ) | |
| CARBON ACTIVATED TIANJIN CO., LTD., ) | |
| and CARBON ACTIVATED CORPORATION, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| and ) | |
| ) | |
| DATONG JUQIANG ACTIVATED CARBON ) | |
| CO., LTD., DATONG JUQIANG ACTIVATED ) | |
| CARBON USA, LLC, NINGXIA GUANGHUA ) | |
| CHERISHMENT ACTIVATED CARBON CO., ) | |
| LTD., and DATONG MUNICIPAL YUNGGUANG) | |
| ACTIVATED CARBON CO. LTD., ) | |
| ) | |
| Consolidated Plaintiffs, ) | |
| ) | |
| v. ) | Consol. Court No. 22-00017 |
| ) | |
| UNITED STATES, ) | |
| ) | |
| Defendant, ) | |
| ) | |
| and ) | |
| ) | |
| CALGON CARBON CORPORATION and ) | |
| CABOT NORIT AMERICAS, INC., ) | |
| ) | |
| Defendant-Intervenors. ) | |
| _____) | |

**DEFENDANT'S RESPONSE TO RULE 56.2**
**<u>MOTIONS FOR JUDGMENT ON THE AGENCY RECORD</u>**

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

                                          CLAUDIA BURKE
                                          Assistant Director

OF COUNSEL:

ASHLANDE GELIN                            ANTONIA R. SOARES
Attorney                                  Senior Trial Counsel
Office of the Chief Counsel               Department of Justice
   for Trade Enforcement & Compliance     Commercial Litigation Branch
Department of Commerce                    P.O. Box 480, Ben Franklin Station
                                          Washington, D.C. 20044
                                          Antonia.Soares@usdoj.gov

December 6, 2022                           Attorneys for Defendant

## TABLE OF CONTENTS

STATEMENT PURSUANT TO RULE 56.2 ................................................................2

I.     Administrative Determination Under Review ..............................................2

II.    The Issues Presented ..................................................................................2

STATEMENT OF FACTS .......................................................................................4

I.     Initiation Of The Thirteenth Administrative Review And Surrogate Value Selection........4

II.    Preliminary Results .....................................................................................5

III.   Case And Rebuttal Briefs............................................................................6

IV.    Final Results................................................................................................7

SUMMARY OF THE ARGUMENT ........................................................................7

ARGUMENT ...........................................................................................................9

I.     Legal Standards...........................................................................................9

       A.     Standard Of Review.........................................................................9

       B.     Surrogate Value Selection..............................................................10

II.    Commerce Lawfully Determined That Malaysia Was The Only Significant-Producer Of Subject Merchandise.........................................12

III.   Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Financial Ratios ...............................................16

       A.     Commerce Lawfully Selected The Financial Statements Of Two Malaysian Companies ..............................................16

       B.     DJAC's And CAT's Challenges To Commerce's Selection Of The Malaysian Financial Statements Lack Merit..........................17

       C.     Commerce's Rejection Of The Romcarbon And JSC Financial Statements Was Supported By Substantial Evidence.............................19

IV.    Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Carbonized Material....................................22

i

A.      Substantial Evidence Supports Commerce's Use Of Malaysian Import Data Under HTS 4402.90.1000 To Calculate The Surrogate Value For Carbonized Material ...................................................................................22

B.      Commerce Lawfully Rejected HTS 4402.90 .......................................................26

V.      Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Coal Tar ...........................................................................................................................29

A.      Commerce Lawfully Selected Malaysian HTS 2706.00 To Value Coal Tar ........29

B.      Commerce Lawfully Rejected Malaysian Domestic Prices As A Benchmark ......31

C.      Commerce Lawfully Rejected Malaysian Domestic Prices And Russian HTS 2706.00 To Value Coal Tar ...........................................................................33

VI.     Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Hydrochloric Acid (HC1)...........................................................................................33

VII.    Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Steam............................................................................................................................35

VIII.   Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Ocean Freight................................................................................................................38

IX.     Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Bituminous Coal ...........................................................................................................40

A.      Commerce Lawfully Selected HTS 2701.19 To Value Bituminous Coal ............40

B.      Commerce Lawfully Accepted DJAC's Reported Consumption Of Bituminous Coal ...............................................................................................43

CONCLUSION.......................................................................................................................47

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                     **Page(s)**

*Calgon Carbon Corp. v. United States,*
   443 F. Supp. 3d 1334 (Ct. Int'l Trade 2020)............................................................. 33

*Carbon Activated Tianjin Co. Ltd. v. United States,*
   586 F. Supp. 3d 1360 (Ct. Int'l Tr. 2022) ......................................................... *passim*

*Carbon Activated Tianjin Co., Ltd. v. United States,*
   503 F. Supp. 3d 1278 (Ct. Int'l Trade 2021)............................................... 15, 46, 47

*Carbon Activated Tianjin Co., Ltd. v. United States,*
   547 F. Supp. 3d 1310 (Ct. Int'l Trade 2021)............................................... 16, 46, 47

*Clearon Corp. v. United States,*
   37 C.I.T. 220 (2013)............................................................................................. 28

*Consolo v. Fed. Mar. Comm'n,*
   383 U.S. 607 (1966) .............................................................................................. 9

*Dorbest Ltd. v. United States,*
   604 F.3d 1363 (Fed. Cir. 2010)............................................................................ 17

*Downhole Pipe & Equipment, L.P. v. United States,*
   776 F.3d 1369 (Fed. Cir. 2015)..................................................................... *passim*

*Fine Furniture (Shanghai) Ltd. v. United States,*
   353 F. Supp. 3d 1323 (Ct. Int'l Trade 2018)........................................................ 39

*Fresh Garlic Producers Ass'n v United States,*
   121 F. Supp. 3d 1313 (Ct. Int'l Trade 2015)........................................................ 13

*Home Meridian Int'l. Inc. v. United States,*
   772 F.3d 1289 (Fed. Cir. 2014).................................................................... 11, 12

*Jacobi Carbons AB v. United States,*
   365 F. Supp. 3d 1323 (Ct. Int'l Trade 2019)........................................................ 16

*Jacobi Carbons AB v. United States,*
   365 F. Supp. 3d 1344 (Ct. Int'l Tr. 2019) ........................................................... 16

*Jacobi Carbons AB v. United States ,*
   619 Fed. Appx. 992 (Fed. Cir. 2015) ................................................................. 28

*Jiaxing Bro. Fastener Co. v. United States,*
    11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) .......................................................... 12

*Jiaxing Bro. Fastener Co., Ltd. v. United States,*
    822 F.3d 1289 (Fed. Cir. 2016) ................................................................. *passim*

*Lifestyle Enterprise, Inc. v. United States,*
    751 F.3d 1371 (Fed. Cir. 2014) ........................................................................... 13

*Nan Ya Plastics Corp. v. United States,*
    810 F.3d 1333 (Fed. Cir. 2016) ........................................................................... 33

*Nation Ford Chem. Co. v. United States,*
    166 F.3d 1373 (Fed. Cir. 1999) ..................................................................... 10, 11

*Ningbo Dafa Chem. Fiber Co. v. United States,*
    580 F.3d 1247 (Fed. Cir. 2009) ....................................................................... 9, 12

*NSK Corp. v. U.S. Int'l Trade Comm.,*
    716 F.3d 1352 (Fed. Cir. 2013) ................................................................... 10, 26

*Polyethylene Retail Carrier Bag Comm. v. United States,*
    29 C.I.T. 1418 (2005) ......................................................................................... 42

*Qingdao Sea-Line Trading Co. v. United States,*
    766 F.3d 1378 (Fed. Cir. 2014) ................................................................. *passim*

*QVD Food Co. v. United States,*
    658 F.3d 1318 (Fed. Cir. 2011) ............................................................. 11, 31, 33

*QVD Food Co. v. United States,*
    721 F. Supp. 2d 1311 (Ct. Int'l Trade 2010) ..................................................... 30

*Seah Steel Vina Corp. v. United States,*
    269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017) ..................................................... 21

*Shenzen Xinboda Indus. Co. v. United States,*
    456 F. Supp. 3d 1272 (Ct. Int'l Trade 2020) ..................................................... 27

*SolarWorld Americas, Inc. v. United States,*
    910 F.3d 1216 (Fed. Cir. 2018) ........................................................................... 10

*T. T. Int'l v. United States,*
    439 F. Supp. 3d 1370 (Ct. Int'l Trade 2020) ..................................................... 17

*United States Steel Corp. v. United States*,
    621 F.3d 1351 (Fed. Cir. 2010) ............................................................... 10

*United States v. Eurodif S.A.*,
    555 U.S. 305 (2009) ................................................................................ 9

*Xiamen Int'l Trade & Indus. Co. v. United States*,
    953 F. Supp. 2d 1307 (Ct. Int'l Trade 2013) ......................................... 12

*Zenith Elecs. Corp. v. United States*,
    988 F.2d 1573 (Fed. Cir. 1993) ............................................................. 39

*Zhejiang DunAn Hetian Metal Co. v. United States*,
    652 F.3d 1333 (Fed. Cir. 2011) ............................................................. 12

**Statutes**

19 U.S.C. § 1673 ........................................................................................ 10

19 U.S.C. § 1675 ........................................................................................ 10

19 U.S.C. § 1677 .............................................................................. *passim*

**Regulations**

19 C.F.R. § 351.408 ......................................................................... *passim*


**Other Authorities**

*Certain Activated Carbon from the People's Republic of China*,
    72 Fed. Reg. 20,988 (Dep't of Commerce Apr. 27, 2007) ...................... 4

*Certain Activated Carbon From the People's Republic of China*,
    86 Fed. Reg. 33,988 (Dep't of Commerce June 28, 2021) ..................... 4

*Certain Activated Carbon From the People's Republic of China*,
    86 Fed. Reg. 73,731 (Dep't of Commerce Dec. 28, 2021) ..................... 2

*Certain Fabricated Structural Steel Final Affirmative Determination
    of Sales at Less Than Fair Value*, 85 Fed. Reg. 5,376
    (Dep't of Commerce Jan. 30, 2020) ...................................................... 19

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*,
    85 Fed. Reg. 35,068 (Dep't of Commerce June 8, 2020) ....................... 4

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., and CARBON ACTIVATED CORPORATION, Plaintiffs, and DATONG JUQIANG ACTIVATED CARBON CO., LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMENT ACTIVATED CARBON CO., LTD., and DATONG MUNICIPAL YUNGGUANG ACTIVATED CARBON CO. LTD., Consolidated Plaintiffs, v. UNITED STATES, Defendant, and CALGON CARBON CORPORATION and CABOT NORIT AMERICAS, INC., Defendant-Intervenors. | Consol. Court No. 22-00017 |

**DEFENDANT'S RESPONSE TO RULE 56.2**
**MOTIONS FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56. 2 of the Rules of this Court, defendant, the United States,

respectfully responds to the motions for judgment upon the agency record filed by plaintiffs

Carbon Activated Tianjin Co., Ltd., and Carbon Activated Corporation (together, CAT) (CAT

Br.) (ECF No. 33); consolidated plaintiffs Datong Juqiang Activated Carbon Co., Ltd., Datong

Juqiang Activated Carbon USA, LLC, Ningxia Guanghua Cherishmet Activated Carbon Co.,

Ltd., and Datong Municipal Yunguang Activated Carbon Co., Ltd., (together, DJAC) (DJAC

Br.) (ECF No. 30); and consolidated plaintiffs Calgon Carbon Corporation and Norit Americas

Inc. (together, CCC) (CCC Br.) (ECF No. 32).  Plaintiffs and consolidated plaintiffs

(collectively, plaintiffs) challenge certain aspects of the Department of Commerce's (Commerce)

final results of the thirteenth administrative review of the antidumping duty order on certain

activated carbon from the People's Republic of China.  As we demonstrate below, the Court

should deny these motions because Commerce's final results are supported by substantial

evidence and in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.    Administrative Determination Under Review

The administrative determination under review is the final results of the thirteenth

administrative review of the antidumping duty order on certain activated carbon from China.  *See*

*Certain Activated Carbon From the People's Republic of China*, 86 Fed. Reg. 73,731 (Dep't of

Commerce Dec. 28, 2021) (*Final Results*) (P.R. 314), and the accompanying Issues and Decision

Memorandum (Dec. 17, 2021) (IDM) (P.R. 308).  The period of review is April 1, 2019, through

March 31, 2020.

