## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD. and CARBON ACTIVATED CORPORATION, | ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| DATONG JUQIANG ACTIVATED CARBON CO., LTD., ET AL., | ) ) ) |
| Consolidated-Plaintiffs, | ) ) |
| v. | )   **Consol. Court No. 22-00017** |
| UNITED STATES, | ) ) |
| Defendant, | ) ) |
| and | ) ) |
| CALGON CARBON CORPORATION and CABOT NORIT AMERICAS, INC., | ) ) ) |
| Defendant-Intervenors. | ) ) |

## DEFENDANT-INTERVENORS' RESPONSE BRIEF

JOHN M. HERRMANN
R. ALAN LUBERDA
MELISSA M. BREWER
JULIA A. KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, DC  20007
(202) 342-8400

Counsel to Calgon Carbon Corporation and
Norit Americas, Inc.

January 20, 2022

Table of Contents

Page

STATEMENT PURSUANT TO USCIT RULE 56.2 .........................................................1

ISSUES PRESENTED AND SUMMARY OF ARGUMENT ........................................2

STATEMENT OF FACTS .............................................................................................5

ARGUMENT .................................................................................................................6

I.      STANDARD OF REVIEW .................................................................................6

II.     THE DEPARTMENT'S SELECTION OF SURROGATE FINANCIAL
        STATEMENTS IS SUPPORTED BY SUBSTANTIAL EVIDENCE ............................6

        A.      Background .........................................................................................6

        B.      The Department's Selection of the Financial Statements of
                Malaysian Activated Carbon Producers Century Works and Bravo
                Green to Calculate Surrogate Financial Ratios Is Supported by
                Substantial Evidence and in Accordance with Law................................9

                1.      The Department Identified Malaysia as a Significant
                        Producer of Comparable Merchandise Because Only
                        Malaysia Was a Net Exporter of Comparable Merchandise.....................10

                2.      The Department's Selection of Malaysian Producers'
                        Financial Statements to Calculate Surrogate Financial
                        Ratios Was in Accordance With Law and Supported By
                        Substantial Evidence ................................................................14

III.    THE DEPARTMENT'S RELIANCE ON MALAYSIAN IMPORT
        STATISTICS FOR MERCHANDISE CLASSIFIED UNDER HTS
        SUBHEADING 4402.90.1000 TO VALUE CARBONIZED MATERIAL
        IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN
        ACCORDANCE WITH LAW ........................................................................17

        A.      Background .......................................................................................17

        B.      Substantial Evidence Supports the Department's Determination
                that Respondents' Carbonized Material FOP Shared Characteristics
                With Coconut Shell-Based Carbonized Material and Its Reliance
                on Malaysian Import Statistics for HTS Subheading 4402.90.1000
                as a Surrogate Value ...........................................................................19

Table of Contents
(continued)

Page

IV.    THE DEPARTMENT'S RELIANCE ON MALAYSIAN IMPORT DATA FOR MERCHANDISE CLASSIFIED UNDER HTS SUBHEADING 2706.00 TO VALUE COAL TAR IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW.......................................................24

    A.     Background............................................................................................24

    B.     Consolidated Plaintiffs and Carbon Activated Fail to Demonstrate That the Department Erred in Valuing Coal Tar Using Malaysian Import Data for Merchandise Classified Under HTS Subheading 2706.00....................................................................................................25

V.     THE SURROGATE VALUES RELIED ON BY THE DEPARTMENT FOR HYDROCHLORIC ACID, STEAM, AND OCEAN FREIGHT ARE SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW .......................................................................................27

VI.    CONCLUSION......................................................................................................28

**<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

**Cases**

<u>Dorbest Ltd. v. United States</u>,
  462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006) .........................................................................10

<u>Hebei Foreign Trade and Advertising Corp.</u>,
  807 F. Supp. 2d 1317 (Ct. Int'l Trade 2011) ........................................................................20

<u>Hebei Metals & Minerals Imp. & Exp. Corp. v. United States</u>,
  29 CIT 288 (2005) ..................................................................................................................23

<u>Qingdao Sea-Line Trading Co. v. United States</u>,
  766 F.3d 1378 (Fed. Cir. 2014)..............................................................................................16

**Statutes and Regulations**

19 U.S.C. § 1677b(c)(1).......................................................................................................10, 11

19 U.S.C. § 1677b(c)(4).........................................................................................................7, 11

19 U.S.C. § 1677b(e) .................................................................................................................15

19 C.F.R. § 351.408 ...................................................................................................................10

**Administrative Determinations**

<u>Activated Carbon from China</u>, Inv. No. 731-TA-1103, USITC Pub. 4797
  (Review) (June 2018)..........................................................................................................21, 22

<u>Certain Activated Carbon From the People's Republic of China: Preliminary
  Results of Antidumping Duty Administrative Review and Preliminary
  Determination of No Shipments; 2019-2020</u>, 86 Fed. Reg. 33,988 (Dep't
  Commerce June 28, 2021) ("Preliminary Results") and accompanying
  <u>Decision Memorandum for the Preliminary Results of Antidumping
  Administrative Review: Certain Activated Carbon from the People's Republic
  of China; 2019-2020</u> (June 21, 2021) ("PDM") ................................................................ *passim*

<u>Certain Activated Carbon from the People's Republic of China: Final Results of
  Antidumping Duty Administrative Review; and Final Determination of No
  Shipments; 2019-2020</u>, 86 Fed. Reg. 73,731 (Dep't Commerce Dec. 28, 2021)
  ("<u>Final Results</u>") and accompanying <u>Issues and Decision Memorandum for
  the Final Results of the Thirteenth Antidumping Duty Administrative Review</u>
  (Dec. 17, 2021) ("<u>IDM</u>") ................................................................................................ *passim*

Certain Activated Carbon from the People's Republic of China: Issues and
    Decision Memorandum for the Final Results of the Eleventh Antidumping
    Duty Administrative Review (Dec. 11, 2019), referenced in 84 Fed. Reg.
    68,881 (Dep't Commerce Dec. 17, 2019)........................................................................ 16-17

Final Results of Redetermination Pursuant to Court Remand: Calgon Carbon
    Corporation, et al. v. United States, Consol. Ct. No. 09-00542 (Dep't
    Commerce July 25, 2011) ..................................................................................... 20-21

Import Administration Bulletin 04.1, Non-Market Economy Surrogate Country
    Selection Process (Dep't of Commerce March 1, 2004), available at
    https://enforcement.trade.gov/policy/bull04-1.html ............................................7, 8

Initiation of Antidumping and Countervailing Duty Administrative Reviews,
    85 Fed. Reg. 35,068 (Dep't Commerce June 8, 2020) ...........................................5

Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China:
    Issues and Decision Memorandum for the Final Determination of Sales at
    Less Than Fair Value (Dep't Commerce Apr. 28, 2014), referenced in 79 Fed.
    Reg. 25,572 (May 5, 2014) .....................................................................................26

