**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**

| | |
|---|---|
| **CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION**<br><br>Plaintiffs,<br><br>and<br><br>**DATONG JUQIANG ACTIVATED CARBON CO.. LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMENT ACTIVATED CARBON CO., LTD., AND DATONG MUNICIPAL YUNGGUANG ACTIVATED CARBON CO. LTD.**<br><br>Consolidated Plaintiffs,<br><br>v.<br><br>**UNITED STATES**,<br> Defendant,<br><br>and<br><br>**CALGON CARBON CORPORATION AND NORIT AMERICAS, INC.,**<br><br>Defendant-Intervenors. | **Consol. Court No. 22-00017** |

<u>**REPLY BRIEF IN SUPPORT OF PLAINTIFFS' CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION'S RULE 56.2 MOTION FOR JUDGMENT ON THE AGNECY RECORD**</u>

John M. Peterson
Richard F. O'Neill
Patrick B. Klein
NEVILLE PETERSON LLP
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

March 24, 2023

1

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... iii

I.     Commerce Improperly Calculated Surrogate Financial Ratios. ...........................................3

II.     The Department's Decision to Value Carbonized Material For Purposes of the SV Calculation By Using Malaysian Subheading 4402.91.1000, HTS, is Unsupported By Substantial Evidence on the Record and is Not in Accordance With the Law. .................12

III.     The Departments' Decision to Value Coal Tar For Purposes of the SV Calculation Using Malaysian Data for Malaysian Subheading 2706.00, HTS, or Malaysian Subheading 2708.10, HTS, is Unsupported By Substantial Evidence on the Record and is Not in Accordance With the Law. ...............................................................................15

IV.     The Departments' Decision to Value Hydrochloric Acid For Purposes of the SV Calculation By Using Malaysian Subheading 2806.10, HTS, Data is Unsupported By Substantial Evidence and is Not in Accordance With the Law. .......................................17

V.     The Departments' Decision to Value Steam for Purposes of the SV Calculation By Using Subheading 2711.11, HTS, Data For Liquefied Natural Gas, is Unsupported By Substantial Evidence and is Not in Accordance With the Law. .......................................18

VI.     The Department's Decision to Value Ocean Freight on the Basis of Boilerplate Maersk Line Freight Charge Quotes is Unsupported By Substantial Evidence and Not in Accordance With the Law. ...............................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*, 36 C.I.T. 1557 (2012) ........................... 12

*Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368 (Ct. Int'l Tr. 2009). ....... 12

*Carbon Activated Tianjin Co. Ltd. v. United States*, 586 F. Supp. 1360 (Ct. Int'l Tr. 2022) passim

*Carbon Activated Tianjin Co. v. United States*, 503 F. Supp. 3d 1278 (Ct. Int'l Tr. 2021) ..... 9, 10

*Catfish Farmers of Am. v. United States*, 37 C.I.T. 717 (2013). ................................................. 11

*Dorbest Ltd. v. United States,* 462 F. Supp. 2d 1262 (Ct. Int'l Tr. 2006)...................................... 5

*Elkay Mfg. Co. v. United States*, 180 F. Supp. 3d 1245 (Ct. Int'l Tr. 2016)................................ 19

*Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313 (Ct. Int'l Tr. 2015) .......... 5

*Hebei Metals & Minerals Imp. & Exp. Co. v. United States*, 29 C.I.T. 288 (2005).................... 18

*Jacobi Carbons AB v. United States*, 365 F. Supp. 1344 (Ct. Int'l Tr. 2019). .............................. 7

*Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323 (Ct. Int'l Tr. 2019) ...................... 4, 7

Jacobi Carbons AB v. United States, 619 Fed. Appx. 992 (Fed. Cir. 2015). ............................... 16

*Jiaxing Brother Fastener Co., Ltd. v. United States,* 822 F.3d 1289 (Fed. Cir. 2016)................. 4

*Seah Steel Vina Corp. v. United States*,  269 F. Supp. 3d 1335 (Ct. Int'l Tr. 2011) ................... 15

*Weshan Hongda Aquatic Food Co. Inc. v. United States*, 917 F.3d 1353 (Fed. Cir. 2019) ......... 11

*Yantai Oriental Juice Co. v. United States*, 26 C.I.T. 605 (2002). ............................................... 21

**Statutes**

19 U.S.C. § 1677b............................................................................................................................. 5

**Other Authorities**

H.R. Rep. No. 100-576 (1988) (conf. report). ................................................................................ 5

*Helical Spring Lock Washers from the People's Republic of China: Final Results of
Antidumping Duty Administrative Review,* 73 Fed. Reg 4175 (January 15, 2008). .................. 19

Merriam-Webster Dictionary, Definition of Steam, Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/steam (last accessed March 24, 2023) ............. 20

*See* Merriam-Webster Dictionary, Definition of Vapor, Merriam-Webster.com,
https://www.merriam-webster.com/dictionary/vapor (last accessed March 24, 2023) ............. 20

U.S. Dep't of Commerce, *Non-Market Economy Surrogate Country Selection Process,
Policy Bulletin 04.1* (2004)............................................................................................... passim

**Regulations**

19 C.F.R. § 351.408 ......................................................................................................................... 6