### II.    The Issues Presented

1.    Whether Commerce's determination that Malaysia was the only significant

producer of subject merchandise on the Office of Policy (OP) List was supported by substantial

evidence and in accordance with law.

2.    Whether Commerce's determination to base financial ratios in the surrogate value

calculation on the financial statements of Malaysian producers Century Chemical Works

Sendirian Berhad (Century Chemical) and Bravo Green Sdn. Bhd. (Bravo Green) was supported by substantial evidence and in accordance with law.

3.     Whether Commerce's valuation of carbonized materials based on Malaysian import data under Harmonized Tariff Schedule (HTS) 4402.90.1000 ("Coconut Shell Charcoal") is supported by substantial evidence and in accordance with law.

4.     Whether Commerce's valuation of coal tar based on Malaysian import data under HTS 2706.00 ("Mineral Tars, Including Reconstituted Tars") is supported by substantial evidence and in accordance with law.

5.     Whether Commerce's valuation of hydrochloric acid (HC1) based on Malaysian import data under HTS 2806.10 ("Hydrogen Chloride (hydrochloric acid)") is supported by substantial evidence and in accordance with law.

6.     Whether Commerce's valuation of steam based on Malaysian import data under HTS 2711.11 ("which covers natural gas in liquid form") is supported by substantial evidence and in accordance with law.

7.     Whether Commerce's determination to value ocean freight on the basis of Maersk Line freight charge quotes is supported by substantial evidence and in accordance with law.

8.     Whether Commerce's valuation of bituminous coal based on Malaysian import data under the HTS subheading 2701.19 ("Other Coal") is supported by substantial evidence and in accordance with law.

9.     Whether Commerce's determination to accept Datong Juqiang's reported consumption of bituminous coal during the activated carbon production process is supported by substantial evidence and in accordance with law.

3

## STATEMENT OF FACTS

**I.    Initiation Of The Thirteenth Administrative Review And Surrogate Value Selection**

On April 27, 2007, Commerce published the antidumping duty order covering the subject

merchandise.  *Certain Activated Carbon from the People's Republic of China*, 72 Fed. Reg.

20,988 (Dep't of Commerce Apr. 27, 2007) (notice of order) (*Order*).  Having received several

requests for a review of the order, on June 8, 2020, Commerce initiated the subject review.  *See*

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 85 Fed. Reg. 35,068

(Dep't of Commerce June 8, 2020).

On July 8, 2020, Commerce selected Carbon Activated and Datong Juqiang as mandatory

respondents for individual examination.  *See Certain Activated Carbon From the People's*

*Republic of China*, 86 Fed. Reg. 33,988 (Dep't of Commerce June 28, 2021) (P.R. 278)

(*Preliminary Results*), and the accompanying Preliminary Decision Memorandum (June 21,

2021) (P.R. 270) (PDM) at 2.  On July 13, 2020, Commerce sent the initial antidumping duty

questionnaires to the mandatory respondents.  *Id*.

As China is considered a non-market economy, Commerce must select one or more

market-economy countries for the surrogate valuation of respondents' factors of production.  *See*

19 U.S.C. §§ 1677(18)(A), 1677b(c).  On January 19, 2021, Commerce requested comments

from interested parties on Commerce's list of economically comparable countries, surrogate

value country selection, and surrogate value data.  PDM at 10.  Commerce identified Brazil,

Malaysia, Mexico, Romania, Russia, and Turkey (collectively, OP List Countries) as

economically comparable countries, at the same level of economic development as China based

on per capita 2019 Global National Income (GNI) data.  *Id*. at 11.  Petitioners and mandatory

respondents submitted comments on economically comparable countries on February 11, 2021,

and surrogate value comments on March 4, 2021. *Id*. at 10. In their surrogate country comments, the mandatory respondents stated that, of the six OP List Countries, only Malaysia is a net exporter in terms of both quantity and value. PDM at 11 (citing Respondents' SC Cmts. at 4-5 and Ex 1).

## II.   **Preliminary Results**

On June 28, 2021, Commerce published the *Preliminary Results*, determining that certain activated carbon from China was sold in the United States at less than normal value during the period of review. 86 Fed. Reg. at 33,988. Commerce preliminarily selected Malaysia as the primary surrogate country. PDM at 17. Commerce found that all six OP List Countries met the requirement for economic comparability, but that the record evidence demonstrated that Malaysia was the only significant producer of comparable merchandise because Malaysia was the only net exporter of activated carbon during the period of review. *Id*. at 14-16. Further, Commerce found that Malaysia had reliable and usable data to value all factors of production and to calculate surrogate financial ratios. *Id*. at 17. Thus, Malaysia satisfied the statutory requirements under 19 U.S.C. § 1677b(c)(4) to be selected as the primary surrogate country to value the respondents' factors of production. *Id*.

Commerce calculated normal value using surrogate values for material inputs primarily based on Malaysian import statistics published in the Global Trade Atlas (GTA). PDM at 27; Surrogate Value (SV) Mem. at 4 (June 18, 2021) (P.R. 273). Commerce also calculated surrogate financial ratios using the financial statements of two Malaysian producers of activated carbon, Century Chemical and Bravo Green. PDM at 30-31. For valuing international freight charges, Commerce relied on ocean freight quotes from Maersk for transportation between

Tianjin, China, and various U.S. ports, because these rates covered the entire period of review and were product-specific.  *See* IDM at 42; SV Mem. at 8.

Following the publication of the *Preliminary Results*, on July 12 and 19, 2021, Commerce sent supplemental questionnaires to mandatory respondents Carbon Activated and Datong Juqiang.  *See* Third Sec. A, C Supp. Questionnaire (July 12, 2021) (P.R. 280); Third Sec. C and Second Sec. D Supp. Questionnaire (July 19, 2021) (P.R. 283).  Commerce received responses from these parties on July 29 and August 11, 2021.  *See* Carbon Activated Response to Sec. A and C Supp. Questionnaire (July 27, 2021) (P.R. 287); Datong Juqiang's Third Supp. Sec. C and Second Supp. Sec. D Response (Aug. 11, 2021) (P.R. 291).

### III.   <u>Case And Rebuttal Briefs</u>

In their case and rebuttal briefs, the mandatory respondents contested Commerce's selection of the surrogate financial information used to calculate the antidumping margins for the *Preliminary Results*.  Specifically, the mandatory respondents contended that Commerce should value financial ratios based on the 2019 financial statements of a Romanian company rather than the two Malaysian financial statements, and contested Commerce's selection of Malaysian import data to value the respondents' material inputs — bituminous coal, coal tar, carbonized material, HC1, and steam.  IDM at 19-36, 43-47.  To value ocean freight, the mandatory respondents maintained that Commerce should use data from a different shipping company, Descartes, which it characterized as representing "actual consummated transactions" rather than "price quotes."  *Id.* at 40-41.  Petitioner also contested Commerce's margin calculations for Datong Juqiang, asserting that Commerce should revise its calculations to include an upward adjustment in Datong Juqiang's reported per-unit consumption factor for bituminous coal.  *Id*. at 4-15.

IV.    **Final Results**

On December 28, 2021, Commerce published the *Final Results*. 86 Fed. Reg. at 73,371.

In the *Final Results*, Commerce made changes to Datong Juqiang's margin calculations in

response to comments from interested parties. IDM at 3-4. First, Commerce relied on the

revised factors of production database that Datong Juqiang submitted in response to Commerce's

supplemental Section D questionnaire when calculating Datong Juqiang's normal value because

this database most accurately reflected Datong Juqiang's use of bituminous coal in the

production of subject merchandise during the period of review. *Id*. at 11. Second, Commerce

relied on the revised sales database that Datong Juqiang submitted to resolve an inadvertent input

error. *Id*. at 4. Third, Commerce valued bituminous coal as a raw material input using

Malaysian imports under HTS 2701.19 ("Other Coal") rather than HTS 2701.12 ("Bituminous

Coal") because HTS 2701.19 was product-specific to bituminous coal with heat values below

5,833 kcal/kg, as used by Datong Juqiang. *Id.* at 20-22.

Commerce continued to find it appropriate to rely on financial statements from Malaysia

in calculating surrogate financial ratios, to value factors of production using Malaysian imports

under the HTS subheadings used in the *Preliminary Results*, and to value the mandatory

respondents' ocean freight expenses using the Maersk data. *See id*. at 26-27, 31, 38-48.

**SUMMARY OF THE ARGUMENT**

Commerce's *Final Results* are supported by substantial evidence and in accordance with

law. Commerce selected Malaysia as the primary surrogate country based on a reasoned

determination that, during the period of review, Malaysia was at a level of economic

development comparable to China and a significant producer of comparable merchandise. The

record also contained complete and usable data to value all of respondents' factors of production

and for general expenses and profit plus the cost of containers, coverings, and other expenses. Plaintiffs collectively challenge several aspects of Commerce's *Final Results*: the agency's significant-producer analysis, the calculation of surrogate financial ratios, the surrogate valuation of five inputs — carbonized material, coal tar, HC1, steam, and bituminous coal, as well as the selection of surrogate ocean freight charges.  These arguments are without merit.

First, DJAC and CAT contend that Commerce unlawfully relied on the net-producer criterion in determining that Malaysia was the only significant producer of subject merchandise. Policy Bulletin 04.1 provides that "'significant producer' could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers."  Commerce lawfully determined that Malaysia was a significant producer of subject merchandise because it was the only net exporter of activated carbon — a fact that the mandatory respondents conceded before Commerce.  DJAC and CAT also contend that Commerce's significant-producer analysis was flawed because the agency failed to take various data into account.  But Policy Bulletin 04.1 provides that "{d}ata {c}onsiderations" only come into play "if more than one country has survived the selection process to this point" related to comparable merchandise and significant producer.  Because only Malaysia satisfied these criteria related to comparable merchandise and significant producer, Commerce was not required to turn to data considerations.