**<u>STATEMENT PURSUANT TO USCIT RULE 56.2</u>**

Defendant-Intervenors Calgon Carbon Corporation and Norit Americas Inc. (hereinafter, "Defendant-Intervenors") respond to the motions for judgment on the agency record filed by consolidated plaintiffs Datong Juqiang Activated Carbon Co., Ltd.; Datong Juqiang Activated Carbon USA, LLC; Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd.; and Datong Municipal Yunguang Activated Carbon Co., Ltd. (collectively, "Consolidated Plaintiffs") and plaintiffs Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation (collectively, "Carbon Activated").  <u>See</u> Consolidated Plaintiffs' Motion for Judgment on the Agency Record Pursuant to Rule 56.2 (Sept. 7, 2022) (ECF No. 31); Memorandum of Law in Support of Consolidated Plaintiffs' Motion for Judgment on the Agency Record Pursuant to USCIT Rule 56.2 (Sept. 7, 2022) (ECF No. 31-1) (hereinafter, "Consol. Pls.' Br."); Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation's Rule 56.2 Motion for Judgment on the Agency Record (Sept. 7, 2022) (ECF No. 34); Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation's Memorandum of Law in Support of Plaintiffs' Rule 56.2 Motion For Judgment on the Agency Record (Sept. 7, 2022) (ECF No. 34-1) (hereinafter, "Carbon Activated's Br."). Plaintiffs challenge certain aspects of the final results of the United States Department of Commerce's ("Commerce" or "the Department") thirteenth annual administrative review of the antidumping duty order on Certain Activated Carbon from the People's Republic of China (Commerce Case No. A-570-904) covering the period of review ("POR") April 1, 2019 through March 31, 2020.  The final results of the Department's review were published as <u>Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; and Final Determination of No Shipments; 2019-2020</u>, 86 Fed. Reg. 73,731 (Dep't Commerce Dec. 28, 2021) (hereinafter, "<u>Final Results</u>") (PR 314) and the

accompanying <u>Issues and Decision Memorandum for the Final Results of the Thirteenth Antidumping Duty Administrative Review</u> (Dec. 17, 2021) (hereinafter, "<u>IDM</u>") (PR 308).[1]  For the reasons below, the Court should deny the motions for judgment on the agency record filed by Consolidated Plaintiffs and Carbon Activated and affirm the <u>Final Results</u> in their entirety.[2]

<h2 style="text-align:center"><u>ISSUES PRESENTED AND SUMMARY OF ARGUMENT</u></h2>

Consolidated Plaintiffs and Carbon Activated collectively challenge six aspects of the <u>Final Results</u>.  For the reasons below, and in addition to the arguments made by the United States, each claim fails.

**1.    Whether the Department's selection of the financial statements of Malaysian activated carbon producers Century Works and Bravo Green to calculate surrogate financial ratios is supported by substantial evidence and in accordance with law?**

Yes.  Contrary to Consolidated Plaintiffs' and Carbon Activated's assertions, substantial evidence supports the Department's determination that only Malaysia was a "significant producer of comparable merchandise" and, thus, the only suitable surrogate country from which to select surrogate financial statements.  The Department rightly declined to rely on the financial statements of Romanian producer Romcarbon, whose principal activities were the production and sale of polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters and protective materials – not the production of activated carbon – and, therefore, had little bearing on whether Romania could be considered a "significant producer."  Because only Malaysia was a

---

[1]    Documents in the administrative record are cited by their confidential and/or public record number (<u>i.e.</u>, "(CR ___)" and "(PR___)") provided in the Index to the Administrative Record filed with the Court on April 5, 2022 (ECF Nos. 16-4, 16-5).

[2]    Pursuant to this Court's Scheduling Order dated May 5, 2022 (ECF No. 25), Defendant-Intervenors do not repeat arguments made by the United States in its previously submitted response brief.  <u>See</u> Defendant's Response to Rule 56.2 Motions for Judgment on the Agency Record, Dec. 6, 2022 (ECF No. 36) (hereinafter, "Def.'s Br.").

net exporter of identical merchandise – a fact that neither Consolidated Plaintiffs nor Carbon Activated contest – the Department, in accordance with its practice and the legislative history of the term "significant producer of comparable merchandise," reasonably selected Malaysia as a surrogate country. Consolidated Plaintiffs and Carbon Activated also misapprehend the law governing the Department's surrogate country selection in asserting that data superiority should take precedence over the Department's "significant producer" analysis. The statute requires the Department to use the "best available information" from a country it has determined to serve as a surrogate, and not the other way around. Finally, an examination of the financial statements of Malaysian producers Century Works and Bravo Green demonstrates Consolidated Plaintiffs and Activated Carbon are wrong in arguing that the statements are insufficiently disaggregated and unreliable.

2.  **Whether the Department's reliance on Malaysian import statistics for merchandise classified under HTS subheading 4402.90.1000 to value carbonized material is supported by substantial evidence and in accordance with law?**

Yes. Based on the record evidence, the Department correctly found that respondents' coal-based carbonized material input had dissimilar physical properties to wood-based carbonized materials and, instead, that the record evidence demonstrated key similarities between coal-based and coconut shell-based carbonized materials. Consolidated Plaintiffs and Carbon Activated selectively refer to U.S. International Trade Commission reports, claiming that the reports establish dissimilarity between coal-based and coconut shell-based carbonized material. Those reports, however, do not discuss any similarities between coal-based and wood-based carbonized materials. Consolidated Plaintiffs' and Carbon Activated's attempt to impeach Malaysian import data for merchandise classified under HTS subheading 4402.90.1000, the

provision for coconut shell charcoal, which they allege reflect low import volumes and high average unit values compared to those of other domestic carbonized materials, is also misplaced. Neither the import values nor pricing data identified by the Plaintiffs indicate aberrancy in conformity with the Department's practice. Based on the record evidence, the Department did not err in valuing respondents' coal-based carbonized material input with Malaysian import statistics for merchandise classified under HTS subheading 4402.90.1000, the provision for coconut shell charcoal.

     **3.**      **Whether the Department's reliance on Malaysian import data for merchandise classified under HTS subheading 2706.00 to value respondents' coal tar input is supported by substantial evidence and in accordance with law?**

Yes. The Department correctly selected Malaysian import data for merchandise classified under HTS subheading 2706.00, the provision for "Mineral Tars, Including Reconstituted Tars," to value respondent's coal tar input because it was the best information on the record. Consolidated Plaintiffs and Carbon Activated allege that the Department failed to consider detracting evidence that, because coal tar pitch classified under HTS 2708.10 should have a higher value than Malaysian imports of coal tar classifiable under HTS 2706.00, the Malaysian import data on merchandise classified under the HTS subheading for coal tar are unreliable. The Department, however, rightly rejected that claim as wholly speculative. Further, the Department appropriately rejected respondents' assertion that Malaysian domestic market pricing information, which was derived from a private market research report, was the best available information to value coal tar. Because the market research report identified by the Plaintiffs did not disclose its methodology in detail, the Department could not confirm the validity of its contents.