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**

| |
|---|
| CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION<br><br>          Plaintiffs,<br><br>   and<br><br>DATONG JUQIANG ACTIVATED CARBON CO.. LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMENT ACTIVATED CARBON CO., LTD., AND DATONG MUNICIPAL YUNGGUANG ACTIVATED CARBON CO. LTD.<br><br>          Consolidated Plaintiffs,<br><br>     v.<br><br>UNITED STATES,<br>          Defendant,<br><br>   and<br><br>CALGON CARBON CORPORATION AND NORIT AMERICAS, INC.,<br><br>          Defendant-Intervenors. |

Consol. Court No. 22-00017

## CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Plaintiffs Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation ("Plaintiffs"), hereby submit this reply brief in support of their U.S. Court of International Trade Rule ("USCIT R.") 56.2 Motion for Judgment on the Agency Record (ECF 33) (Pl.'s Br."), and addressing the responses filed by Defendant, the United States (ECF 36) ("Def.'s Br."), and

Defendant-Intervenors Calgon Carbon Corporation and Norit Americas, Inc. (ECF 37) (Def. Inv.'s Br.).

Defendant asserts in its brief that all aspects of the final determination by the U.S. Department of Commerce (the "Department" or "Commerce") in *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review*; a*nd Final Determination of No. Shipments; 2019- 2020*, Case No. A-570-904, as published in the Federal Register. *See* 86 Fed. Reg. 73,731 (Dec. 28, 2021) are based on substantial evidence and are otherwise in accordance with law, including:

(i) the Department's determination to base financial ratios on the surrogate value calculation on data reported by Malaysian producer Century and Bravo Green;

(ii) the Department's determination to value carbonized material for purposes of the surrogate value calculation by using import data reported for Malaysian subheading 4402.91.1000, Harmonized Tariff Schedule (HTS);

(iii) the Department's determination to value coal tar for purposes of the surrogate value calculation using Malaysian data for subheading 2706.00, HTS, or subheading 2708.10, HTS;

(iv) the Department's determination to value hydrochloric acid ("HCl") for purposes of the surrogate value calculation by using Malaysian subheading 2806.10, HTS, data;

(v) the Department's determination to value steam for purposes of the surrogate value calculation by using subheading 2711.11, HTS, data for liquefied natural gas; and

(vi) the Department's determination to value ocean freight on the basis of Maersk Line freight charge quotes.

As discussed herein and in our principal brief, the Department made errors on each of these points which renders its decisions unsupported by substantial evidence.

**ARGUMENT**

## I.    Commerce Improperly Calculated Surrogate Financial Ratios.

As discussed in Plaintiff's principal brief, Commerce's decision to calculate surrogate financial ratios using the data of two Malaysian producers, Century and Bravo Green, was not only unsupported by substantial evidence on the record, it also disregarded Commerce's own policy. Commerce willfully blinded itself to the universe of "significant producers" of comparable merchandise, and, as it concedes in its brief,[1] thereby relieved itself of any obligation to consider the data quality. As a result, Commerce violated its own policy directives requiring the use of the best available information and selected financial data which was not sufficiently disaggregated to allow accurate calculation of surrogate financial ratios.

Commerce considers four factors in selecting a primary surrogate country. First, the Office of Policy ("OP") assembles a list of potential surrogate countries at a comparable level of development to the non-market economy ("NME") country whose exports are being investigated. Second, Commerce identifies countries from OP's list which are producers of comparable merchandise. Third, Commerce determines which of the identified countries are "significant producers" of comparable merchandise. Fourth, if more than one country satisfies the first three steps, Commerce selects the country with the best factors data. *See* Import Admin., U.S. Dep't of Commerce, *Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1* (2004), http://enforcement.trade.gov/policy/bull04-1.html ("Policy Bulletin 04.1").[2].

In this review, interested parties submitted financial statements from multiple countries for use in Commerce's calculation of surrogate financial ratios for AR13. Commerce "used the

---

[1] Def.'s Br., at 15

[2] *See also Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323, 1328-1329 (Ct. Int'l Tr. 2019); *Jiaxing Brother Fastener Co., Ltd. v. United States,* 822 F.3d 1289, 1293 (Fed. Cir. 2016).

financial statements of two Malaysian producers of identical or comparable merchandise (*i.e.*, Century Chemical Works Sendirian Berhad and Bravo Green Sdn. Bhd.)."[3] Although the record included the contemporaneous financial statement of Romcarbon, a Romanian producer with data of superior quality, Commerce disregarded this data based on its finding that there was only one surrogate country—*i.e.,* Malaysia—which was a "significant producer of comparable merchandise." Def.'s Br. at 15.

While the record showed that numerous surrogate countries were producers of comparable merchandise—*i.e.,* Brazil, Malaysia, Mexico, Romania, Russia and Turkey[4]—Commerce elected to recognize only Malaysia as a significant producer, since it was a "net exporter" of activated carbon. Commerce reasoned that the statute does not define the concept of a surrogate country that is a "significant producer of comparable merchandise,"[5] but relied on Policy Bulletin 04.1, *supra,* which explains that "Commerce should define 'significant producer' in relation to world production and trade (subject to availability of data on these characteristics."[6] Policy Bulletin 04.1 explains further that "the legislative history provides that the term '<u>significant producer</u>' **includes any country that is a 'net exporter' of identical or comparable merchandise</u>**."[7]

Commerce concluded that it was not required to define "significant producer" in any particular manner[8] because the term "significant producer" is "inherently ambiguous."[9] Instead, Commerce looked only to the "net exporter" factor, treated it as dispositive, and -- having