Also without merit are plaintiffs' challenges to the calculation of surrogate financial ratios, the surrogate valuation of the five inputs — carbonized material, coal tar, HC1, steam, and bituminous coal, as well as the selection of surrogate ocean freight charges.  In focusing on the imperfections of Commerce's surrogate value selections, plaintiffs fail to recognize that Commerce's selections need not be perfect under the governing standard.  Plaintiffs' arguments

8

in favor of alternative datasets are not supported by law or the record, but merely reflect disagreements with Commerce's lawful exercise of its discretion to weigh the evidence differently.

Commerce's reasoned analysis should be sustained, and judgment entered in favor of the United States.

## ARGUMENT

## I.    Legal Standards

### A.    Standard Of Review

The Court upholds Commerce determinations that are supported "by substantial evidence on the record" and otherwise "in accordance with law{.}"  19 U.S.C. § 1516a(b)(1)(B)(i); *see also United States v. Eurodif S.A.*, 555 U.S. 305, 316 & n.6 (2009) ("The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence.") (citation omitted)).  "Substantial evidence" means "more than a mere scintilla" of evidence that "a reasonable mind might accept as adequate to support a conclusion." *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1253 (Fed. Cir. 2009) (internal quotation marks and citations omitted).  The Court's "review is limited to the record before Commerce in the particular review proceeding at issue and includes all evidence that supports or detracts from Commerce's conclusion." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014) (citations omitted).

Even if the Court may draw two inconsistent conclusions from the evidence contained in the record, doing so "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citation omitted).  This Court does not "reweigh the evidence already considered by Commerce{.}" *SolarWorld Americas, Inc. v. United States*, 910 F.3d 1216, 1225 (Fed. Cir. 2018) (citing

*Downhole Pipe & Equipment, L.P. v. United States*, 776 F.3d 1369, 1378 (Fed. Cir. 2015));

*accord NSK Corp. v. U.S. Int'l Trade Comm.*, 716 F.3d 1352, 1366 (Fed. Cir. 2013)).

    **B.**     **<u>Surrogate Value Selection</u>**

    The antidumping duty statute provides for the application of remedial duties to foreign

goods sold, or likely to be sold, in the United States "at less than its fair value." 19 U.S.C.

§ 1673. Once Commerce issues an antidumping duty order after an initial investigation (*see* 19

U.S.C. §§ 1673a, 1673b(b), (d), 1673d(a), (c)), the agency conducts administrative reviews, such

as the subject review, to determine the amount of duties owed. 19 U.S.C. § 1675(a)(1), (2)(A).

In so doing, Commerce calculates a "dumping margin" for each entry of subject merchandise

under review. 19 U.S.C. § 1675(a)(2)(A)(ii). A dumping margin is the amount by which the

"'normal value' (the price a producer charges in its home market) exceeds the 'export price' (the

price of the product in the United States) or 'constructed export price.'" *United States Steel*

*Corp. v. United States*, 621 F.3d 1351, 1353 (Fed. Cir. 2010) (citing 19 U.S.C. § 1677(35)(A))

(internal footnotes omitted).

    If the review involves products from a nonmarket economy (NME), and Commerce

determines that available information does not permit a standard normal value calculation, then

Commerce determines normal value using surrogate values for "the factors of production utilized

in producing the merchandise" plus "an amount for general expenses and profit plus the cost of

containers, coverings, and other expenses." 19 U.S.C. § 1677b(c)(1)(B). Commerce uses this

framework "to construct a hypothetical market value" of the subject merchandise in the NME.

*Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

    Commerce values a respondent's factors of production "based on the best available

information regarding the values of such factors in a market economy country or countries{.}"

*Jiaxing Bro. Fastener Co., Ltd. v. United States*, 822 F.3d 1289, 1294 (Fed. Cir. 2016) (citing 19 U.S.C. § 1677b(c)(1)(B)).  The statute does not define the phrase "best available information" and, thus, does not mandate that Commerce use any particular data source in reaching its determination.  *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  This statutory gap leaves Commerce with considerable discretion to determine what constitutes the best available information.  *See, e.g.*, *Nation Ford Chem. Co.*, 166 F.3d at 1377 ("While 19 U.S.C. § 1677b(c) provides guidelines to assist Commerce in this process, this section also accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines.") (citations omitted).

The statute does not require Commerce to use "perfect" surrogate value data.  *Jiaxing*, 822 F.3d at 1301 (quoting *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)).  And "Commerce need not duplicate the exact production experience of the Chinese manufacturers at the expense of choosing a surrogate value that most accurately represents the fair market value" of the factors of production in question.  *Nation Ford Chem. Co.*, 166 F.3d at 1377 (brackets and internal quotation marks omitted).

In filling the statutory gap as to what constitutes the "best available information," Commerce considers the criteria set forth in its "Policy Bulletin 04.1."  *See Import Administration Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process*, *available at* https://enforcement.trade.gov/policy/bull04-1.html (last visited Dec. 4, 2022).  To the extent practicable, Commerce selects surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of review, and tax and duty exclusive.  *Id.*  "Commerce has not identified a hierarchy among these factors, and the weight accorded to a factor varies depending on the facts of each case."  *Xiamen*

*Int'l Trade & Indus. Co. v. United States,* 953 F. Supp. 2d 1307, 1313 (Ct. Int'l Trade 2013)

(citation omitted).  Commerce also has a regulatory preference to use as much data as possible

from a single surrogate country.  19 C.F.R. § 351.408(c)(2); *Jiaxing*, 822 F.3d at 1294 & n.3

(citing Policy Bulletin 04.1).  Commerce will "only resort to a secondary surrogate country if

data from the primary surrogate country are unavailable or unreliable." *See Jiaxing Bro.*

*Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1332-33 (Ct. Int'l Trade 2014) (citations

omitted), *aff'd,* 822 F.3d 1289.

   In reviewing Commerce's surrogate value selections for substantial evidence, the Court

must not "evaluate whether the information Commerce used was the best available, but rather

whether a reasonable mind could conclude that Commerce chose the best available information."

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed. Cir. 2011).  That

principle applies particularly "{w}hen all the available information is flawed in some way,"

leaving Commerce to "make a judgment call as to what constitutes the 'best' information."

*Lifestyle Enterprise, Inc. v. United States*, 751 F.3d 1371, 1378 (Fed. Cir. 2014).

## II.    Commerce Lawfully Determined That Malaysia Was The Only Significant-Producer Of Subject Merchandise

   DJAC and CAT raise several challenges to Commerce's significant-producer

determination, all of which lack merit.

   Commerce must, "to the extent possible," select surrogate value information from "one or

more market economy countries that are — (A) at a level of economic development comparable

to that of the nonmarket economy country, and (B) significant producers of comparable

merchandise." 19 U.S.C. § 1677b(c)(4).  Neither the statute nor Commerce's regulations provide

further guidance on the definition of significant producer.  *See, e.g.*, *Fresh Garlic Producers Ass'n*

*v United States*, 121 F. Supp. 3d 1313, 1338-39 (Ct. Int'l Trade 2015).  In light of this statutory

and regulatory gap, Commerce looks to other sources such as the Policy Bulletin 04.1 for guidance in defining "significant producer." Policy Bulletin 04.1 provides that "'significant producer' could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers." Policy Bulletin 04.1.

Given this guidance, and after examining the import and export data for the six OP List Countries on the record, Commerce determined that *solely* Malaysia was a net exporter of activated carbon among the list of potential surrogate countries — both in terms quantity and value — during the period of review. IDM at 32 (citing Respondents' SC Cmts. at 4-5 and Ex. 1 (Feb. 11, 2021)). Commerce also determined that financial statements from two manufacturers of identical activated carbon were only available from Malaysia. IDM at 33 (citing Petitioners' SV Submission at Attach. 5 (March 4, 2021)). In fact, before Commerce, DJAC and CAT agreed that, of the OP List countries, only Malaysia was a net exporter of subject merchandise. *See* PDM at 16 ("The mandatory respondents note that of the six OP List Countries, only Malaysia is a net exporter in terms of both quantity and value.") (citing Respondents' SC Cmts. at 4-5 & Ex. 1).

Despite their concession that only Malaysia is a net exporter, DJAC and CAT contend that Commerce did not comply with 19 U.S.C. § 1677b(c)(4) and Policy Bulletin 04.1 by "rigidly adhering to a net-producer criterion rather than providing a contextual analysis, including consideration of data quality among other factors." DJAC Br. at 9-15, 18; CAT Br. at 11-17. DJAC and CAT misstate the governing law. Relying on the legislative history discussed above, Policy Bulletin 04.1 expressly provides that "'significant producer' could mean a country that is a net exporter, even though the selected surrogate country may not be one of the world's top producers."

As for data quality, Policy Bulletin 04.1 provides that "{d}ata {c}onsiderations" only come into play "if more than one country has survived the selection process to this point" related to comparable merchandise and significant producer. *See Jiaxing*, 822 F.3d at 1294 ("{W}when several countries are both at a level of economic development comparable to the nonmarket economy country and significant producers of comparable merchandise, Commerce evaluates the reliability and completeness of the data in the similarly-situated surrogate countries and generally selects the one with the best data as the primary surrogate country.") (citing Policy Bulletin 04.1). Thus, once Commerce determined that Malaysia produced comparable merchandise and was the sole OP List country that was a significant producer in terms of net exports, the agency was not required to consider data quality. In this case, Commerce lawfully concluded that it was not required to analyze data availability and reliability because no other country except for Malaysia satisfied the statutory requirements for selection as a surrogate country. PDM 23, 24.

Also without merit is DJAC's assertion that Commerce unlawfully based its significant-producer determination on a comparison of production data in Malaysia and Romania and relied on comparative net exports. DJAC Br. at 13-14. Commerce engaged in no such comparison. Rather, Commerce based its significant-producer determination on its examination of import and export data published by the GTA (for Malaysia, Mexico, Russia, Brazil and Turkey) and TDM (for Romania), which indicated that, of the six OP List Countries, only Malaysia was a net exporter of activated carbon during the period of review. IDM at 32 (citing Respondents' SC Cmts. at 4-5 and Ex. 1).

DJAC and CAT assert that, on a similar record, in AR11, this Court invalidated Commerce's identical significant-producer analysis related to Romania (DJAC Br. at 15-16; CAT Br. at 19-20), but they misread that case. In AR11, this Court faulted Commerce for failing

14

to analyze the *value* of any OP List country's net exports after Commerce determined that none

of the countries on the OP List was a net exporter by *volume*. *See Carbon Activated Tianjin Co.,*

*Ltd. v. United States*, 503 F. Supp. 3d 1278, 1286 (Ct. Int'l Trade 2021). In that case, Commerce

also failed to explain why it changed its preliminary finding that Romania was a substantial

producer of subject merchandise based on net export quantity to a final determination that it was

not. *Id.* at 1287. On remand, Commerce determined that both Malaysia and Romania were

significant producers of subject merchandise and, thus, because more than one country was in

contention, Commerce was required to look to data considerations. *Carbon Activated Tianjin*

*Co., Ltd. v. United States*, 547 F. Supp. 3d 1310, 1319-20 (Ct. Int'l Trade 2021). In this case,

however, there was no need for Commerce to turn to data considerations because Commerce

found that Malaysia was the *only* significant producer of subject merchandise based on net

exports. IDM at 32.