**4.-6.    Whether the Department's selection of surrogate values for hydrochloric acid, steam, and ocean freight are supported by substantial evidence and in accordance with law?**

Yes.  For the reasons explained in the United States' response brief, the Department's selections of surrogate values for hydrochloric acid, steam, and ocean freight are supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

On June 8, 2020, the Department initiated the thirteenth administrative review of the antidumping order on activated carbon from China, the segment underlying this action.  See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 85 Fed. Reg. 35,068 (Dep't Commerce June 8, 2020) (PR 61).  The Department subsequently selected two respondents for mandatory review – Carbon Activated Tianjin Co., Ltd. (hereinafter, "Carbon Activated Tianjin") and Datong Juqiang Activated Carbon Co., Ltd. (hereinafter, "DJAC") (collectively, "respondents").  See Department's July 8, 2020 Memorandum Thirteenth Antidumping Duty Administrative Review of Certain Activated Carbon from the People's Republic of China: Selection of Respondents for Individual Review, at 5 (CR 9; PR 43).

On June 28, 2021, the Department issued its preliminary results and calculated margins of $1.13/kg. for Carbon Activated Tianjin and $0.45/kg. for DJAC, and assigned the rate of $0.58/kg. to the separate rate companies.  See Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2019-2020, 86 Fed. Reg. 33,988, 33,989 (Dep't Commerce June 28, 2021) (hereinafter, "Preliminary Results") (PR 278), and accompanying Decision Memorandum for the Preliminary Results of Antidumping Administrative Review:

<u>Certain Activated Carbon from the People's Republic of China; 2019-2020</u> (June 21, 2021) (hereinafter, "<u>PDM</u>") (PR 270).

On December 28, 2021, the Department published the <u>Final Results</u> and calculated margins of $1.13/kg. for Carbon Activated Tianjin and $0.31/kg. for DJAC, and assigned the rate of $0.47/kg. to the separate rate companies.  <u>See</u> <u>Final Results</u>, 86 Fed. Reg. at 73,732 (PR 314).

Statements of the relevant facts pertaining to the issues challenged by Consolidated Plaintiffs and Carbon Activated are provided below in each respective section of this brief.

## ARGUMENT

### I.     STANDARD OF REVIEW

Defendant-Intervenors agree with the standard of review set out in the United States' response brief.  <u>See</u> Def.'s Br. at 9-10.

### II.    THE DEPARTMENT'S SELECTION OF SURROGATE FINANCIAL STATEMENTS IS SUPPORTED BY SUBSTANTIAL EVIDENCE

#### A.     Background

On January 19, 2021, the Department sent a letter to interested parties inviting comments on the selection of a surrogate market economy ("ME") country for China and the identification of corresponding surrogate value data.  <u>See</u> Letter From USDOC to Interested Parties Pertaining to Interested Parties Surrogate Value Comments Request (Jan. 19, 2021) (PR 93).   The Department's list of potential surrogate ME countries included Romania, Russia, Malaysia, Turkey, Mexico, and Brazil.  <u>See</u> <u>id.</u> (PR 93).   In their response, Petitioners urged the Department to select Malaysia or Mexico as the surrogate ME country, given the availability of high-quality surrogate value information from those countries.  <u>See</u> Petitioners' Comments on Surrogate Country Selection (Feb. 11, 2021) (PR 106).   Respondents did not recommend a

particular surrogate country in their response, but rather indicated they would do so when submitting surrogate value information.  See DJAC and Carbon Activated Surrogate Country Comments (Feb. 11, 2021) (PR 104).

In response to the Department's request to submit surrogate information to value the respondents' factors of production, respondents submitted import and export statistics from all six potential surrogate countries to value certain factors of production ("FOP") for activated carbon.  See Respondents' SV Submission (Mar. 4, 2021) (PR 114).  For surrogate financial ratios, however, respondents placed on the record only the 2019 financial statements of Romanian entity Romcarbon and of Russian entity JSC Sorbent.  See id. at Exh. 14 (PR 104); Respondents' Final SV Comments (May 19, 2021) at Exh. 5-A (PR 230-42).  Petitioners placed on the record the financial statements of Malaysian activated carbon producers Century Chemical Works Sdn. Bhd. ("Century Works") and Bravo Green Sdn. Bhd. ("Bravo Green"). Petitioners' SV Submission, at Attach. 5 (Mar. 4, 2021) (PR 177).

In the Preliminary Results, the Department selected Malaysia as the primary surrogate ME country and relied on the financial statements of Century Works and Bravo Green to calculate surrogate financial ratios.  See PDM at (PR 270).  The Department determined that all six potential surrogate countries were at a level of "economic development comparable to {the NME} country" China – the first requirement under 19 U.S.C. § 1677b(c)(4) to select a surrogate country.  See PDM at 14-16 (PR 270); 19 § 1677b(c)(4); see also Import Administration Bulletin 04.1, Non-Market Economy Surrogate Country Selection Process (Dep't of Commerce March 1, 2004), available at https://enforcement.trade.gov/policy/bull04-1.html (hereinafter, "Policy Bulletin 04.1").  The Department, however, found that only Malaysia was a "significant producer of comparable merchandise" – the second statutory requirement.  Id.  The Department explained

that the legislative history of the term "significant producer of comparable merchandise" includes any country that is a "net exporter," but does not preclude the Department from relying additional metrics.  PDM at 16 (PR 270).  Although the  Department examined the financial statements of Romcarbon – the only other potential source of surrogate country production evidence for Romania – it found that Romcarbon's financial statements did not reflect the production experience of the respondents, unlike the financial statements of the Malaysian activated carbon producers.  See IDM at 33 (PR 308).  Because other evidence on the record established Malaysia as the sole net exporter of comparable merchandise, which respondents themselves acknowledged, the Department selected Malaysia as the primary surrogate country. See PDM at 11, 17 (PR 270).  Further, the Department considered the financial statements of the Malaysian producers Century Works and Bravo Green to be reliable and determined them to be the best available information on the record for calculating surrogate financial ratios.  See id. at 17 (PR 270).

During administrative briefing, respondents argued that that the Department erred in calculating surrogate financial ratios with the Malaysian producers' financial statements because the Department improperly concluded that the five other potential surrogate countries were not significant producers of comparable merchandise.  See DJAC & Carbon Activated Case Brief at 4-22 (Sept. 27, 2021) (CR 214-15; PR 295) (hereinafter, "Respondents' Case Br.").  Respondents also critiqued the Malaysian producers' financial statements as insufficiently disaggregated compared to the financial statements of Romcarbon.  See id.  Respondents therefore urged the Department to select the financial statements of Romanian producer Romcarbon or, in the alternative, of Russian producer JSC Sorbent to calculate surrogate financial ratios in the final results.  See id. at 22-27 (CR 214-15; PR 295).  In their rebuttal brief, Petitioners explained that

the record did not contain evidence supporting the selection of Romania or Russia as a secondary surrogate country and, further, that the Malaysian financial statements were reliable.  <u>See</u> Petitioners' Rebuttal Br. at 6-24 (Oct. 6, 2021) (CR 218, PR 303).

In the <u>Final Results</u>, the Department continued to rely on the financial statements of the two Malaysian producers to calculate surrogate financial ratios and meaningfully addressed respondents' concerns, as recounted further below.  <u>See</u> <u>IDM</u> at 31-35 (PR 308).