---

[3] *Certain Activated Carbon from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2019–2020,* 86 Fed. Reg. 33,988 (June 28, 2021 (hereinafter, "Prelim. Decision Memo.") PR 273. (emphasis added).
[4] I&D Memo at 28, PR 308; Case Brief at 16-17, PR 295.
[5] I&D Memo at 31; PR 308.
[6] *Id.;* quoting Policy Bulletin 04.1.
[7] H.R. Rep. No. 100-576 (1988) at 590 (conf. report).
[8] *Id.* at FN 211; *citing Dorbest Ltd. v. United States,* 462 F. Supp. 2d 1262 (Ct. Int'l Tr. 2006).
[9] I&D Memo at 31 at FN 210, PR 308; *citing Fresh Garlic Producers Ass'n v. United States*, 121 F. Supp. 3d 1313 (Ct. Int'l Tr. 2015).

concluded that Malaysia was the only "net exporter" of activated carbon during the POR -- held that the financial statements from other countries submitted on the record of AR13 could be ignored, thus excusing itself from considering data quality in its selection.

Commerce's election to willfully blind itself by unreasonably restricting the definition of "significant producer" of comparable material and disregarding the superior quality of financial data in the Romcarbon report was not supported by substantial evidence and must be overturned.

Commerce's own Policy Bulletin 04.1 prohibits it from applying fixed criteria (such as the "net exporter" criterion), and requires that it evaluate the "net exporter" criterion in conjunction with other factors, including the nature of the finished product, the nature of the inputs being valued and the **data quality** of the surrogate value. Indeed, Policy Bulletin 04.1 stresses that Commerce's paramount concern is "the best available information:"[10]

> **Data quality is a critical consideration affecting surrogate country selection.** After all a country that perfectly meets the requirements of economic comparability and significant producer is not of much use as a primary surrogate **if crucial factor price data from that country are inadequate or unavailable.**[11]

While the governing regulation, 19 C.F.R. § 351.408, does not specify the relative weight to be assigned to each criterion, Commerce concedes that it need not select the surrogate country which is most economically comparable to the NME or the "most significant producer" of comparable merchandise. It must examine these concepts with the objective of calculating the *most accurate financial ratios*. It follows that a surrogate country having superior quality surrogate value data would not be required to meet the same level of significance of production as a country lacking in such data. In this case, Commerce erred in not considering the data quality of the Romanian financial statements in making its determination of "significant producer" status.[12]

---

[10] Policy Bulletin 04-1; quoting 19 U.S.C. § 1677b(c)(1)(B).
[11] Policy Bulletin 04.1(emphasis added).
[12] Def.'s Br. at 15.

Choosing convenience over accuracy, Commerce sought to shield itself from having to consider the on-record (and superior) financial statements of Romanian producer Romcarbon and Russian producer JSC Sorbent. Indeed, by narrowing the concept of "significant producer," Commerce could overlook its observation that the two Malaysian producer financial statements used to derive financial ratios were "not as detailed as Commerce prefers in that none of them have separate line items breaking out the cost of raw material, labor and energy."[13]

Commerce's rigid application of the "net exporter" test is contrary to the agency's own policy and practice, which indicates that "[t]he extent to which a country is a significant producer should not be judged against the NME country's production level or comparative production of the five or six countries on the OP's surrogate country list." Policy Bulletin 04.1. As noted in our principal brief, Pl.'s Br. at 13-14, this Court has previously rejected a fixation on the "net exporter" criterion in selecting surrogate values.[14] Here, because the subject merchandise and its inputs are unexceptional, Commerce must apply a sliding scale and an attenuated product requirement when examining potential surrogate countries. The agency did not do this and instead blindly relied on the "net exporter" criterion to determine that "Malaysia is the only significant producer of activated carbon among the OP list countries."[15] This decision is not supported by substantial evidence.

In *Carbon Activated Tianjin Co. Ltd. v. United States*, 586 F. Supp. 1360 (Ct. Int'l Tr. 2022), which involved AR12—*i.e.,* the previous AR of the instant order—this Court rejected Commerce's selection of financial statements of Malaysian producer Bravo Green, noting that the

---

[13] I&D Memo at p.34, PR 308.
[14] *Jacobi Carbons AB v. United States*, 365 F. Supp. 3d 1323 (Ct. Int'l Tr. 2019); *Jacobi Carbons AB v. United States*, 365 F. Supp. 1344 (Ct. Int'l Tr. 2019).
[15] I&D Memo at 31-32, PR 308.

Bravo Green Statements, "were not as detailed as Commerce prefers"[16] but did not explain why those statements were superior to those proffered by the respondents.

Commerce's rejection of the Romcarbon and JSC Sorbent financial reports is based on circular reasoning. Commerce states that "in the *Preliminary Results*, Commerce analyzed the 2019 Romcarbon statements, but rejected them on the ground that Romcarbon's 'production experience' was not as similar to the mandatory respondents' production experience as that of Century Chemical and Bravo Green."[17] But nowhere does Commerce define "production experience." Commerce can cite to no authority for determining that because Romcarbon made products in addition to activated carbon, it is prohibited from being a source of surrogate data.

Commerce has conceded that the Malaysian financial statements were inferior to the Romcarbon (and JSC Sorbent) statements. Def.'s Br. at 20-21. Yet having conceded that the Malaysian statements lacked disaggregation and thus lacked "usable financial data,"[18] Commerce nonetheless has used these statements for purposes of calculating surrogate financial ratios.[19] The determination is conclusory and should be remanded for further detailed explanation or the selection of other surrogate value data.