CAT relies on other cases in support of its argument that this Court has rejected

Commerce's use of the net-exporter criterion to determine whether an OP List country is a

significant producer (CAT Br. at 13-14, 19), but none of those cases contain such a holding.

Rather, in those cases, the Court found Commerce's net-producer analysis required further

explanation. *See Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323, 1333 (Ct. Int'l

Trade 2019) (holding that Commerce failed to explain why it found that Thailand was a

significant producer based on its net export quantity of 1,172,897 kg given that the record also

contained evidence that the Philippines and Indonesia had net export quantities of 60,662,341 kg,

and 11,112,825 kg, respectively); *id.* (faulting Commerce for "declar{ing} all three countries to

be significant producers without addressing the disparities between their net export quantities");

*see also Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1344, 1350-51 (Ct. Int'l Tr. 2019)

(remanding because Commerce determined that Thailand was a significant producer despite failing to satisfy either of the agency's stated metrics in that proceeding for evaluating whether a country was a significant producer — being a net exporter or a major exporter to the United States).

## III.   Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Financial Ratios

DJAC and CAT challenge Commerce's determination to use financial statements from two Malaysian producers of activated carbon to value financial ratios.  DJAC Br. at 9-24; CAT Br. at 21-26.  As explained below, the record supports Commerce's selection of the Malaysian financial statements as the best available information.

### A.   Commerce Lawfully Selected The Financial Statements Of Two Malaysian Companies

In a non-market economy antidumping proceeding, Commerce determines normal value on the basis of factors of production used to produce subject merchandise valued in a surrogate country or countries.  *See* 19 U.S.C. § 1677b(c)(1).  After calculating the total value of the factors of production, Commerce adds "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  *Id*.  Commerce does this by calculating surrogate financial ratios that it "derives from the financial statements of one or more companies that produce identical or comparable merchandise, preferably in the primary surrogate country."  *T. T. Int'l v. United States*, 439 F. Supp. 3d 1370, 1382 (Ct. Int'l Trade 2020) (citing *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010)).

The administrative record contained four financial statements:  two from Malaysia, one from Romania, and one from Russia.  IDM at 32-33 (citing Petitioners' SV Submission at Attach. 5; Respondents' SV Submission at Ex. 14B; Respondents' Final SV Submission at Ex.

5A).  Commerce selected the two Malaysian financial statements from Century Chemical and

Bravo Green as the best available information to calculate the respondents' financial ratios

because the financial statements were contemporaneous with the period of review, from the

primary surrogate country, from the only country among the OP List countries determined to be

a significant producer of comparable merchandise, and reflected the experience of a producer of

merchandise identical to the mandatory respondents.  IDM at 31-33.  Commerce also explained

that the companies' financial statements provided sufficient information to calculate surrogate

financial ratios for factory overhead, selling, general and administrative (SG&A) expenses, and

profit.  *Id.* at 34; PDM at 17, 31.  Further, Commerce reasoned that use of the Malaysian

financial statements was preferable to use of the financial statements from Romania and Russia

based on Commerce's preference for using multiple financial statements.  IDM at 35.

　　　　Thus, Commerce provided a reasoned explanation for determining that the Malaysian

financial statements are the best available information to value financial ratios.

### B.    DJAC's And CAT's Challenges To Commerce's Selection Of The Malaysian Financial Statements Lack Merit

　　　　DJAC and CAT challenge Commerce's selection of the Malaysian financial statements

over the Romanian and Russian financial statements.  DJAC Br. at 16-24; CAT Br. at 21-26.

These arguments do nothing more than ask this Court to reweigh the evidence, which is

foreclosed by the governing standard of review.

　　　　First, DJAC and CAT contend that the Malaysian financial statements were insufficiently

disaggregated as compared with the Romanian and Russian alternatives, thereby contravening

the agency's longstanding practice to reject insufficiently disaggregated financial statements that

contain basket category cost line items.  DJAC Br. at 16-20; CAT Br. at 21-24.  In the *Final

Results*, Commerce rejected this argument after finding that the Malaysian financial statements

17

provided sufficient information to segregate and calculate surrogate ratios for factory overhead costs, SG&A expenses, and profit.  IDM at 34.  "Commerce has previously used financial statements that were not able to break out labor or energy where there were no other useable financial statements on the record."  *Certain Fabricated Structural Steel Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5,376 (Dep't of Commerce Jan. 30, 2020) and accompanying IDM at Cmt. 2.  Further, in the *Preliminary Results*, Commerce explained that, when it is unable to segregate expenses in the calculation of the surrogate financial ratios that would otherwise be included in the normal value calculation, its practice is to disregard these expenses in the calculation in order to avoid double-counting costs which have necessarily been captured in the surrogate financial ratios.  PDM at 31.  In this review, however, Commerce explained that it did not disregard energy or labor in the normal value calculation because the two Malaysian financial statements separate overhead expenses such as depreciation from the rest of the costs of manufacture — that is, material, labor, and energy expenses.  *Id.* Commerce further explained that it used the lump sum of material, labor, and energy expenses as the denominator in its calculation of the surrogate financial ratios.  *Id.*  As a result, Commerce found that it did not double-count energy and labor expenses when including them in the normal value calculation.  *Id.*

Second, CAT contends that Commerce's selection of the Malaysian financial statements is inconsistent with the Court's holding in *Carbon Activated Tianjin Co. Ltd. v. United States*, 586 F. Supp. 3d 1360 (Ct. Int'l Tr. 2022) (CAT Br. at 15-16), but that case is distinguishable.  In *Carbon Activated*, despite acknowledging that Bravo Green's 2018 statements were "not as detailed as Commerce prefers," the agency selected those financial statements over the non-Malaysian alternatives without providing any explanation as to why the less-than-ideal Bravo

Green statements were better than the alternatives proposed by respondents.  586 F. Supp. 3d at 1381.  As discussed above, in this case, Commerce thoroughly explained its selection of the Malaysian financial statements.  IDM at 34; PDM at 31.

Third, DJAC and CAT contend that Commerce allocated the amount reported in Bravo's basket category line item, "Operating expenses" solely to SG&A even though "Operating expenses" "potentially" includes excludable expenses such as transport costs.  DJAC Br. at 19; CAT Br. at 23.  DJAC also contends that, in Century's ratio calculation, Commerce allocated the amount in "Administrative expense" to SG&A when, absent a breakout of transportation expenses, this line item "likely" includes such excludable expenses.  *Id.*  DJAC contends that, because SG&A ratios in both financials are "potentially" distorted by transport expenses, Bravo's and Century's "potentially" distorted overhead and SG&A ratios give rise to distorted profit ratios.  *Id.*  These arguments as to what was "likely" included and "potentially" distortive are based on nothing more than speculation — not on record evidence — and, accordingly, should be rejected.  *See, e.g.*, *Downhole Pipe & Equipment, L.P.*, 776 F.3d at 1380 (rejecting appellants' argument that "HTS 7304.59.20 *most likely* also lacked entries of drill-pipe green tube" because they "fail to provide any evidence in support of this proposition") (emphasis in the original).

DJAC and CAT do nothing more than ask this Court to reweigh the evidence while failing to provide any legally-plausible basis for displacing Commerce's judgment calls regarding its surrogate-value selection.

**C.    Commerce's Rejection Of The Romcarbon And JSC Financial Statements Was Supported By Substantial Evidence**

DJAC and CAT contend that Commerce should have selected the financial statement of the Romanian company Romcarbon because it meets all established criteria (DJAC Br. at 20-21;

CAT Br. at 25-26) or, alternatively, they assert that Commerce should have selected the financial statement of the Russian company JSC for similar reasons.  DJAC Br. at 46-48; CAT Br. at 26. Commerce lawfully rejected these financial statements.

Commerce explained its reasoning for rejecting the Romcarbon financial statement based on its preference to use the financial statements of producers with a production experience similar to the NME respondents.  IDM at 33-34.  Commerce found that, while Romcarbon's profit center no.2 includes an "Active Coal Workshop," which is dedicated to the production of activated carbon, its financial statement indicates that its principal activities are the manufacture of polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters and protective materials.  *Id.* at 33 (citing Respondents' SV Submission at Ex. 14B).  Commerce determined this was not evidence of "significant production" when compared to the two financial statements from the Malaysian producers because their principal business activity of the two companies is the manufacture and sale of activated carbon.  *Id.*  Commerce lawfully considered Romcarbon's production experience vis-à-vis that of the Malaysian companies.  *See Seah Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335, 1348 (Ct. Int'l Trade 2017) ("{I}n selecting surrogate producers, Commerce may also consider the representativeness of the production experience of the surrogate producers in relation to the nonmarket economy producer's own experience.").

DJAC and CAT also contend that Romcarbon's financial statement is superior to the Malaysian financial statements because all major expense categories are disaggregated.  DJAC Br. at 21-23; CAT Br. at 24-25.  These arguments are without merit.  Although acknowledging that Commerce generally only resorts to using a secondary surrogate country if data, including financial statements, from the primary surrogate country are unavailable or unreliable, DJAC and CAT fail to demonstrate that the Malaysian financial statements on the record are unreliable.

While recognizing that the Malaysian financial statements were not ideal insofar as they did not provide line-item break downs, Commerce concluded that the Malaysian financial statements constituted the best information in the record because they provided sufficient information to segregate and calculate surrogate financial ratios.  IDM at 34; PDM at 31.

DJAC and CAT would have this Court look solely at the disaggregation issue in isolation as a basis for invalidating the agency's surrogate value selection, but Commerce relied on several other factors in support of its selection, explaining that Malaysian financial statements were contemporaneous with the period of review, consistent with the agency's regulatory preference for valuing all factors of production in a single surrogate country, from the only country among the OP List countries determined to be a significant producer of comparable merchandise, and reflected the experience of a producer of merchandise identical to the mandatory respondents. IDM at 31-33.  Commerce also found that the selection of the Malaysian financial statements was consistent with its long-standing preference to use multiple companies' financial statements whenever practicable, because "using the greatest number of financial statements possible will yield the most representative data from the relevant manufacturing sector to calculate accurate surrogate financial ratios."  *Id.* at 32.

As an alternative argument, DJAC and CAT assert that Commerce should have selected the Russian JSC financial statement because its disaggregated expense categories are superior to the insufficiently disaggregated Malaysian financial statements.  DJAC Br. at 24; CAT Br. at 26. As Commerce explained, the production experience of JSC — which produces respiratory protection products and activated carbon and implements water treatment projects — is relatively dissimilar to that of the respondents.  IDM at 33 (citing Respondents' Final SV Submission at Ex. 5A; Petitioners' SV Submission at Attach. 5, pdf pp. 83 and 144).  Commerce also found that

it is difficult to ascertain what portion of JSC's portfolio relates to the production of respiratory protective equipment and to the implementation of water treatment projects and what portion relates to the production of activated carbon.  *Id.*

## IV.   Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Carbonized Material

To value carbonized material, Commerce selected the Malaysian GTA data for coconut-shell charcoal classified under HTS 4402.90.1000, applicable to the previous period of review (from April 1, 2018 through March 31, 2019), and inflated the value to make it contemporaneous because the Malaysian imports covering the current period of review were only from a broadly-subsidized economy.  Substantial evidence supports Commerce's selection.