<div style="margin-left:2em">

**B.** **<u>The Department's Selection of the Financial Statements of Malaysian Activated Carbon Producers Century Works and Bravo Green to Calculate Surrogate Financial Ratios Is Supported by Substantial Evidence and in Accordance with Law</u>**

</div>

Consolidated Plaintiffs and Carbon Activated challenge the Department's reliance on the financial statements of Malaysian producers Century Works and Bravo Green to calculate surrogate financial ratios.  <u>See</u> Consol. Pls.' Br. at 5-24; Carbon Activated's Br. at 8-26. According to Consolidated Plaintiffs and Carbon Activated, the Department should have selected the financial statements of Romanian producer Romcarbon, or, alternatively, the Russian financial statement of JSC Sorbent.  <u>Id.</u>  They contend that the Department wrongly determined that Romania was not a significant producer of comparable merchandise and, thus, failed to consider Romania as a surrogate country.  <u>See</u> Consol. Pls.' Br. at 9-16; Carbon Activated's Br. at 16-21.  Consolidated Plaintiffs and Carbon Activated also allege that the Department erred in finding the Malaysian producers' financial statements reliable, when they were not as disaggregated as Romcarbon's financial statements.  <u>See</u> Consol. Pls.' Br. at 16-24; Carbon Activated's Br. at 21-26.  Consolidated Plaintiffs' and Carbon Activated's claims of error are meritless.

     **1.**        **The Department Identified Malaysia as a Significant Producer of Comparable Merchandise Because Only Malaysia Was a Net Exporter of Comparable Merchandise**

As an initial matter, Consolidated Plaintiffs and Carbon Activated misunderstand the law governing the Department's selection of a surrogate market economy country (or countries) to value a respondent's factors of production in cases involving goods from a non-market economy ("NME") country. By statute, in such cases, the Department must determine normal value based on factors of production used to produce subject merchandise in a surrogate ME country or countries. See 19 U.S.C. § 1677b(c)(1). Although the statute specifies that a surrogate country is an ME country at a "comparable level of economic development" to the NME country and is a "significant producer of comparable merchandise," it does not define those terms. See id. at § 1677b(c)(4); see also Dorbest Ltd. v. United States, 462 F. Supp. 2d 1262, 1274 n.5 (Ct. Int'l Trade 2006) (noting that the term "significant producer" is not statutorily defined and is "inherently ambiguous"). The Department has issued regulations and Policy Bulletin 04.1, reflecting the Department's view of the terms and describing its process for identifying a surrogate country. See 19 C.F.R. § 351.408; Policy Bulletin 04.1. As relevant to this action, Policy Bulletin 04.1 clarifies that the legislative history for the term "significant producer" "includes any country that is a 'significant net exporter'." Policy Bulletin 04.1 (citing S. Rep. No., 100-576, at 590 (1988) (Conf. Rep.)). Policy Bulletin 04.1 offers no other concrete guidance, emphasizing that the "significant producer" standard will vary from case to case, depending on the particular data and supporting information. See id. Importantly, only after the Department identifies countries that are "significant producers" of comparable merchandise will it evaluate which country has the best available data for valuing the factors of production. See id.

Consolidated Plaintiffs and Carbon Activated make several claims that do not accord with either the statute or the Department's practice.  First, they allege that data superiority should take precedence over the Department's "significant producer" analysis.  <u>See</u> Consol. Pls.' Br. at 11 (stating that "because Romcarbon's are the best quality data on this record, Romania should not have been subjected to an equally stringent application of significant production criteria in the selection of a surrogate country"); Carbon Activated's Br. at 12 (stating that "a surrogate country having superior quality surrogate value data would not be required to meet the same level of significant production as a country lacking in such data").  Consolidated Plaintiffs' and Carbon Activated's argument ignores the established, sequential nature of the Department's surrogate country analysis. <u>See</u> Policy Bulletin 04.1 (stating that the Department adopted a "sequential" assessment).  Indeed, the Department must use the "best available information" from a country it has determined to serve as a surrogate, and not the other way around.  <u>See</u> 19 U.S.C. § 1677b(c)(1).

Second, Consolidated Plaintiffs and Carbon Activated contend that the Department made the "qualified" significant producer analysis into a "mandatory" one, contrary to the statute.  <u>See</u> Consol. Pls.' Br. at 14-15 (citing 19 U.S.C. § 1677b(c)(4)); Carbon Activated's Br. at 13 ("Commerce is required to apply a sliding scale and apply an attenuated product requirement when examining potential surrogate countries.").  The statute, however, explicitly requires a surrogate country to be a "significant producer{} of comparable merchandise."  19 U.S.C. § 1677b(c)(4).  Consolidated Plaintiffs' and Carbon Activated's claimed error in law amounts to dissatisfaction with the Department's conclusion that the record evidence did not support a finding that Romania is a "significant producer" of comparable merchandise.

In addition to Consolidated Plaintiffs' and Carbon Activated's misapprehension of the law, they baselessly assert that the record contains "direct evidence" of Romania's production of allegedly "identical" merchandise.  <u>See</u> Consol. Pls.' Br. at 12-13; Carbon Activated's Br. at 17. Consolidated Plaintiffs and Carbon Activated extrapolate from Romcarbon's financial statement the total value of the Romanian domestic market's activated carbon production.  <u>See id.</u>  The cited 2019 revenue figure of 2,111,661 Lei (USD 506,799) from Romcarbon's workshop 2, however, is not generated solely from the sale of activated carbon.  Rather, it also includes sales of respiratory protective equipment – a higher value product that is not merchandise that is "comparable" to activated carbon.  <u>See</u> Respondents' SV Submission at Exh. 14B (PR 114); <u>see also</u> <u>IDM</u> at 33 (PR 308) (observing that the principal activities of workshop 2 do not include the manufacture of activated carbon).

Consolidated Plaintiffs' and Carbon Activated's related claim that the activities of Romcarbon's workshop CP1 also demonstrate the significant value of the Romanian domestic market's activated carbon production is likewise misplaced.  <u>See</u> Consol. Pls.' Br. at 12; Carbon Activated's Br. at 17.  As Consolidated Plaintiffs and Carbon Activated concede, CP1 "produc{es} auto and industrial filters," not activated carbon.  <u>Id.</u>  Importantly, there is no information on the record establishing that the auto and industrial filters manufactured by Romcarbon contain *any* activated carbon, nor is there any information on the record that could establish why Plaintiffs believe auto and industrial filters are "comparable" to activated carbon. <u>Cf.</u> Petitioners' Rebuttal Br. at 8-9 (CR 218, PR 303).  Consolidated Plaintiffs' and Carbon Activated's estimate of the total value of the Romanian market for activated carbon, therefore, is based on speculation, not evidence.

Given that the Department could not establish "significant production" in Romania of merchandise comparable to activated carbon from the financial statements of Romcarbon, see IDM at 33; PDM at 16, the Department considered the only reliable record evidence, export and import data for the six potential surrogate countries.  The Department did not depart from Policy Bulletin 04.1, as Consolidated Plaintiffs and Carbon Activated allege, in "comparing" production data from Malaysia and Romania.  See Consol. Pls.' Br. at 12-13; Carbon Activated's Br. at 18. Rather, with only export and import data from the six potential surrogate countries to consider, the Department tallied that data to find that *only* Malaysia had net exports in terms of both quantity and value during the period of review.  See IDM at 32 n.217 (PR 308).  Because Romania lacked net exports – a fact Consolidated Plaintiffs and Carbon Activated do not contest – as did the four other potential surrogate countries, the Department focused on Malaysia, whose net exports signaled "significant production" consistent with Policy Bulletin 04.1.  Compare IDM at 32 (PR 308) with Policy Bulletin 04.1.  Consolidated Plaintiffs and Carbon Activated therefore err in claiming that the Department the Department failed to "engag{e} in a fact- and context-specific analysis."  Consol. Pls.' Br. at 11; see Carbon Activated's Br. at 18.