Instead of selecting "one or more" significant producer countries, Commerce selected only one country, the single "most significant producer country." Def.'s Br. at 8. As explained above, this is contrary to the policy stated in Policy Bulletin 04.1. Additionally, Commerce's determination was based on a comparison of production data in Romania and Malaysia. Again, this is contrary to the direction of Policy Bulletin 04.1, which provides that the "significant producer" criterion "should not be judged against … the comparative production of the five or six

---

[16] *Carbon Activated Tianjin Co. Ltd. v. United States*, 586 F. Supp. 1360, 1377-1378 (Ct. Int'l Tr. 2022)
[17] I&D Memo at FN 227, PR 308.
[18] *Id.* at 34.
[19] *Id.* at 35.

countries on OP's surrogate country list."[20] Instead of making a country-specific assessment that is "consistent with the characteristics of world production of, and trade in, comparable merchandise,"[21] Commerce improperly compared one OP List country against another to artificially achieve a result that selected Malaysia and eliminated other OP countries, including Romania. This is contrary to prior Commerce practice.[22]

In *Carbon Activated Tianjin Co. v. United States*, 503 F. Supp. 3d 1278 (Ct. Int'l Tr. 2021), this Court rejected Commerce's attempt to narrow the field of surrogate countries that are "significant producers" of activated carbon. The Court should similarly reject Commerce's determination here.

Commerce concedes that the two Malaysian financial statements it used to calculate financial ratios are not detailed, and do not break out separately the costs of raw material, labor and energy.[23] Yet, the agency asserts that the Malaysian statements contain sufficient information to calculate surrogate ratios for factory overhead costs, SG&A expenses, and profit.[24] It claims not to value certain factors of product its suspects (but does not know) are in the aggregated data.

While Commerce asserts that it prefers to use financial data from the primary surrogate country "unless those statements are unavailable or unreliable,"[25] it also acknowledges that in previous reviews of this order, it selected Romanian financial statements over Malaysian financial statements precisely because those Malaysian financial statements "lack[ed] usable financial data in that none of them have separate line items breaking down the cost of raw materials and

---

[20] Policy Bulletin 04.1.
[21] *Id.*
[22] *See Hardwood and Decorative Plywood from China*, 78 Fed. Reg. 58.723 (September 23, 2013) (final determination), I&D Memo at 45-46 n.19, PR 308.
[23] I&D Memo at 34 PR 308.
[24] *Id.*
[25] *Id.*

energy,"[26] and when Commerce switched back to Malaysian financial data in the 12th review, that decision was disallowed by this Court. *See Carbon Activated Tianjin Co. v. United States*, 503 F. Supp. 3d 1278 (Ct. Int'l Tr. 2021).

The Malaysian financial reports here do not sufficiently disaggregate data to allow for accurate calculation of financial ratios. Both the Century and Bravo Green financial statements contain a basket category titled "Cost of Sales," which is believed to represent the sum of numerous cost categories, including raw materials, labor, energy, manufacturing overheads, change in finished goods inventory, and traded goods. Without explanation, Commerce allocated the entire "cost of sales" amount to "raw materials." Pl's Br. at 22. This allocation has direct consequences on the resulting financial ratios.

Under "manufacturing overhead expenses," Commerce allocated only depreciation-related line items. The Malaysian financial statements fail to break out costs of non-depreciation manufacturing overheads, such as the costs of consumables and the cost of repairs. Since both companies "costs of sales" likely include a portion of manufacturing overheads, they do not identify an accurate amount of manufacturing overhead expenses. As a result, Commerce's financial ratio calculation is clearly distorted.

As noted in Plaintiffs' initial brief, since the Malaysian firms' financial statements did not accurately account for certain excludable expenses, such as transportation, Commerce likely committed errors in calculating SG&A. Commerce makes a conclusory claim that the Malaysian financials "provide sufficient information to calculate surrogate ratios for factory overhead costs, SGA expenses and profit,"[27] the agency is taking a shot in the dark. Romcarbon's financials, on the other hand, contain disaggregated data which would permit a more accurate calculation.

---

[26] *Id.*
[27] *Id.* at p. 35.

Commerce's refusal to consider record evidence which fairly detracts from its conclusion, renders Commerce's final determination unsupported by substantial evidence.[28]

Commerce's final determination is at odds with its own practice of rejecting insufficiently disaggregated financial statements which contain basket category cost items. Indeed, Commerce has previously rejected financial statements which do not contain separate reporting of specific raw materials and energy costs,[29] and noted that financial statements which "do not break out raw material costs" result in a "large gap of unknown costs,"[30] and that where financials do not separately break out "factory overhead," it is "impossible to calculate any of the financial ratios."[31]

While Commerce rejected Romcarbon's financial statements without making a determination of data quality, the record evidence shows that Romcarbon's financials are vastly superior in quality to those of the Malaysian producers, providing discrete breakouts for all significant cost categories that are used to calculate the ratios, and identifying cost categories which do not factor in the financial ratios determination. Because of this superior disaggregation, Romcarbon's 2019 financial statement provides accurate, undistorted and reliable overhead and SG&A ratios.