### A.   Substantial Evidence Supports Commerce's Use Of Malaysian Import Data Under HTS 4402.90.1000 To Calculate The Surrogate Value For Carbonized Material

Commerce provided a reasoned explanation for its decision to select Malaysian GTA import data under HTS 4402.90.1000 (Wood Charcoal (Including Shell or Nut Charcoal, Other Than of Bamboo: Of Coconut Shell) as the best available information on the record to value coal-based carbonized material.

In the *Final Results*, Commerce valued carbonized materials using the Malaysian GTA data for coconut-shell charcoal under HTS 4402.90.1000 based on record evidence demonstrating the similarities of coal-based carbonized material consumed by the respondents to coconut shell-based carbonized material.  IDM at 38-39.  In particular, Commerce found that coconut-shell carbonized material and coal-based carbonized material are similar because both are steam-activated, whereas wood-based carbonized materials are generally chemically-activated.  *Id.* at 38.  Commerce observed that this difference in activation process impacts the ultimate physical structure of the carbonized material.  *Id.* at 38-39 (citing Respondents' Final

SV Submission at Ex. 1B).  Commerce also found that the physical structure of coal-based carbonized material is also similar to coconut shell-based carbonized material because both have a substantial amount of micropore surface area suitable for filtration uses.  *Id*. at 39 (citing Respondents' Case Brief at 40; Respondents' Final SV Submission at Exs. 1C and 1I).  In contrast, Commerce found that wood-based carbonized material has significantly fewer micropores and consists mostly of mesopores and macropores and is unsuited for the same level of filtration.  *Id*. (citing Respondents' Final SV Submission at Exs. 1C and 1I).

Relying on *Carbon Activated Tianjin Co. Ltd*, 586 F. Supp. 3d 1360, DJAC and CAT challenge Commerce's finding that neither mandatory respondent nor their suppliers purchased carbonized material that was made from wood or nut charcoal so as to merit the inclusion of the HTS 4402.90.9000 to value carbonized materials because Commerce did not make an analogous finding as to whether the mandatory respondents or their suppliers purchased carbonized material made from coconut shell charcoal.  DJAC Br. at 26-27; CAT Br. at 31-32.  The mandatory respondents purchased coal-based carbonized material.  In selecting a surrogate value for coal-based carbonized material, Commerce sought to determine whether coconut-shell or wood-based was more similar to the coal-based carbonized material the mandatory respondents actually used.  Thus, Commerce was not required to make a finding that the mandatory respondents purchased carbonized material made from coconut shell charcoal in order to use HTS 4402.90.9000 as a surrogate value.

DJAC also takes issue with Commerce's finding that coal-based carbonized material is similar to coconut-shell instead of wood-based carbonized material, reasoning that "both coconut shell- and coal-based carbonized material are steam activated whereas wood-based carbonized material is generally chemically-activated."  DJAC Br. at 27-28 (citing IDM at 38).  DJAC

contends that this assertion is undermined by evidence showing that "wood based activated

carbon . . . is produced by either steam or phosphoric acid activation." *Id.* (citing Final SV

Submission Exhibit 1-K).  This quotation is taken from the website of one of the mandatory

respondents.  This information is insufficient to support a determination that would require

Commerce to use wood-based carbonized material to value the mandatory respondent's coal tar.

*See, e.g.*, *NSK Corp.*, 716 F.3d at 1366 ("Although there is evidence that detracts from the

{agency's} ultimate conclusion . . ., we cannot say that this conflicting evidence casts such doubt

on the {agency's} conclusions to leave less than a mere scintilla of evidence or less evidence

than a reasonable mind might accept as adequate to support the {agency's} conclusion.") (citing

cases).

DJAC also contends that Commerce overstates that "coconut shell-based and coal-based

carbonized materials each have a 'substantial' amount of micropore surface area suitable for

filtration uses, whereas wood-based activated carbon has significantly less micropores and

consists mostly of mesopores and macropores, making it unsuited for the same level of

filtration." DJAC Br. at 27 (citing IDM at 39).  DJAC claims that such an assertion is

diminished by evidence that "coconut shell . . . contains 50 percent more micro-pores than

bituminous coal." *Id.* (citing Final SV Submission Exhibit 1-E).  But in making this finding,

Commerce relied on respondents' own case brief in which respondents stated that "{a}s restated

by another authoritative source," Canadian filtration equipment company PS Filter, coconut-

based activated carbon is effective for filtration because "up to 90% of the surface area of

coconut-based activated carbon consists of micro pores," and "{t}hough less efficient than

coconut-based activated carbon, charcoal activated carbon filtration still provides a *substantial*

*micro pore surface area*."  Respondents' Case Brief at 40 (P.R. 295) (citing Respondents' Final

24

SV Submission at Ex. 1-I (May 19, 2021) (P.R. 230) (emphasis added).  This evidence thus establishes similarities in the physical structure and function of coconut shell-carbonized materials and coal-based carbonized materials as distinguished from wood-based carbonized materials, which "has significantly less micropores and consists mostly of mesopores and macropores" and is "unsuited for the same level of filtration."  IDM at 39 (citing Respondents' Final SV Submission at Exs. 1C and 1I).

Also without merit is CAT's contention that Commerce's selection of HTS 4402.90.1000 was unlawful because it was not contemporaneous with the period of review, and that "the lack of usable contemporaneous data from the principal surrogate country . . . suggests that this input should be valued using available data from a second surrogate country."  CAT Br. at 26-27, 32. Whether surrogate values are contemporaneous with the period of review is one of the factors that Commerce considers when selecting the best available information, but it is not a dispositive factor.  *See Jiaxing*, 822 F.3d at 1293 ("Commerce generally selects, *to the extent practicable*, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review") (emphasis added) (citing *Qingdao Sea-Line Trading Co*, 766 F.3d at 1386); *Shenzen Xinboda Indus. Co. v. United States*, 456 F. Supp. 3d 1272, 1284 (Ct. Int'l Trade 2020) ("{D}epending on the factual circumstances, Commerce may select non-contemporaneous data over contemporaneous data").  Commerce properly exercised its discretion to weigh specificity over contemporaneity in selecting a surrogate value based on record evidence showing that coconut shell charcoal under Malaysian HTS 4402.90.1000 is the most similar to respondents' coal-based charcoal and, thus, a more specific surrogate value than the broader category of wood charcoal under HTS 4402.90.  IDM at 38-40.

**B.**    **Commerce Lawfully Rejected HTS 4402.90**

Commerce lawfully used import data from Malaysia rather than the Turkish import data under HTS 4402.90 ("Wood Charcoal") based on its preference to use surrogate value data from a single primary country for all factors of production.  IDM at 40; *see also* 19 C.F.R. § 351.408(c)(2); *Jiaxing*, 822 F.3d at 1294.  The use of data from a single surrogate country "limits the amount of distortion" in Commerce's surrogate value calculations.  *Clearon Corp. v. United States*, 37 C.I.T. 220, 229 (2013).  Further, on this record, there is "complete, publicly-available, contemporaneous, and specific" Malaysian data for all factors of production (PDM at 17), whereas the record does not contain complete data for Turkey; mandatory respondents only submitted Turkish import data for carbonized materials.  *Id*. at 28.  Accordingly, Commerce's selection of Malaysian HTS 4402.90.1000 ("Coconut Shell Charcoal") to value the respondents' carbonized material is supported by substantial evidence.

DJAC and CAT contend that the Federal Circuit's nonprecedential decision in *Jacobi Carbons AB*, 619 Fed. Appx. 992, compels the selection of HTS 4402.90.  DJAC Br. at 32-34; CAT Br. at 30-31.  DJAC and CAT misread that case.  Although recognizing that "{w}ood charcoal is also a type of charcoal and can also be used to create the subject merchandise{,}" the Federal Circuit concluded that "{t}here are no express findings or comparisons between wood charcoal and coconut shell charcoal, and this record does not establish any such conclusions." *Jacobi Carbons AB*, 619 Fed. Appx. at 999; *see also id.* ("the record does not compare coconut shell charcoal and wood charcoal").  In any event, that wood charcoal *could* be used to produce subject merchandise does not compel that result here because "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line Trading Co.*, 776 F.3d at 1387; *accord Jiaxing*,

822 F.3d at 1299.  On this record, Commerce determined that Malaysia HTS 4402.90.1000 ("Coconut Shell Charcoal") was a more appropriate and product-specific surrogate for coal-based carbonized material than Turkey HTS 4402.90 ("Wood Charcoal") because both coconut shell-carbonized material and coal-based carbonized material are steam activated whereas wood-based carbonized material is generally chemically-activated, which impacts the ultimate physical structure of the carbonized material, making coconut shell a more appropriate proxy for coal. IDM at 38-39 (citing Respondents' Final SV Submission at Ex. 1B).  Commerce also relied on evidence demonstrating that coconut shell-based and coal-based carbonized materials each have a substantial amount of micropore surface area suitable for filtration uses, whereas wood-based activated carbon has significantly less micropores and consists mostly of mesopores and macropores, making it unsuited for the same level of filtration.  *Id.* at 39 (citing Respondents' Case Brief at 40; Respondents' Final SV Submission at Exs. 1C and 1I; Respondents' Final SV Submission at Ex. 1B).  Commerce also relied on the lack of any evidence on the record indicating that the mandatory respondents produced subject merchandise from wood, nuts, or any other non-coal charcoal.  *Id.*

Based on Commerce's reasoning, the Court should reject DJAC's and CAT's contention that record evidence shows that coal-based carbonized material possesses characteristics that place it between coconut shell charcoal and wood-based charcoal and, thus, that Commerce should have selected HTS 4402.90 because that subheading encompasses both coconut shell-based and wood-based materials.  DJAC Br. at 28-32; CAT Br. at 27-28.  Commerce considered this argument and rejected it based on record evidence showing the similarities of coal-based carbonized material to coconut shell-based carbonized material.  IDM at 38-39.

DJAC also contends that Commerce failed to consider evidence on the record that compels the choice of HTS 4402.90 based on price data for the underlying material, bituminous coal, which DJAC contends can be used to benchmark the available surrogate value alternatives for coal-based carbonized material.  DJAC Br. at 31-32.  Their arguments are based on nothing but speculation regarding pricing that "could have been potentially used" and supposition that "the value of the resulting carbonized material *should be proximate* to the value of the starting raw material, bituminous coal{.}"  *Id.* at 31 (emphasis added).  Such speculation does not constitute substantial evidence.  Further, DJAC's proposed benchmark data is not consistent with Commerce's practice when considering benchmark data for purposes of determining whether a surrogate value is aberrational; Commerce's practice is to examine historical import data for the potential surrogate countries for a given case, to the extent such import data are available, or to examine data from the same HTS category for the primary surrogate country over multiple years to determine if the current data appear aberrational compared to historical values.  IDM at 22-23.