Finally, for the reasons explained by the United States, Consolidated Plaintiffs' and Carbon Activated's arguments that the Department's selection of a surrogate country in prior reviews bear on the particular factual circumstances of this review are misplaced and wholly irrelevant.  Compare Consol. Pls.' Br. at 14-16 and Carbon Activated's Br. at 13-14 with Def.'s Br. at 14-16.

2.    **The Department's Selection of Malaysian Producers' Financial Statements to Calculate Surrogate Financial Ratios Was in Accordance With Law and Supported By Substantial Evidence**

Consolidated Plaintiffs and Carbon Activated are also wrong to argue that the Department's selection of surrogate financial statements from Malaysian producers of activated carbon was not in accordance with law and unsupported by substantial evidence. First, Consolidated Plaintiffs assert that the Department was "required" to engage in a comparative analysis of the financial statements of Malaysian activated carbon producers Century Works and Bravo Green with those of Romanian entity Romcarbon. <u>See</u> Consol. Pls.' Br. at 18. Consolidated Plaintiffs cite, as the source of this requirement, Policy Bulletin 04.1, and they refer to two decisions issued by the Court of International Trade, <u>CP Kelco, Inc. v. United States</u> ("<u>CP Kelco</u>") and <u>Mid Continent Steel & Wire, Inc. v. United States</u> ("<u>Mid Continent</u>"). <u>See</u> <u>id.</u> Policy Bulletin 04.1, however, describes the Department's sequential process for identifying a surrogate ME country, not for identifying a source for surrogate financial ratios. <u>See</u> Policy Bulletin 04.1. Further, in <u>CP Kelco</u>, the court faulted the Department for failing to compare the relative strengths and weaknesses of potential surrogate financial statements from producers in the *same* surrogate country. <u>See</u> <u>CP Kelco</u>, 2015 WL 1544714, *7 (Ct. Int'l Trade March 31, 2015) (ordering remand because the Department failed to evaluate side-by-side the two Thai financial statements under consideration). Here, by contrast, Consolidated Plaintiffs claim that the Department failed to compare the financial statements from producers in the surrogate country (Malaysia) and producers in countries the Department rejected as potential surrogate countries (Romania and Russia). <u>See</u> Consol. Pls.' Br. at 16-18. Finally, Consolidated Plaintiffs' citation to <u>Mid Continent</u> is inapposite. That case concerned a challenge to the Department's selection of surrogate financial statements in an antidumping investigation

-14-

involving merchandise from a ME country and, thus, governed by separate regulations that do not mandate selection of a surrogate country.  See 19 U.S.C. § 1677b(e); Mid Continent, 586 F. Supp. 3d 1349, 1352-53, 1354.

Second, Consolidated Plaintiffs and Carbon Activated contend that the financial statements for Malaysian activated carbon producers Century Works and Bravo Green were insufficiently disaggregated and, therefore, the Department's reliance on the statements to calculate surrogate financial statements is unsupported by substantial evidence.  See Consol. Pls.' Br. at 16-20; Carbon Activated's Br. at 21-24.  According to Consolidated Plaintiffs and Carbon Activated, the Department misallocated the line items "Operating expenses" in Bravo's financial statement and "Administrative Expenses" in Century Chemical's financial statement to SG&A because these line items could include certain transportation-related expenses that are excludable.  See Consol. Pls.' Br. at 19; Carbon Activated's Br. at 21-22.  Consolidated Plaintiffs and Carbon Activated, however, fail to acknowledge that the Department offset the companies' SG&A expenses by the total amount of  "Other Income" in their financial statements, which could also include income that is excludable.  See Petitioners' SV Submission at Attach. 5 (PR 177).  Moreover, as aptly observed by the United States in its response brief, Consolidated Plaintiffs' and Carbon Activated's claim of error is wholly speculative.  See Def.'s Br. at 19.

Consolidated Plaintiffs' other claim that the Department erred in allocating the line item "Cost of sales" in both companies' financial statements to "raw materials" is, likewise, misplaced.  According to the accompanying notes, Bravo Green's financial statement itemizes three different factory depreciation line items plus staff costs, meaning that the remainder of Bravo Green's "Cost of Sales" could be conservatively allocated to raw materials.  See Petitioners' SV Submission at Attach. 5 (PR 177).  Likewise, the financial statement of Century

Chemical and accompanying notes also itemize three different types of factory depreciation, employee benefits, and changes in inventories, including raw materials, finished goods, and stores and spares, such that Century Chemical's "Cost of Sales" could be allocated to raw materials.  See id. (PR 177).  Accordingly, the Department appropriately determined that the Malaysian financial statements "provided sufficient information" to calculate surrogate financial ratios.  See IDM at 34 (PR 308).

Third, Consolidated Plaintiffs' and Activated Carbon's arguments concerning the purported superiority of the Romanian financial statement of Romcarbon, and alternatively the Russian financial statement of JSC Sorbent, are misplaced.  See Consol. Pls.' Br. at 20-24; Carbon Activated's Br. at 25.  Consolidated Plaintiffs contend that, because, in the eleventh administrative review ("AR11") of the underlying antidumping order, the Department selected a Romanian financial statement over Malaysian statements, that "controlling AR11 precedent" should have dictated the Department's selection of the Romcarbon financial statement.  See Consol. Pls.' Br. at 21-23.  Each review, however, is a separate proceeding with a unique administrative record, and the Department's determination in one review does not bear on its determinations in a subsequent review.  Cf. Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1385 (Fed. Cir. 2014) (stating that "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record").  Moreover, the facts of record in AR11 are distinct: the Department selected Malaysia as a primary surrogate country and Romania as a secondary surrogate country, and, as a result, the Department compared the relative strengths and weaknesses of the financial statements from the two countries.  See Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Eleventh Antidumping Duty

Administrative Review (Dec. 11, 2019), referenced in 84 Fed. Reg. 68,881 (Dep't Commerce Dec. 17, 2019).  Here, the Department rejected Romania as a secondary surrogate country, as Romania was not a "significant producer of comparable merchandise."  See IDM at 32-33 (PR 308).  Further, Consolidated Plaintiffs' argument that Department should have relied on the Russian financial statement of JSC Sorbent overlooks the Department's unchallenged finding that Russia was not a "significant producer" of comparable merchandise and, thus, not a potential surrogate country.  For the reasons explained by the United States, Consolidated Plaintiffs' and Carbon Activated's remaining arguments that the Department erroneously rejected the Romcarbon and JSC Sorbent financial statements fail.  Compare Consol. Pls.' Br. at 20-24 and Carbon Activated's Br. at 24-25 with Def.'s Br. at 19-22.