The U.S. Court of Appeals for the Federal Circuit has approved Commerce's use of superior quality financial statements from a secondary surrogate country over inferior financial statements from the primary surrogate.[32]

Defendant responds that, in contrast to the situation in *Carbon Activated Tianjin Co. Ltd. v. United States*, 586 F. Supp. 1360 (Ct. Int'l Tr. 2022), here, Commerce has provided a more

---

[28] *See e.g., Catfish Farmers of Am. v. United States*, 37 C.I.T. 717, 742 (2013).
[29] *See e.g., Chlorinated Isocyanurates from China*, 80 Fed. Reg. 4539 (I & D Memo comment 2), PR 308 at 20-21.
[30] *Tapered Roller Bearings from China*, 77 Fed. Reg. 65668 (October 30, 2012), I&D Memo. Comment 4, PR 308 at 21.
[31] *Citric Acid from China*, 74 Fed. Reg. 16,838 (April 13, 2009) (I&D Memo. Comment 1), PR 308 at 21.
[32] *See Weshan Hongda Aquatic Food Co. Inc. v. United States*, 917 F.3d 1353, 1366 (Fed. Cir. 2019).

fulsome explanation of its rationale for calculating financial ratios using the Malaysian producers' statements. Def.'s Br. at 18-19. Essentially, Defendant argues that it made "best guesses" and assumptions about what might be in the aggregated data in the Malaysian financials. "Further, in the *Preliminary Results*, Commerce explained that, when it is unable to segregate expenses in the calculation of the surrogate financial ratios that would otherwise be included in the normal value calculation, its practice is to disregard those expenses in the calculation in order to avoid double-counting costs which have necessarily been captured in the surrogate financial ratios." Def.'s Br. at 18. This explanation does not improve the *quality* of the data selected, but merely underscores its deficiencies. Using the admittedly inferior Malaysian data when the admittedly superior Romcarbon data is on record renders Commerce's determination unsupported by substantial evidence. Surrogate value determinations necessarily call upon Commerce to weight competing available evidence on the record, and Courts have recognized that "a blanket policy of simply refusing to engage in this inquiry does not amount to reasoned decision-making."[33]

Alternatively, JSC Sorbent's 2019 financial statement offers the second-best option for deriving surrogate financial ratio. This Russian producer's financial is on the record,[34] and sufficiently disaggregates the relative expense categories. Commerce has previously confirmed that JSC is a producer of identical and comparable merchandise,[35] and Russia is an economically compatible OP List country and qualifies as a significant producer of comparable merchandise.

---

[33] *Ad Hoc Shrimp Trade Action Comm. v. United States*, 36 C.I.T. 1557, 1566 (2012); *see also, Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368, 1376 (Ct. Int'l Tr. 2009).

[34] Respondents' Final SV Submission, May 19, 2021, Exhibit 5A, PR 116-PR 117.

[35] *Certain Activated Carbon from the People's Republic of China; Final Results of Antidumping Duty Administrative Review; Final Determination of No Shipments and Final Rescission of Administrative* Review, in Part, 2018-19, 86 Fed. Reg. 10,539 (February 22, 2021), I&D Memo at 27, PR 308.

The Court should set aside Commerce's use of the Century Chemical and Bravo Green financial statements and direct Commerce to use the financials from Romcarbon, or alternatively, JSC Sorbent.

**II.      The Department's Decision to Value Carbonized Material For Purposes of the SV Calculation By Using Malaysian Subheading 4402.91.1000, HTS, is Unsupported By Substantial Evidence on the Record and is Not in Accordance With the Law.**

Commerce's decision to value carbonized material based on non-contemporaneous Malaysian import data for subheading 4402.90.10, HTS (coconut charcoal), was not supported by substantial evidence on the record.

As noted in Carbon Activated's principal brief, Pl.'s Br. at 26, Malaysian import data for subheading 4402.90.10, HTS, was not available for the AR13 review of the antidumping order against Chinese activated carbon. Commerce instead used the Malaysian subheading 4402.90.10 data from AR12 and "inflated the value to make it POR-contemporaneous." *Id.*

Initially, we note that Commerce's selection of Malaysian coconut shell charcoal data for AR12 was recently found by this Court to be unsupported by substantial evidence. *See Carbon Activated Tianjin Co. Ltd. v. United States*, 586 F. Supp. 1360, 1379 (Ct. Int'l Tr. 2022). Those same flaws apply in this case as well, but the Malaysian data here is further weakened by its lack of contemporaneity.

Commerce's stated practice is to use "prices that are contemporaneous with the review" in selecting surrogate values.[36] Inflating stale values is a "last resort" to be done only when product-specific contemporaneous data to value to the input is completely unavailable from any surrogate country. In this case, Commerce had superior and contemporaneous data from Turkey—an OP-identified surrogate—which could, and should, have been used to value carbonized materials.

---

[36] *See* Policy Bulletin 04.1.

Moreover, Commerce's surrogate valuation practice is to use "prices specific to the input in question."[37] That was not done here. Neither of the mandatory respondents in this review used coconut shell charcoal as a carbonized material. Both, rather, used coal-based charcoal. [38] Record evidence further establishes that coal-based charcoal has critical properties midway between those of wood charcoal (Malaysian subheading 4402.90.90, HTS) and coconut shell charcoal. It would have been far more accurate and appropriate for Commerce to have valued carbonized materials using data at the 6-digit tariff level, subheading 4402.90, which would have encompassed values for both wood and coconut shell charcoals.