In support of their argument that Turkish HTS 4402.90 is the best available information to value carbonized material, DJAC and CAT devote several pages of their respective briefs to the flaws in the contemporaneous Malaysian HTS 4402.90.9000 imports.  DJAC Br. at 34-36; CAT Br. at 32.  But Commerce selected Malaysian HTS 4402.90.9000 from the previous period of review, and Commerce has the discretion to select non-contemporaneous data if it determines another statutory factor is entitled to more weight.  IDM at 40; *see also, e.g.*, *Qingdao Sea-Line Trading Co.*, 766 F.3d at 1386 (sustaining Commerce's decision to find specificity a more important factor than contemporaneity); *QVD Food Co. v. United States*, 721 F. Supp. 2d 1311, 1318 (Ct. Int'l Trade 2010) (sustaining Commerce's surrogate value selection when the agency chose more reliable data over more contemporaneous data), *aff'd* 658 F. 3d 1318 (Fed. Cir.

2011).  Commerce also relied on its regulatory preference under 19 C.F.R. § 351.408(c)(2) to value all factors of production in a single surrogate country, resorting to a secondary surrogate country only if data from the primary surrogate country are unavailable or unreliable.  IDM at 40.  On this record, Commerce had selected Malaysia as the primary surrogate country and found that the import data from the previous administrative review for coconut shell-based carbonized material is reliable and is most similar to the coal-based carbonized material used by the respondents in the production of the subject merchandise.  *Id.*  As a result, Commerce found that it had no reason to resort to a secondary surrogate country to value carbonized material.  *Id.*

**V.      Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Coal Tar**

DJAC and CAT challenge Commerce's selection of the surrogate value for coal tar. DJAC Br. at 37-48; CAT Br. at 33-37.  As demonstrated below, these arguments do no more than ask this Court to reweigh the evidence, engage in speculation, or disregard Commerce's practice for determining when surrogate values are aberrational.

**A.      Commerce Lawfully Selected Malaysian HTS 2706.00 To Value Coal Tar**

In the *Final Results*, Commerce lawfully determined that the Malaysian GTA import data under HTS 2706.00 (Mineral Tars, Including Reconstituted Tars) are the best available information on the record to value coal tar based on publicly available data and the agency's regulatory preference to value all factors of production in a single surrogate country.  IDM at 26. Reliance on Malaysian import data was also consistent with Commerce's regulatory preference to value all factors of production in a single surrogate country.  *Id*. at 28.

DJAC and CAT contend that the coal tar average unit value (AUV) from Malaysian HTS 2706.00 was anomalous and unreliable because it significantly exceeded the AUV of the value-added product, pitch, reported in Malaysian HTS 2708.10.  DJAC Br. at 39-40; CAT Br. at 33-

34.  As Commerce explained, even if it were true that the AUV of pitch should be higher, which DJAC and CAT have not established, the fact that coal tar pitch has a lower AUV does not necessarily mean that both values are tainted because there may be factors involved with pricing apart from the cost of manufacturing that impact a product's value and may cause a product with less "value-added" like coal tar to be more expensive than another product.  IDM at 26-27.  DJAC's and CAT's value-added argument is dependent on the factual premise that coal tar pitch under HS 2708.10 "should have" a higher AUV than coal tar under HTS 2706.00, but there is no record evidence to support the premise that coal tar pitch must be higher.  Likewise, DJAC's contention that distortion was "likely" caused by coal tar and pitch being conflated with one another, and consequently entered under incorrect HTS subheadings (DJAC Br. at 40) is based on speculation, not evidence.

DJAC and CAT contend that Commerce unlawfully selected Malaysian HTS 2706.00 import data to value coal tar and Malaysian HTS 2708.10 to value coal tar pitch because an overwhelming majority of imports under both HTS subheadings originated from Spain, a country with unreliable coal tar prices.  DJAC Br. at 40-42, 44-45; CAT Br. at 34-35.  As Commerce explained, the mandatory respondents' usage of Spanish data to reinforce their allegation of an unusual pricing trend between coal tar and pitch imports into Malaysia suffers from this same deficiency as their value-added argument.  IDM at 26-27.  Although the mandatory respondents compared the import and export values of HTS 2706.00 in Spain to demonstrate an AUV only one third the size of that in Malaysia, they failed to provide specific evidence to explain why the pattern of Spanish imports into Malaysia under HTS 2706.00 are priced higher than those under HTS 2708.10 is occurring and thereby renders Malaysian HTS 2706.00 unreliable.  *Id.*  Thus, DJAC and CAT again fail to provide specific evidence supporting their claims.

DJAC contends that "Commerce – not Respondents – was required to explain how Malaysian HTS 2706.00 or its Spanish component AUVs were reliable despite being plainly inconsistent and anomalous compared to the Malaysian HTS 2708.10 or its Spanish component AUVs." DJAC Br. at 42. DJAC misstates the governing law. It is the responsibility of interested parties — not Commerce — to build the factual record supporting its position. *See, e.g.*, *Calgon Carbon Corp. v. United States*, 443 F. Supp. 3d 1334, 1345 (Ct. Int'l Trade 2020) ("the burden of creating an adequate record lies with {interested parties} and not with Commerce") (citing *QVD Food Co.*, 658 F.3d at 1324); *see also, e.g.*, *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1338 (Fed. Cir. 2016) ("The burden of creating an adequate record lies with interested parties and not with Commerce . . . {stemming from the fact that} the International Trade Administration, the relevant agency within Commerce, has no subpoena power."); *Ancientree Cabinet Co. v. United States*, 532 F. Supp. 3d 1241, 1254 (Ct. Int'l Trade 2021) (explaining that when there is insufficient evidence to determine certain data aberrational or unreliable, Commerce has no basis for rejecting the data).

Also without merit is DJAC's assertion that Commerce unlawfully found that the AUV for Malaysian HTS 2706.00 was not aberrant. DJAC at 42. Commerce explained that it prefers to have historical data on the record with which to evaluate whether a value is aberrational. IDM at 27. Because Commerce did not have data from the same HTS category for the primary surrogate country over multiple years on the record, the agency was unable to evaluate the aberrancy of the Malaysian data in comparison to historical Malaysian coal tar values. *Id.*

### B.   Commerce Lawfully Rejected Malaysian Domestic Prices As A Benchmark

In the *Final Results*, Commerce rejected respondents' reliance on Malaysian domestic prices as a comparative benchmark after finding that the record lacked publicly-available

31

domestic prices to use as a comparison with import AUVs.  IDM at 27.  Commerce found

unacceptable the mandatory respondents' reliance on a private market report, the Global Coal

Tar and Coal Tar Pitch Market Analysis & Forecast 2017-2027, because that report did not

explain the methodology used to obtain the prices it reports and, thus, Commerce was unable to

confirm their validity.  *Id.*  Commerce also found that it was unable determine how

representative the private market report prices are of a broad market average or if those prices are

tax- and duty-exclusive.  *Id.*

DJAC contends that Commerce unlawfully refused to benchmark the Malaysian coal tar

and pitch AUVs with the domestic market price data of those products in Malaysia and other

market economy countries based on its findings that it did "not have publicly available domestic

prices on the record to use as a comparison with import AUVs{,}" and that it was unclear

whether the prices were "tax- and duty-exclusive."  DJAC Br. at 42-45.  DJAC is wrong.

Commerce's practice when selecting the best available information for valuing factors of

production is to select, to the extent practicable, surrogate values which are publicly available

and tax- and duty-exclusive, among other factors.  Policy Bulletin 04.1.  In light of Commerce's

discretion to prefer publicly-available and tax- and duty-exclusive information, DJAC fails to

explain why Commerce's determination was unlawful.

Also without merit is DJAC's contention that Commerce unlawfully "eliminated the

Market Report . . . claiming that Respondents did 'not explain the methodology used to obtain

the prices it reports, and as such Commerce cannot confirm their validity[,]'" when in fact the

Market Report did provide a methodology.  DJAC at 43-44 (citing Final SV Submission Ex. 2N

at 13 (P.R. 236)).  The information from the Market Report that DJAC cites does not pertain

specifically to the methodology used to obtain the prices being reported.  Rather, the cited pages

are very general and across various industries.  *See* Respondents' Final SV Submission Ex. 2N at

13.  None of this information specifies how the prices were reported and if they are tax-and-duty

exclusive.  *Id.*

### C.   Commerce Lawfully Rejected Malaysian Domestic Prices And Russian HTS 2706.00 To Value Coal Tar

DJAC and CAT also contend that Malaysian domestic prices or, alternatively, Russian

HTS 2706.00 constitute the best information available to value coal tar.  DJAC Br. at 46-47;

CAT Br. at 36-37.  Commerce lawfully concluded that DJAC's and CAT's reliance on

Malaysian domestic prices and Russian import data were flawed because the data they rely on

comes from the same private market report that DJAC and CAT used to establish Malaysian

domestic prices as a comparative benchmark.  IDM at 27.  Because that private market report

does not explain how it obtained the reported prices or if those prices are tax- and duty-

exclusive, Commerce was unable to confirm how representative the Malaysian domestic prices

and Russian prices are of a broad market average or if they are tax- and duty-exclusive.  *Id.*

Commerce also relied on its preference for continuing to select import data from the primary

surrogate country.  *Id.*  Again, in light of Commerce's discretion to prefer publicly-available and

tax- and duty-exclusive information and its regulatory preference for selecting data from the

primary surrogate country, DJAC fails to explain why Commerce's determination was unlawful.

## VI.   Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Hydrochloric Acid (HCl)

Commerce lawfully determined that Malaysian data under HTS 2806.10 (hydrogen

chloride (hydrochloric acid)) are the best available information on the record to value

respondents' HCl input because they are contemporaneous with the period of review, publicly

available, product-specific, tax-exclusive, and representative of a broad market average.  IDM at

45-46.  Moreover, reliance on the Malaysian data accords with Commerce's regulatory

preference to value all factors of production from a single surrogate country.  *Id*. at 45.

      CAT asserts that the Malaysian data is not sufficiently specific to respondents' HCl

inputs because the Malaysian data provides only a single HTS classification covering both forms

of HCl:  "(1) anhydrous or liquid form (without added water); and (2) aqueous solution (with

added water)."  CAT Br. at 37-38.  CAT contends that respondents' input, in contrast, is HCl in

only aqueous form.  *Id.*  Commerce found, however, that respondents had failed to substantiate

their assertion that their HCl inputs were, in fact, in an aqueous state.  IDM at 46 (citing CAT's

SDQR at Ex. SD-10.1).  As Commerce explained, "contrary to the mandatory respondents'

assertion," "the evidence on the record only demonstrates the purity level of HCl that {CAT}

purchased for a portion of the total quantity of HCl used in production."  *Id*.  Commerce

concluded that this information, standing alone, did not indicate whether the HCl that the

mandatory respondents consumed during the period of review was in an aqueous state.  *Id*.  In

the immediately prior review, this Court came to the same conclusion, holding that the "evidence

was insufficient to clearly define the HCl on the record as aqueous hydrochloric acid or to depart

from the Malaysian basket category in favor of the narrower Brazilian { } aqueous HCl data."

*Carbon Activated Tianjin Co.*, 586 F. Supp. 3d at 1373-74.

      CAT also contends that Commerce unlawfully rejected Brazilian 2806.10.20 because it

affords product-specific import data to value the specific grade of HC1 used by the respondent

— aqueous HCl — and is representative of a broad market average.  CAT Br. at 39-40.