**III.    THE DEPARTMENT'S RELIANCE ON MALAYSIAN IMPORT STATISTICS FOR MERCHANDISE CLASSIFIED UNDER HTS SUBHEADING 4402.90.1000 TO VALUE CARBONIZED MATERIAL IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW**

### A.    Background

In their initial Section D questionnaire responses, DJAC and Carbon Activated reported consumption of a coal-based carbonized material as a factor of production ("FOP") in manufacturing activated carbon.  See DJAC Section D Questionnaire Response, at 12, Exh. D-6 (Sept. 17, 2020) (CR 36, PR 84); Carbon Activated Section D Questionnaire Response (Sept. 24, 2020), at Attach. B & D, Exh. D-5 (CR 42, PR 85).  However, because no usable, contemporaneous data existed for coal-based carbonized material for the POR, the Department relied on Malaysian import statistics for coconut shell charcoal classified under HTS subheading 4402.90.10000 from the immediately preceding 12th administrative review to value DJAC's FOP.  See PDM at 29 (PR 270); Prelim. SV Memo at 4 (PR 273).

In their case brief, respondents argued that the Department should have instead valued coal-based carbonized material using Turkish import statistics for merchandise classified under HTS subheading 4402.90 (the provision for "Wood Charcoal (Including Shell Or Nut Charcoal), Excluding That Of Bamboo"), which is the six-digit classification encompassing both HTS 4402.90.1000 ("coconut shell charcoal") and HTS 4402.90.9000 ("other wood charcoal").  See Respondents' Case Br. at 37-52 (CR 214-15; PR 295).  Respondents contended that the coal-based carbonized material consumed in their operations had properties that fell within the middle of the range of properties for wood-based carbonized material and coconut shell-based carbonized material, such that the carbon-based carbonized material consumed would be properly valued using information on merchandise classified under HTS subheading 4402.90. See id. at 39-45 (CR 214-15, PR 295).  Respondents also faulted the Malaysian import data's lack of contemporaneity with the POR.  See id. at 38-39 (CR 214-15, PR 295).

The Department disagreed.  In the Final Results, the Department explained record evidence demonstrated DJAC's coal-based carbonized material shared key physical properties with coconut shell-based carbonized material and lacked similarities to wood-based carbonized material.  See IDM at 38 (PR 308).  Specifically, the Department observed that coconut shell-based carbonized material and the coal-based carbonized materials consumed by respondents were both steam-activated, not chemically-activated, a process that impacts the physical structure of the resulting carbonized material.  See IDM at 38-39 (PR 308).  The Department also found that both coconut shell-based carbonized material and coal-based carbonized materials have high micropore surface area, suitable for filtration, whereas wood-based carbonized materials have significantly fewer micropores, making them unsuitable for the same level of filtration.  See id. at 39 (PR 308).  Given that the coal-based carbonized material consumed by respondents shared

key physical attributes with coconut shell-based carbonized material, and not with wood-based carbonized material, the Department did not find that respondents' carbonized materials fit in a "middle ground of physical characteristics" to warrant valuation with Turkish import statistics for merchandise classified under HTS subheading 4402.90.  See id. (PR 308).  Moreover, the Department concluded that the specificity of the Malaysian import statistics for merchandise classified under HTS subheading 4402.90.1000 ("coconut shell charcoal") to respondents' carbonized material "outweigh{ed} contemporaneity," and that respondents' failed to demonstrate that the Malaysian data were unreliable.  See id. at 39-40 (PR 308).

**B.      Substantial Evidence Supports the Department's Determination that Respondents' Carbonized Material FOP Shared Characteristics With Coconut Shell-Based Carbonized Material and Its Reliance on Malaysian Import Statistics for HTS Subheading 4402.90.1000 as a Surrogate Value**

Consolidated Plaintiffs and Carbon Activated challenge several aspects of the Department's determination to value respondents' coal-based carbonized material FOP with Malaysian import statistics for coconut shell charcoal classified under HTS subheading 4402.90.10000.    First, according to Consolidated Plaintiffs and Carbon Activated, the Department failed to address record evidence allegedly indicating comparability between respondents' coal-based carbonized material and wood-based carbonized material classified under HTS subheading 4402.90.9000.  See Consol. Pls.' Br. at 26-32; Carbon Activated's Br. at 26-29.  Second, Consolidated Plaintiffs and Carbon Activated assert that the Department did not consider record evidence demonstrating that coal-based carbonized material have distinct properties from coconut shell-based activated carbon.  See Consol. Pls.' Br. at 28-32; Carbon Activated's Br. at 26-29.  Third, Consolidated Plaintiffs and Carbon Activated contend that the Department's finding that coal-based carbonized material was similar to wood-based carbonized

material in prior reviews compels the same finding in the underlying review.  See Consol. Pls.'
Br. at 32-34; Carbon Activated's Br. at 29-31.  Finally, Consolidated Plaintiffs and Carbon
Activated fault the Department for finding Malaysian import data for merchandise classified
under HTS subheading 4402.90.1000 reliable for surrogate valuation, when those data reflect
low import volumes and high average unit values (hereinafter, "AUVs") compared to discreet
U.S. sales prices for other carbonized materials.  See Consol. Pls.' Br. at 34-37; Carbon
Activated's Br. at 31-32.  Each claim is meritless for the reasons explained by the United States
in its brief and as elaborated further below.  Cf. Def.'s Br. at 22-28.

First, contrary to Consolidated Plaintiffs' and Carbon Activated's allegations, the
Department identified substantial evidence supporting its finding that the coal-based carbonized
material had dissimilar physical properties to wood-based carbonized materials.  As an initial
matter, Consolidated Plaintiffs are wrong to fault the Department for citing to the first
administrative review ("AR1") of the antidumping order on certain activated carbon from China
as support for its determination that coal-based carbonized material may be comparable to
coconut shell-based carbonized material.  See Consol. Pls.' Br. at 27 (citing IDM at 39 (PR
308)).  Consolidated Plaintiffs refer to an initial opinion issued by the U.S. Court of International
Trade, ordering remand on the Department's carbonized material surrogate value determination,
when the Department in its IDM, here, referred to the Court's opinion *following* remand in AR1.
Compare id. with IDM at 39 n.271.  After remand in AR1, the Court affirmed the Department's
determination to value the respondents' carbonized material FOP with Indian import statistics for
merchandise classified under HTS subheading 4402.00.10, the provision for "Coconut Shell
Charcoal."  See Hebei Foreign Trade and Advertising Corp., 807 F. Supp. 2d 1317, 1319 n.2 (Ct.
Int'l Trade 2011); see also Final Results of Redetermination Pursuant to Court Remand: *Calgon*

_Carbon Corporation, et al. v. United States_, Consol. Ct. No. 09-00542 (Dep't Commerce July 25, 2011), at 10.  In addition to this misplaced claim of error, Consolidated Plaintiffs' and Carbon Activated's remaining arguments that coal-based carbonized material is similar to wood-based carbonized materials are meritless for the reasons explained by the United States. See Def.'s Br. at 22-28.