Defendant argues in its response brief, Def.'s Br. at 23, that "Commerce sought to determine whether coconut-shell or wood-based {charcoal} was more similar to the coal-based carbonized material the mandatory respondents actually used." The Department argues that the fact that neither of the mandatory respondents used coconut shell charcoal did not preclude it from using coconut shell charcoal data to value this factor of production. *Id*. However, as this Court pointed out in *Carbon Activated Tianjin Co. v. United States*, 586 F. Supp. 3d 1360, 1379 (Ct. Int'l Tr. 2022),

> While Commerce found it "clear that Carbon Activated's suppliers did not purchase carbonized material that was made from wood or nut charcoal so as to merit the inclusion of HS 4402.90.9000, 'other wood charcoal,' as part of the [surrogate value] valuation," Commerce made no analogous finding as to whether Carbon Activated's suppliers purchased carbonized material made from coconut shell charcoal. I&D Mem. at 43. Thus, the problem Commerce identified with respect to wood-based charcoal also appears to apply to coconut shell charcoal. Absent evidence that Respondents used coconut shell charcoal, Commerce's selection of one subheading (coconut shell charcoal) over another (other wood charcoal) is unsupported by substantial evidence and reasoned explanation.

---

[37] Policy Directive 04.1.
[38] Respondents' Final SV submission, May 19, 2021, Exhibit 1, PR230-PR232.

Commerce repeated its error in this review. The evidence establishes that neither of the mandatory respondents used coconut shell-based charcoal, yet Commerce sought to value carbonized materials solely with reference to coconut shell charcoal trade data. They did use coal-based material, which would have been classified in subheading 4402.90.9000. Yet, Commerce declined to use data from that subheading, or to value this input at the six-digit tariff heading level under subheading 4402.90, despite substantial evidence on the record showing that the coal-based material the respondents used had properties largely in the mid-range between the properties of wood and coconut shell charcoal.[39] Nor did Commerce explain its reasons for relying solely on the Malaysian subheading 4402.90.10 data.

As this Court noted in *Carbon Activated Tianjin, supra*, "Commerce is within its discretion to choose among imperfect datasets; however, Commerce's decision-making must take into account the facts on the record and reflect a well-reasoned application of its methodology to the situation." *Id.* at 1379 (citing *Seah Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335 (Ct. Int'l Tr. 2011).

It was therefore incorrect for Commerce to value respondents' coal-based carbonized material using solely non-contemporaneous import data for coconut shell material under Malaysian subheading 4402.90.10, HTS. A more appropriate approach would have been to value the goods at the six-digit subheading level—*i.e.,* subheading 4402.90, HTS—since that encompasses both coconut shell-based and wood-based materials. This type of hybrid valuation is compelled by extensive evidence on the record which shows that coal-based activated carbon shares certain characteristics which overlap those of both wood and coconut-shell-based carbonized materials.

---

[39] *See* the Kalpaka Chemicals publication placed on the record entitled "Coconut Activated Carbon [vs.] Coal Activated Carbon [vs] Wood Activated Carbon", Resp. Final SV submission (May 19, 2021) at Exhibit 1-C., PR 230.

As in *Jacobi Carbons AB v. United States*:

> There are no findings nor have we been presented with record evidence that coconut shell charcoal is a better surrogate for coal-based carbonized material than wood charcoal. Thus for the bulk of the imports at issue, there is no proof that coconut shell charcoal is a better surrogate.

619 Fed. Appx. 992, 999 (Fed. Cir. 2015). The same conclusion applies to AR13. Commerce should have valued this input using an average of data from the six-digit tariff level, subheading 4402.90, HTS. Commerce here defends its decision not to use this approved averaging method by simply noting that each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on the record. Def.'s Br. at 26-27. Defendant never explains how the AR13 evidence supports its use of data solely pertaining to coconut-shell-based materials, which neither of the mandatory respondents use, to value this input.

Finally, Commerce ignored the flaws in the contemporaneous Malaysian import data for subheading 4402.90, HTS, and eschewed the use of Turkish import data in its stead. While Commerce noted that it was using old Malaysian import data, Policy Directive 04.1 still calls for the use of contemporaneous data. While Commerce asserts that it can use "more reliable" data over more contemporaneous data, Def.'s Br. at 28-29, it did not explain what makes the old Malaysian data "more reliable" than the Turkish data on the record.

The Court should remand this issue for further explanation.

III.   **The Departments' Decision to Value Coal Tar For Purposes of the SV Calculation Using Malaysian Data for Malaysian Subheading 2706.00, HTS, or Malaysian Subheading 2708.10, HTS, is Unsupported By Substantial Evidence on the Record and is Not in Accordance With the Law.**

Commerce valued coal tar as an input using an average of Malaysian import values reported under subheading 2706.00, HTS (tar distilled from coal, from lignite or from peat; other

mineral tars), and subheading 2708.10, HTS (pitch). This data was aberrational and unreasonable for several reasons.

First, the average unit value ("AUV") reported in the import statistics was higher than the reported Malaysian domestic price for these products. Second, most of the imports into Malaysia were from Spain—a country with notably unreliable pricing for these products.[40] Third, the AUVs reported for coal tar and pitch were substantially higher than market prices for pitch, which makes no sense since pitch is a "value added" product which sells for more than coal tar. Commerce made no effort to identify any factor which would have made the import AUVs so, instead relying on speculation offered by the domestic petitioners that unspecified factors other than manufacturing costs may impact a product's value.