Commerce provided several reasons for rejecting Brazilian 2806.10.20.  First, Commerce found

that there was no evidence on the record demonstrating that respondents used an aqueous

solution of HC1.  IDM at 45.  Commerce rejected the evidence provided by CAT — a

publication by PubChem, a public chemistry database, as well as a safety datasheet pertaining to HCl produced by Woodman Hill Ltd. — because "{t}he mandatory respondents did not connect this record evidence to support their claim that Malaysian HTS 2806.10 is not product-specific nor does the record demonstrate a difference in purity levels between the Malaysian and Brazilian import data." *Id.* at 46 (citing Respondents' Final SV Submission at Exs. 6D and 6E). Commerce also observed that the Brazilian import data are reported on a free on board (FOB) basis while the Malaysian HTS 2806.10 data on the record was reported on the cost, insurance, and freight (CIF) basis preferred by Commerce.  IDM at 45.

## VII.   Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Steam

Commerce determined that Malaysian data under HTS 2711.11 (liquefied natural gas) are the best available information on the record to value steam because this data was publicly available, and its selection was consistent with the agency's regulatory preference to value, when possible, all of the factors of production from a single surrogate country, in this case Malaysia. IDM at 48.

In further support of Commerce's reliance on HTS 2711.11, rather than HTS 2711.21 covering natural gas in a gaseous form, Commerce explained that it has, in the past, used import data under both HTS subheadings depending on the record in each review and Commerce's case-by-case analysis.  IDM at 48-49.  Although recognizing that the record contained import data under both HTS 2711.11 and HTS 2711.21 from the primary surrogate country that are publicly available, contemporaneous with the period of review, and tax- and duty-exclusive, Commerce found that the Malaysian import data under HTS 2711.11 are the more appropriate source to value the steam input because the data represent a significantly larger volume of imports (2,876,439,699 kg) from multiple countries (Singapore, Brunei, and Australia), covering nearly

35

the entirety of the period of review whereas the import data under HTS 2711.21 represent a

smaller volume of imports (872,136.95 kg) from only one country (Brunei) covering only two

months of the period of review.  *Id.* at 49-50 (citing Petitioners' SV Submission at Attach. 3B

and 7; Respondents' SV Submission at Ex. 7A).  Because Malaysian HTS 2711.11 represents a

broader market average and a larger import volume than Malaysian HTS 2711.21, Commerce

determined that Malaysian HTS 2711.11 is the best available information to value steam.  *Id.* at

50.

     Relying on a dictionary definition of "steam," CAT contends that Malaysian HTS

2711.11 is not specific to steam because it is data for liquified natural gas whereas respondents

"reported the use of steam, in a gaseous form defined as 'water in the form of an invisible gas of

vapor' to Commerce."  CAT Br. at 41 (citing Respondent' Br. at 68 (P.R. 295)).  However, the

dictionary definition of "steam" is an inadequate resource to definitively establish whether the

"steam" reported by respondents on this record is more appropriately classified as natural gas in

liquid form or in a gaseous state under the HTS.  "Steam" would appear to straddle the line

between liquid and gas, depending on its particular state at a given moment.  Dictionary.com

defines "steam" as "water in the form of an invisible gas or vapor" and "water changed to this

form by boiling{.}"  *See* "Steam," Dictionary.com, https://www.dictionary.com/browse/steam.

Webster's dictionary more completely defines "steam" to also include "the mist formed when the

gas or vapor from boiling water condenses in the air."  *See* "Steam," Webster's Dictionary

(1989).  Respondents may have reported "steam" on the record, but they do not appear to have

added to the record such other information as would have required Commerce to then value that

steam under the HTS subheading for natural gas in its gaseous state rather than its liquid state.

IDM at 48-49.  As with many of the other inputs, Commerce was within its discretion to choose

from imperfect datasets. *See, e.g.*, *Fine Furniture (Shanghai) Ltd. v. United States*, 353 F. Supp. 3d 1323, 1348 (Ct. Int'l Trade 2018) (emphasizing that when "there is nothing on the record regarding the specific composition {of an input}. . . any claims of greater specificity of the HTS subheadings that can be applied to them are immaterial"); *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information.").

CAT also contends that Malaysian HTS 2711.11 import data are unreliable because natural gas domestic prices in Malaysia are significantly lower than the \$US0.53/kg AUV from Malaysian HTS 2711.11 import data for liquified natural gas used as a basis to value respondents' steam. CAT Br. at 42. Commerce rejected CAT's reliance on this data because the agency was unable to establish the underlying methodology used by the respondents to derive or collect the domestic prices; the respondents merely placed a table with alternative prices on the record without providing the source of that data; and respondents failed to explain how those prices were determined. IDM at 49. In the immediately preceding administrative review, this Court upheld Commerce's concern with respondents' failure to provide the underlying methodology used to derive the domestic prices. *Carbon Activated Tianjin Co. Ltd. v. United States*, 586 F. Supp. 3d at 1377.

Commerce also found that, while the respondents identified six sources of data for domestic Malaysian natural gas prices, only two of the prices were partially within the period of review. IDM at 49 (citing Respondents' Final SV Submission at Ex. 4A). Of these data, one is the price for residential use (0.327 USD/kg) and the other is for commercial use (0.413 USD/kg). *Id.* These data only cover three months of the period of review, and do not represent a broad market average because the data are price quotes from one company with an unclear geographic

scope.  *Id.*  Because of these deficiencies, Commerce found that the domestic Malaysian natural gas data do not represent the best available information and do not demonstrate that the import data under HTS 2711.11 are unreliable.  *Id.*  Unlike the domestic prices relied on by the respondents, the GTA data Commerce used were clearly identified and the method for deriving those prices is available on the GTA website.  *Id.* at 49.

**VIII.   Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Ocean Freight**

As potential surrogate values for ocean freight, the parties placed on the record data from Maersk and Descartes.  After weighing its surrogate value factors, Commerce determined that the data acquired from Maersk represented the best available information to value freight expenses because that data represent freight tariffs covering the entire 12-month period of review and various routings.  IDM at 42.  And all 48 data points pertain to a 40-foot, dry container for the chemical products commodity category of which activated carbon is a part.  *Id.* Thus, Commerce determined that the Maersk data was the best available information on the record to value ocean freight because the data cover the entire period of review and are product-specific.  *Id.*

Unlike the Maersk data, Commerce found that the Descartes data are not product-specific in that they cover freight charge approximations for commodities unrelated to the subject merchandise, such as chairs, Christmas decorations, and cast ironware, and cover only a part of the period of review for each route presented.  *Id.* at 43 (citing Respondents' SV Submission at Ex. 13A).  Commerce also found that the Descartes data contain ocean freight charges that are estimates:

> "Estimates of freight charges," "furnished as a convenience to the shipping public and represent nothing more than an approximation of freight charges which is not binding either on the carrier or

> shipper.  Rates are subject to change and should be verified prior to shipment."

*Id.* (citing Respondents' SV Submission at Attach. 13-B (PR 127-28).  In contrast, Commerce found that the Maersk rates represent actual tariffs, not mere approximations.  *Id.* (citing Petitioners' SV Submission at Attach. 6C).  Thus, Commerce found that the Maersk data are preferable to the Descartes data for use in valuing the mandatory respondents' ocean freight expenses.  CAT challenges these findings, but fails to explain why they are not supported by substantial evidence.  *See* CAT Br. at 46 (citing Respondents First SV Submission at Ex. 13B (Mar. 4, 2021) (PR 127-28).

CAT contends that the Maersk data is unreliable because they are based on quotes rather than actual shipments, and the price quotes from Maersk are "generated through online research by inputting various unknown shipment parameters{,}" and do not represent actual tariffs.  CAT Br. at 45 (citing Case Br. at 72 (P.R. 295) (citing Petitioners' SV Submission at Attach. 6C (Mar. 4, 2021) (P.R. 177)).  But the Maersk data that CAT cites states that "tariff rates have been applied."  Petitioners' SV Submission at Attach. 6C.  Also without merit is CAT's contention that the Maersk data are unreliable because the prices remained static over the period of review.  CAT Br. at 45.  CAT's argument is based on nothing more than assumptions about the pattern of prices on the record.  Such arguments do nothing to undermine Commerce's determination that the Maersk data are reliable.

CAT's contentions do not demonstrate that Commerce's determination is unsupported by substantial evidence.  Rather, CAT asks this Court to "substitute its own judgment for the agency's in considering and weighing the relative importance of the various criteria applied."  *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010) (quoting *Polyethylene Retail Carrier Bag Comm. v. United States*, 29 C.I.T. 1418, 1445 (2005)).

IX.    **Substantial Evidence Supports Commerce's Selection Of The Surrogate Value For Bituminous Coal**

CCC challenges Commerce's reliance on Malaysian import data for merchandise classified under HTS subheading 2701.19 (Other Coal) to value DJAC's consumption of non-coking bituminous coal.  CCC Br. at 12-18.  CCC also challenges Commerce's reliance on the consumption of bituminous coal reported by DJAC because Commerce misunderstood DJAC's calculations and mischaracterized those calculations in the *Final Results*.  *Id.* at 18-30.  For the reasons discussed below, CCC's arguments lack merit.

A.    **Commerce Lawfully Selected HTS 2701.19 To Value Bituminous Coal**

In the *Final Results*, Commerce relied on data under Malaysian HTS 2701.19 (Other Coal), which covers non-coking bituminous coal, to value the non-coking bituminous coal inputs used by DJAC and its supplier.  IDM at 20-23.  Initially, Commerce had valued all respondents' bituminous coal inputs under Malaysian HTS 2701.12 (Bituminous coal) — a basket category covering both coking and non-coking bituminous coal.  IDM at 21.  However, in the *Final Results*, Commerce selected the more specific Malaysian HTS subheading 2701.19 (Other Coal) following further analysis of the record.  IDM at 20-23; Prelim. Surrogate Value Mem. at 4 (P.R. 276).  Commerce relied on its finding in AR 11 that bituminous coal with a calorific value less than 5,833 kcal/kg should be classified under HTS 2701.19.  That finding was based on the Harmonized System Nomenclature (HSN) explanatory notes to Chapter 27 of the HTS, Chapter 27, Subheading Note 2, which defines sub-heading 2701.12, "bituminous coal," as coal having a "calorific value limit . . . equal to or greater than 5,833 kcal/kg."  *Carbon Activated Tianjin Co., Ltd.*, 547 F. Supp. 3d at 1315 & n.6; IDM at 21-22.  The respondents' administrative brief included data derived from the respondents' sample test reports and other supportive documentation for the formula and data used to calculate the respondents' useful heat value

40

(UHV) for bituminous coal.  IDM at 21 (citing Respondents' Case Br. at 30 (C.R. 214-15)).

Because the evidence showed that the bituminous coal used by DJAC and its supplier have heat

values below 5,833 kcal/kg, Commerce found that HTS 2701.19 was more product-specific than

HTS 2701.12 because HTS 2701.19 applies to heat values below 5,833 kcal/kg.  *Id.* at 21-22.

CCC contends that Commerce erroneously found that the bituminous coal consumed by

DJAC and its supplier does not reach the heat value threshold to be classifiable under HTS

subheading 2701.12 due to the agency's reliance on a formula and calculation proposed by

DJAC.  CCC Br. at 12-16.  That formula, CCC contends, derives the UHV scale from a report

about the domestic coal industry in India and relies on domestic Indian standards, which is a unit

of measure that differs from the internationally-accepted gross calorific value (GCV) — the

standard used in the HTS.  CCC further contends that UHV and GVC are two separate scales,

resulting in different ratings for the same grade of non-coking coal.  CCC Br. at 13-14.  CCC is

wrong.