Second, the record evidence cited by Consolidated Plaintiffs and Carbon Activated does not establish that coal-based activated carbon shares properties with wood-based activated carbon.  See Consol. Pls.' Br. at 28-32; Carbon Activated's Br. at 26-29.  According to Consolidated Plaintiffs, the U.S. International Trade Commission's ("ITC") determinations in the original injury investigation and in the second sunset review provide evidence of key differences in physical properties between coconut shell-based activated carbon and coal-based activated carbon.  See Consol. Pls.' Br. at 29 (citing Activated Carbon from China, Inv. No. 731-TA-1103, USITC Pub. 3913 at 26 (Final) (Apr. 2007); Activated Carbon from China, Inv. No. 731-TA-1103, USITC Pub. 4797 at I-10 – I-11 (2nd Rev.) (June 2018)).  Consolidated Plaintiffs include a misleading table in their brief, asserting that coconut shell-based activated carbon has higher hardness and smaller pore sizes compared to coal-based activated carbon, where coconut shell-based activated carbon is used for "{c}igarette filters, home water filters, gold mining" and coal-based activated carbon is used for "{p}rocessing drinking water, filtering air and gases."  Id. at 29.  Significantly, Consolidated Plaintiffs' analysis omits a key portion of the ITC's analysis in its second sunset review, which states that, although in some narrow applications (e.g., gold mining, cigarette filters) coconut-shell activated carbon may be better than coal-based activated carbon, in other applications, either coconut shell-based or coal-based activated carbon may be used.  See Activated Carbon from China, Inv. No. 731-TA-1103,

USITC Pub. 4797 at I-12 (2nd Rev.) (June 2018).  Consolidated Plaintiffs also fail to address the

ITC's finding that wood-based activated carbon, which is normally manufactured by chemical

activation, "has a lower hardness than certain activated carbon made from coal."  Id. at I-11.

Any alleged differences between coconut shell-based activated carbon and coal-based activated

carbon (although they are comparable, as the Department reasonably concluded here), do not

prove similarity between coal-based and wood-based carbonized material.

Moreover, Consolidated Plaintiffs and Carbon Activated mischaracterize price data for

coal-based activated carbon.  See Consol. Pls.' Br. at 30-32; Carbon Activated's Br. at 29.  The

wood-based, coal-based, and coconut shell-based activated carbon prices, presented in a chart,

are from Zhengzhou Zhulin Activated Carbon Development Co. Ltd. of China.  See id. at 30

(citing Respondents' SV Submission at Exh. 3D (PR 114)).  These prices, from an NME country,

have no probity in establishing a benchmark, and even if they did the comparisons are for

finished activated carbon – not for the upstream carbonized material input.

Third, for the reasons articulated by the United States, Consolidated Plaintiffs' and

Carbon Activated's assertion that the Department's finding that coal-based carbonized material

was similar to wood-based carbonized material in prior reviews do not compel the same finding

in the underlying review at issue in this action.  Compare Consol. Pls.' Br. at 32-34 and Carbon

Activated's Br. at 29-31 with Def.'s Br. at 26-27.

Finally, Consolidated Plaintiffs and Carbon Activated err in their attempt to impeach the

Department's decision to rely on Malaysian import data for merchandise classified under HTS

subheading 4402.90.1000 with corresponding import volume and value statistics.  See Consol.

Pls.' Br. at 34-37; Carbon Activated's Br. at 31-32.  Consolidated Plaintiffs and Carbon

Activated contend that, because Malaysian import volumes under HTS subheading 4402.90

during the underlying POR (i.e., AR13) comprised 57,165 kg. of merchandise classified under HTS subheading 4402.90.9000 and no merchandise classified under HTS subheading 4402.90.1000, the import volume does not represent a broad market average. See Consol. Pls.' Br. at 34-35; Carbon Activated's Br. at 31-32. This argument, however, is premised on the incorrect assumption that wood-based charcoal imports classified under HTS subheading 4402.90.9000 provide an appropriate source of surrogate information for valuing coal-based carbonized materials consumed by the respondents. As explained above, respondents reported consuming coal-based carbonized material, an input that the Department properly determined was more comparable to coconut shell-based carbonized material classifiable under HTS subheading 4402.90.1000.

Moreover, there is no evidence that the price comparisons proffered by Consolidated Plaintiffs and Carbon Activated demonstrate that the import value for Malaysian imports classified under HTS subheading 4402.90 are aberrant. The price quotes of items – such as Wood Chip Charcoal at US $280 per ton, Lump Wood Charcoal at US $270 per ton, Hard wood BBQ Sawdust Briquette Charcoal between US $100-150 per ton, and plain "Wood" Charcoal at US $208 per ton – are irrelevant in determining a value for inputs for activated carbon. Nothing on the record indicates that the materials identified would be a suitable input.[3] Consolidated Plaintiffs and Activated Carbon ignore benchmarking information Petitioners placed on the record that demonstrates that the AR12 Malaysian import value for merchandise classified under HTS subheading 4402.90.1000 is not aberrant. For example, Petitioners' surrogate value

---

[3]    For this reason, Consolidated Plaintiffs' citation to Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT 288, 300 (2005) is irrelevant because, unlike that case, there is no information on the record that any of the inputs suggested by Consolidated Plaintiffs and Carbon Activated would have been suitable for use in activated carbon production.

submission demonstrated that the AUVs for carbonized materials relied on by Commerce from AR1 through AR12 (US $560.54) is close to the value relied on by the Department (US $502.83) and, further, that AUVs for Malaysian imports of merchandise classified under HTS subheading 4402.90.1000 in the most recent annual administrative reviews prior to AR12 were consistent with the AR12 value used by the Department.  See Petitioners' SV Submission (PR 177). Consolidated Plaintiffs' and Carbon Activated's contentions, based on irrelevant price data, must therefore fail.

Finally, for the reasons explained by the United States, Consolidated Plaintiffs' and Carbon Activated's remaining arguments are meritless.  See Def.'s Br. at 22-28.

## IV.   THE DEPARTMENT'S RELIANCE ON MALAYSIAN IMPORT DATA FOR MERCHANDISE CLASSIFIED UNDER HTS SUBHEADING 2706.00 TO VALUE COAL TAR IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW

### A.   Background

In its Preliminary Determination, the Department valued respondents' reported consumption of coal tar using Malaysian import data for merchandise classified under HTS subheading 2706.00 (Mineral Tars, Including Reconstituted Tars) with a value of Ringgit 6.49/kg (or $1.558/kg).  See Prelim. SV Memo at 4 (PR 273).  In their case brief, respondents challenged the Malaysian import statistics as unrepresentative, urging the Department instead to value the coal tar pitch input with the domestic Malaysian market price or, alternatively, with Russian imports statistics for the same HTS classification.  See Respondents' Case Br. at 52 n.94 (CR 214-15; PR 295).  The Department disagreed in the Final Determination, explaining that record evidence failed to support respondents' allegation that the Malaysian import data were aberrant or otherwise unreliable.  See IDM at 26-27 (PR 308).  Moreover, because the Malaysian

import data are product-specific, representative of a broad market average, publicly available, contemporaneous with the POR, tax- and duty-exclusive, and from the primary surrogate country, the Department concluded they were the best information available to value the coal tar consumed by respondents.  See id. at 26-27 (PR 308).