While Commerce argues that the respondents failed to explain the reasons why Spanish prices were unreliable, Def.'s Br. at 31, the mere fact that the import AUVs were aberrational—as shown by a comparison to domestic pricing information on the agency record —renders the data unreliable.[41] With the record showing Malaysian import AUVs to be as much as 620% higher than domestic prices,[42] it is unlikely that any producer would utilize the imported product in manufacturing. Commerce should have used Malaysian domestic prices to value this factor. In this regard, Commerce made the decision to simply disregard data placed on the record, in the form of a Global Coal Tar and Coal Pitch Market Analysis & Forecast 2017-21, because it claimed not to understand the methodology described therein. But ironically, Commerce has no curiosity into

---

[40] PR 295 at 58-59.
[41] *See Hebei Metals & Minerals Imp. & Exp. Co. v. United States*, 29 C.I.T. 288, 300 (2005) ("[T]he preference for domestic data is most appropriate where the circumstances indicate that a producer in a hypothetical market would be unlikely to use an imported factor in its production process.").
[42] PR 295 at 60.

what unknown factors other than manufacturing costs might have caused the Malaysian import AUVs to be aberrationally high.

In *Hebei Metals II,* the court noted that in addition to being Commerce policy, the "conditional preference for domestic data is a logical starting point" for achieving the objective set by Congress for placing a value on NME products.[43] Commerce's insistence on valuing coal tar using the admittedly aberrant Malaysian import AUVs renders its determination unsupported by substantial evidence.

**IV.  The Departments' Decision to Value Hydrochloric Acid For Purposes of the SV Calculation By Using Malaysian Subheading 2806.10, HTS, Data is Unsupported By Substantial Evidence and is Not in Accordance With the Law.**

Commerce erred by valuing hydrochloric acid ("HCl") using Malaysian import data from subheading 2806.10, HTS—a "basket" provision which includes both aqueous and pure forms of HCl. The record evidence indicates that the mandatory respondents used aqueous HCl, comprised mainly of water. Commerce's selection of a value that is not specific to the input was inconsistent with its prior practice,[44] and contrary to the judicially-stated rule that the antidumping statute "prefer[s] data that has greater specificity to the input it is valuing."[45] The Department should instead have used import data from Brazil, the only approved surrogate whose tariff reporting distinguishes "pure" and "aqueous solution" HCl.

Commerce does not deny that the data used was non-specific to the aqueous HCL used by respondents, but in litigation contends that the respondents "did not connect this record evidence to support their claim that Malaysian subheading 2806.10, HTS, is not product-specific." Def.'s Br. at 35. However, the mere fact that the Brazilian import data reported the goods separately

---

[43] *Hebei Metals & Minerals Imp. & Exp. Co. v. United States*, 29 C.I.T. 288, 300 (2005)
[44] *Helical Spring Lock Washers from the People's Republic of China: Final Results of Antidumping Duty Administrative Review,* 73 Fed. Reg 4175 (January 15, 2008).
[45] *Elkay Mfg. Co. v. United States*, 180 F. Supp. 3d 1245, 1253 (Ct. Int'l Tr. 2016).

establishes that the "basket" Malaysian tariff category was non-specific. Commerce claims that it "rejected" the evidence provided by Carbon Activated to show the material its supplier used, but even assuming the evidence was properly rejected, it was unnecessary to demonstrate that Commerce used non-specific data to value HCl.

The use of the non-specific data to value HCl renders Commerce's decision unsupported by substantial evidence.

**V.      The Departments' Decision to Value Steam for Purposes of the SV Calculation By Using Subheading 2711.11, HTS, Data For Liquefied Natural Gas, is Unsupported By Substantial Evidence and is Not in Accordance With the Law.**

In another instance of using non-specific data to value an input, Commerce valued steam for surrogate value calculation by using Malaysian subheading 2711.11, HTS, data for liquefied natural gas. Plaintiff contends that Commerce should have valued steam with reference to the value for natural gas in a gaseous state, as reported in subheading 2711.21, HTS.

Relaying on a dictionary.com definition, Defendant now argues that "'[s]team' would appear to straddle the line between liquid and gas, depending on its particular state at the moment." Def.'s Br. at 36. This not only defies common sense and understanding but is also unsupported by Defendant's own cited definition, which notes that steam is in the form of "invisible gas or vapor" and "water changed to this form by boiling." The Merriam-Webster Dictionary defines "steam" as the "vapor arising from a heated substance" and "the invisible vapor into which water is converted when heated to the boiling point."[46] Merriam-Webster in turn defines "vapor" as "a substance in the gaseous state **as distinguished from the liquid or solid state.**"[47] Steam does not "straddle the line" between liquid and gas—it is gas. Hence, Commerce's use of LNG data to value steam is

---

[46]  *See* Merriam-Webster Dictionary, Definition of Steam, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/steam (last accessed March 24, 2023),

[47] *See* Merriam-Webster Dictionary, Definition of Vapor, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/vapor (last accessed March 24, 2023) (emphasis added).

incorrect. Commerce should have used the Malaysia subheading 2711.21, HTS, data for natural gas in a gaseous state.

This Court must remand Commerce's determination because the agency had not adequately explained why LNG is an appropriate substitute over natural gas in the gaseous state.[48] Similarly in this case, Commerce failed to explain how the use of LNG explains the cost incurred by plaintiffs when they did not use a liquid to produce steam, and instead used natural gas in a gaseous state. Commerce's position regarding the larger volume and broader market average of the Malaysian subheading 2711, HTS, fails to explain why the LNG data is a better alternative against the gaseous tariff data, the form in which the product was actually consumed in production. The agency has failed to explain its position.