Although the two heat value scales rely on two different tests to calculate the heat value

for non-coking bituminous coal, Commerce found that "there is insufficient record evidence to

demonstrate that the heat values discussed in the HSN explanatory notes are derived using either

the UHV or GCV scale because the notes do not explicitly state one way or the other."  IDM at

21.  And Commerce further explained that, because no parties placed evidence on the record to

determine whether the HSN explanatory notes are derived using either the UHV or GCV scale, the

agency would continue to rely on the information on the record and previous precedent in this

proceeding, and accept the calculated heat value of DJAC and its supplier's bituminous coal input.

*Id.* at 22.  Further, in support of its selection of HTS 2701.19, Commerce relied on its remand

results in AR11 in which the agency determined that it would value bituminous coal with a heat value below 5,833 kcal/kg under HTS 2701.19.  *Id.* at 22, 23.

Indeed, CCC concedes that no such evidence is on the record, but erroneously faults Commerce for not placing that evidence on the record.  *See* CCC Br. at 11 n. 4 ("Petitioners urged {Commerce} to place information on the record to confirm that note 2 to Chapter 27 of the Harmonized Tariff Schedule reflected the GCV scale, not the UHV scale{,}" but that {Commerce} " declined to take any action in response to this request.") (citing Petitioners' Rebuttal Br. at 27 (CR 218; PR 303)).  As an alternative argument, CCC asks this Court to infer that, because UHV was not mentioned in other parts of the record, it is specific to the Indian industry.  CCC Br. at 14. But Commerce found that there is no evidence on the record to support this statement.  IDM at 22. Although CCC seeks to shift the burden to Commerce "to place information on the record to confirm that note 2 to Chapter 27 of the Harmonized Tariff Schedule reflected the GCV scale, not the UHV scale{,}" it is the responsibility of interested parties — not Commerce — to provide documentation on the record to support its contentions, and CCC has failed to do so here.

CCC contends that Commerce mistakenly interpreted the analysis in the AR 11 remand, and erroneously relied on its findings in AR11 rather than the information on the record for this review.  CCC Br. at 16-18.  In particular, CCC contends that Commerce "is mistaken that its interpretation of the HTS subheadings in the AR11 Remand 'focused specifically' on heat value." *Id.* at 17.  In the AR 11 remand, the Court sought further explanation from Commerce as to the applicability of Chapter 27, Subheading Note 2, to Commerce's selection of a surrogate value.  *See Carbon Activated Tianjin Co., Ltd.*, 547 F. Supp. 3d at 1314 (citing *Carbon Activated*, 503 F. Supp. 3d at 1290-91).  On remand, Commerce determined that Note 2 applied to Malaysian HTS data and chose different data sets to value bituminous coal depending on whether the calorific value of

42

the bituminous coal was known to be below 5,833 kcal/kg.  *Id.* at 1314-1315.  In that case, Commerce lacked record evidence as to whether the bituminous coal of two of the mandatory respondent's suppliers had a calorific value of less than 5,833 kcal/kg as required for valuation under HTS 2701.19.  *Id.* at 1315.  Because the heat value for the two suppliers was unknown, Commerce had no basis to apply HTS 2701.19 and, instead, Commerce turned to the plain meaning of the HTS descriptions to value bituminous coal, concluding that the "'plain language description' of HS 2701.12 — 'Bituminous Coal, Not Agglomerated' — most accurately described the bituminous coal in question."  *Id.* at 1317-18.  However, to the extent the heat value of the bituminous coal was known to be below 5,833 kcal/kg, Commerce used HTS 2701.19 to value the bituminous coal.  *Id.*  This Court concluded that Commerce's selection of Malaysian HTS 2701.19 data to value bituminous coal when the record demonstrated that the coal had a calorific value of less than 5,833 kcal/kg was supported by substantial evidence.  *Id.* at 1318.  In this case, there is sufficient evidence on the record for Commerce to determine the respondents' respective heat values to select the appropriate HTS subheading and, thus, there was no need for Commerce to analyze the plain meaning of the HTS subheadings.  IDM at 22.  Thus, Commerce correctly interpreted AR11, and relied on the record *of this review* to find that Malaysian HTS 2701.19 was the best information to value bituminous coal because DJAC and its suppliers used bituminous coal with a heat value less than 5,833 kcal/kg.  *Id.*

    **B.**    **Commerce Lawfully Accepted DJAC's Reported Consumption Of Bituminous Coal**

Commerce provided a reasoned explanation for why DJAC's reporting of theoretical bituminous coal consumption was accurate and in accordance with Commerce's decision in the prior administrative review of this proceeding.  IDM at 9 -11.

Under 19 U.S.C. § 1677b(c), Commerce is required to determine the normal value of the subject merchandise based on the value of the factors of production utilized in producing the merchandise, including, specifically, the "quantities of raw materials employed." The calculation of normal value in a non-market economy proceeding is thus based upon the aggregation of quantities of raw materials consumed in the production of one unit of the finished goods. IDM at 9. With respect bituminous coal, DJAC processes this raw material through three stages: the carbonization stage, the activation stage, and then the screenings stage. DJAC Initial Sec. D Questionnaire Response, at 4-5 (Sept. 17, 2020) (C.R. 36-41; P.R. 84). The screenings stage further grinds and/or screens the activated material to produce products of various specifications — that is, normal-ash carbonized material is further screened to low-ash carbonized material. *Id.* These products are then divided into normal-ash and low-ash finished products and reported based on standard and actual consumption rates. *Id.*

Following the submission of DJAC's initial questionnaire, Commerce determined that the sum of the bituminous coal consumption quantities calculated with standard consumption rates — that is, based on normal and low-ash finished products — did not equal the total actual consumption quantities of bituminous coal reported. *See* Commerce Letter (Apr. 20, 2021) (C.R. 66; P.R. 193). In response, DJAC explained that there was a difference between the quantity of bituminous coal actually consumed and the standard bituminous coal consumption because some of the bituminous coal consumed was contained in the normal-ash carbonized material sold, contained in the normal-ash carbonized material in the closing inventory, and contained in the low-ash carbonized material in the opening inventory. DJAC Sec. D Suppl. Questionnaire Response, at 11 (May 21, 2021) (C.R. 146-73; P.R. 243-256). To account for this difference, DJAC stated that the total quantity of bituminous coal that was consumed but not utilized in the production of

merchandise under consideration is reflected in the following formula: normal-ash carbonized material sold + normal-ash carbonized material in closing inventory + the amount of screenings 2 – the low-ash carbonized material in opening inventory. *Id*. at 11-12. The low-ash carbonized material in the opening inventory was subtracted — *not* added — to account for the difference between the standard bituminous coal consumption quantity and the actual consumption quantity. IDM at 11 (citing DJAC SDQR at Ex. SD-1B Revised D-12.6, and Ex. SD-18).

CCC contends that Commerce erroneously accepted DJAC's reporting of consumption of bituminous coal in its August 11, 2021 submission even though that submission did not comply with Commerce's instructions in the July 19, 2021 supplemental questionnaire with respect to the treatment of inventories. CCC Br. at 26-30. In particular, CCC contends that DJAC's final cost calculations did not subtract the opening balance of low-ash carbonized material in the manner directed by Commerce, but rather subtracted a net negative bituminous coal equivalent change in inventory, thereby resulting in the addition of that quantity to its reported consumption. *Id.* Thus, CCC contends that DJAC incorrectly added the low-ash carbonized material from the opening inventory, in contrast to the methodology applied in the prior administrative review. *Id.* CCC misunderstands DJAC's calculations.

In AR12, Commerce confirmed that "including the amount of bituminous coal consumed in the production of carbonized material consumed from opening inventory in the calculation of the per-unit bituminous coal consumption in the current {period of review} would { } result in double-counting the bituminous coal consumed in the previous {period of review}." IDM at 11. In the *Final Results* for the current administrative review, Commerce explained:

> {T}he opening balance of low-ash carbonized material was
> rightfully subtracted from the bituminous coal equivalent of closing
> inventory balance of self produced normal-ash carbonized material
> and bituminous coal equivalent of self-produced normal-ash

> carbonized material sold, when accounting for the difference
> between standard and actual bituminous coal consumption, as the
> amount of bituminous coal contained in the opening inventory low-
> ash carbonized material was consumed and accounted for in the
> previous {period of review}.

IDM at 10-11.  Commerce concluded that, consistent with the prior review, DJAC excluded the

amount of bituminous coal consumed from the opening inventory when it accounted for the

difference between the standard consumption quantities and the actual consumption quantities.

*Id*.

Based on the record, it is unclear why CCC now asserts that DJAC "subtracted a net

negative bituminous coal equivalent change in inventory, thereby resulting in the addition of that

quantity to its reported consumption," or what evidence it relies on to support this assertion.

CCC Br. at 28-30.  It is also unclear why CCC believes that the actual total quantity of

bituminous coal that was consumed but not utilized in the production of subject merchandise

should be treated as a negative number.  *Id.* at 27.  DJAC provided an explanation as to why the

calculated consumption quantities (that is, calculated consumption quantities based on standard

consumption rates for subject merchandise) differed from the total amount of bituminous coal

actually consumed (that is, including the amount of bituminous consumed but not utilized in the

production of subject merchandise).  IDM at 10-11.  The quantity excluded from the actual

consumption total was not treated as a reduction, as CCC appears to argue, but as a reasonable

explanation to account for the activated carbon process which involves various production stages

and resulting intermediary products.  *Id*.  Accordingly, Commerce's decision to rely on Datong

Juqiang's explanation was reasonable and supported by substantial evidence.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court deny plaintiffs' and consolidated plaintiffs' motions for judgment upon the agency record, sustain Commerce's final determination in all respects, and enter judgment for the United States.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General


PATRICIA M. McCARTHY
Director


/s/ Claudia Burke
CLAUDIA BURKE
Assistant Director

OF COUNSEL:

ASHLANDE GELIN
Attorney
Office of the Chief Counsel
  for Trade Enforcement & Compliance
Department of Commerce


December 6, 2022

/s/ Antonia R. Soares
ANTONIA R. SOARES
Senior Trial Counsel
Department of Justice
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
(202) 305-7405 (Telephone)
Antonia.Soares@usdoj.gov

Attorneys for Defendant

**<u>CERTIFICATE OF COMPLIANCE</u>**

I hereby certify that this brief complies with the word limitation of Court of International Trade Standard Chambers Procedures § 2(B)(1) and contains 13,754 words, excluding the parts of the brief exempted from the word limitation.  In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

<u>/s/ Antonia R. Soares</u>
ANTONIA R. SOARES

### CERTIFICATE OF SERVICE

I certify under penalty of perjury that on this 6th day of December 2022, a copy of the foregoing "DEFENDANT'S RESPONSE TO RULE 56.2 MOTIONS FOR JUDGMENT UPON THE AGENGY RECORD" was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ Antonia R. Soares
ANTONIA R. SOARES