**B.      Consolidated Plaintiffs and Carbon Activated Fail to Demonstrate That the Department Erred in Valuing Coal Tar Using Malaysian Import Data for Merchandise Classified Under HTS Subheading 2706.00**

Consolidated Plaintiffs and Carbon Activated contest the Department's findings that Malaysian import data for merchandise classified under HTS subheading 2706.00 constitute the best information available to value coal tar.  First, Consolidated Plaintiffs and Carbon Activated allege that record evidence detracts from the Department's finding that the Malaysian import data are reliable.  See Consol. Pls.' Br. at 39-45; Carbon Activated's Br. at 33-34.  Second, based on their argument that the Malaysian import data are unreliable, Consolidated Plaintiffs and Carbon Activated argue the Department erred in rejecting the Malaysian domestic market price for coal tar in its valuation analysis.  See Consol. Pls.' Br. at 45-46; Carbon Activated's Br. at 35. Third, and in the alternative, Consolidated Plaintiffs and Carbon Activated assert that the Department wrongly rejected Russian import data for merchandise classified under HTS subheading 2706.00 to value coal tar.  See Consol. Pls.' Br. at 46-48; Carbon Activated's Br. at 35-36.  As the United States explains in its brief, and as elaborated further below, Consolidated Plaintiffs' and Carbon Activated's arguments are each meritless.  See Def.'s Br. at 29-33.

First, Consolidated Plaintiffs and Carbon Activated wrongly assert that the Department did not support with substantial evidence its reliance on Malaysian import statistics for merchandise classified under HTS subheading 2706.00 to value coal tar.  As an initial point, Consolidated Plaintiffs take issue with the Department's observation that "there may be factors

involved with pricing apart from the cost of manufacturing that impact a product's value and may cause a product with less 'value-added' like coal tar to be more expensive than another product." Consol. Pls.' Br. at 39-40 (citing IDM at 26 (PR 308). The Department, in making that statement, responded to respondents' wholly unsupported claim that Malaysian imports of coal tar pitch classifiable under HTS subheading 2708.10 should have a higher value than Malaysian imports of coal tar classifiable under HTS heading 2706.00, as the United States observes. Compare IDM at 26 (PR 308) with Consol. Pls.' Br. at 39-40; see Def.'s Br. at 30. However speculative the Department's statement may appear to Consolidated Plaintiffs does not cure respondents' flawed argument nor fill the gap in the record. Further, Consolidated Plaintiffs and Carbon Activated misleadingly refer to a comparison of the Malaysian domestic market prices of coal tar and pure pitch with Malaysian import prices and Spanish import prices, which are taken from a *private* market research report – the Global Coal Tar and Coal Tar Pitch Market Analysis & Forecast 2017-2027 (hereinafter, the "Global Coal Tar Report"). See Consol. Pls.' Br. at 44-45; Carbon Activated's Br. at 34; see also Respondents' Case Br. at 60 (CR 214-15; PR 295) (citing Respondents' Final SV Comments (May 19, 2021) at Exhibit 2-N (PR 230-42). The Department correctly declined to rely on information in that report, which is not publicly available, as the United States explains in its brief. Compare IDM at 27 (PR 308) with Def.'s Br. at 31-33; see also Prestressed Concrete Steel Rail Tie Wire from the People's Republic of China: Issues and Decision Memorandum for the Final Determination of Sales at Less Than Fair Value, at Comment 6 (Dep't Commerce Apr. 28, 2014), referenced in 79 Fed. Reg. 25,572 (May 5, 2014). Consequently, Consolidated Plaintiffs' and Carbon Activated's assertions alleging "stark disparities" between Malaysian domestic market prices of coal tar and pure pitch and Malaysian

import prices and Spanish import prices are of no moment.  See Consol. Pls.' Br. at 44-45; Carbon Activated's Br. at 33-34.

Second, and relatedly, Consolidated Plaintiffs' and Carbon Activated's claim that Malaysian domestic market pricing information was the best available information to value coal tar also fails.  See Consol. Pls.' Br. at 45-46; Carbon Activated's Br. at 35.  The source of the Malaysian domestic market price of coal tar identified by respondents is from the private market research Global Coal Tar Report.  Because the Global Coal Tar Report does not disclose its methodology in detail as the United States notes (see Def.'s Br. at 32-33), the Department could not confirm the validity of the Malaysian domestic market price, nor could the Department determine whether the prices were representative of a broad market average or were tax- and duty-exclusive in conformity with its well-established administrative practice.  See IDM at 26 (PR 308).

Finally, for the reasons explained by the United States, the Department did not err in rejecting Russian import data for merchandise classifiable under HTS subheading 2706.00 to value coal tar.  Compare Consol. Pls.' Br. at 46-48 and Carbon Activated's Br. at 35-36 with Def.'s Br. at 33.

**V.    THE SURROGATE VALUES RELIED ON BY THE DEPARTMENT FOR HYDROCHLORIC ACID, STEAM, AND OCEAN FREIGHT ARE SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH LAW**

In the Final Results, the Department made several surrogate value selections now challenged by Consolidated Plaintiffs and Carbon Activated.  Specifically, the Department valued (1) respondents' hydrochloric acid ("HCl") input consumption using Malaysian import data statistics for merchandise classified under HTS subheading 2806.10, the provision for HCl; (2) respondents' consumption of steam using Malaysian import data for merchandise classified

under HTS subheading 2711.11, the provision for liquefied natural gas, and (3) international freight using ocean freight quotes from Maersk.  <u>See</u> <u>IDM</u> at 42, 46, 48-51 (PR 208). Consolidated Plaintiffs' and Carbon Activated's challenges to these surrogate value selections are meritless for the reasons explained by the United States.  <u>See</u> Def.'s Br. at 34-39.

**VI.    <u>CONCLUSION</u>**

For the reasons provided in this response brief, Defendant-Intervenors respectfully request that this Court reject the claims of Consolidated Plaintiffs and Carbon Activated and sustain the Department's challenged determinations in its <u>Final Results</u>.

Respectfully submitted,

<u>/s/ John M. Herrmann</u>
JOHN M. HERRMANN
R. ALAN LUBERDA
MELISSA M. BREWER
JULIA KUELZOW

Counsel to Defendant-Intervenors

## CERTIFICATE OF COMPLIANCE
## WITH COURT OF INTERNATIONAL TRADE
## STANDARD CHAMBERS PROCEDURES

Pursuant to this Court's Order dated August 18, 2022 (ECF No. 29), setting the word limitation for Defendant-Intervenors' Response Brief to 8,000 words, counsel for Defendant-Intervenors certifies that the attached Response Brief contains 7,803 words, including footnotes. The word count certification is made in reliance on the word-count feature contained in Microsoft Word Office 2016.

/s/ John M. Herrmann
JOHN M. HERRMANN
R. ALAN LUBERDA
MELISSA M. BREWER
JULIA KUELZOW
KELLEY DRYE & WARREN LLP
3050 K Street, N.W., Suite 400
Washington, D.C.  20007
(202) 342-8400
JHerrmann@kelleydrye.com

Counsel to Defendant-Intervenors

Dated:  January 20, 2023