Commerce's determinations are also unsupported by substantial evidence because record evidence of natural gas domestic prices in Malaysia contradicts the $US0.53/kg AUV from Malaysian subheading 2711.11, HTS, import data for LNG used as a basis to value respondents' steam. Commerce noted in the preliminary results memo that valuation of steam is directly correlated with 'the cost of natural gas required to generate steam[,]" but then disregarded this correlation in the Final Results.[49] Here, the record evidence of lower domestic prices for natural gas detract from the reliability of the data which Commerce used. This aspect of the calculation must also be remanded.

---

[48] *See Yantai Oriental Juice Co. v. United States*, 26 C.I.T. 605, 617 (2002).
[49] Prelim SV Memo at 6, PR 273.

**VI.** **The Department's Decision to Value Ocean Freight on the Basis of Boilerplate Maersk Line Freight Charge Quotes is Unsupported By Substantial Evidence and Not in Accordance With the Law.**

Finally, Commerce valued international freight charges using Maersk Line freight quotations which did not represent actual consummated shipping transactions, in the process eschewing Datamyne information placed on the record which showed the freight for actual shipments between China and the United States. The Maersk line data was static over the period of the review, since ocean tariffs are generally "price lists" for all comers against which actual shippers usually negotiate discounts.

Commerce contends that the Maersk data represented "actual tariffs," Def.'s Br. at 39, but that does not equate to actual consummated transactions with actual freight charges. Even in the presence of a filed ocean freight tariff, the tariff itself may provide for downward or upward departures from stated rates, volume discounts, and the like. For instance, a shipper entering into a service contract guaranteeing 1,000 containers of business for the year will receive a more favorable shipping rate than a shipper whose service contract guarantees only 50 containers for the same period. The Maersk quotations included specific disclaimers (*e.g.*, "Please notice! This look up is not covered by a service contract, therefore tariff rates have been applied."). In other words, the tariff quotations are not actual shipping costs.

Most ocean cargo is transported pursuant to service contracts, rather than tariff rates. There is no evidence on the record that the amounts shown in any of the Maersk quotes were ever used to ship cargoes. By contrast, the Descartes data shows the freight costs associated with actual cargo movements, not theoretical ones. Again, Commerce failed to "use 'the best available information' from a market economy country or countries that are economically comparable to the nonmarket

economy country and are 'significant producers of comparable merchandise." *Carbon Activated Tianjin Co. v. United States*, 586 F. Supp. 3d 1360, 1366 (Ct. Int'l Tr. 2022).

<u>**CONCLUSION**</u>

For the reasons set forth herein, Plaintiffs, Carbon Activated Tianjin Co., Ltd., and Carbon Activated Corporation, respectfully request their Rule 56.2 Motion for Judgment on the Agency Record be granted.

Respectfully submitted,

NEVILLE PETERSON LLP

<u>/s/ John M. Peterson</u>
John M. Peterson
Richard F. O'Neill
Patrick B. Klein
One Exchange Plaza
55 Broadway, Suite 2602
New York, NY 10006
(212) 635-2730
jpeterson@npwny.com

Dated: March 24, 2023

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**

| |
|---|
| **CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION** |
| **Plaintiffs,** |
| **and** |
| **DATONG JUQIANG ACTIVATED CARBON CO.. LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMENT ACTIVATED CARBON CO., LTD., AND DATONG MUNICIPAL YUNGGUANG ACTIVATED CARBON CO. LTD.** |
| **Consolidated Plaintiffs,** |
| **v.** |
| **UNITED STATES,** |
| **Defendant,** |
| **and** |
| **CALGON CARBON CORPORATION AND NORIT AMERICAS, INC.,** |
| **Defendant-Intervenors.** |

**Consol. Court No. 22-00017**

**CERTIFICATE OF COMPLIANCE**

I, John M. Peterson, a partner in the New York City office of Neville Peterson LLP, who is responsible for the instant Reply Brief in Support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record, certify that it complies with the word count limitation under the Court's Standard Chambers Procedures and contains 5,909 words.

　　　　　　　　　　　　　　　　/s/ John M. Peterson

　　　　　　　　　　　　　　　　John M. Peterson

Dated: March 24, 2023

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE: HON. MARK A. BARNETT, JUDGE**

| |
|---|
| CARBON ACTIVATED TIANJIN CO., LTD., AND CARBON ACTIVATED CORPORATION |
| **Plaintiffs,** |
| **and** |
| DATONG JUQIANG ACTIVATED CARBON CO.. LTD., DATONG JUQIANG ACTIVATED CARBON USA, LLC, NINGXIA GUANGHUA CHERISHMENT ACTIVATED CARBON CO., LTD., AND DATONG MUNICIPAL YUNGGUANG ACTIVATED CARBON CO. LTD. |
| **Consolidated Plaintiffs,** |
| **v.** |
| UNITED STATES, |
| **Defendant,** |
| **and** |
| CALGON CARBON CORPORATION AND NORIT AMERICAS, INC.,** |
| **Defendant-Intervenors.** |

Consol. Court No. 22-00017

## CERTIFICATE OF SERVICE

I hereby certify that a copy of Defendant Intervenors, Carbon Activated Tianjin Co., Ltd. and Carbon Activated Corporation's Reply Brief in Support of Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record was served electronically by this Court's CM/ECF on March 24, 2023.

/s/ John M. Peterson
John M. Peterson

1