**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| _____x | |
| : | |
| CARBON ACTIVATED TIANJIN CO., LTD., : | |
| and CARBON ACTIVATED CORPORATION, : | |
| : | |
| Plaintiffs, : | |
| : | |
| and : | |
| : | |
| DATONG JUQIANG ACTIVATED CARBON : | |
| CO., LTD., DATONG JUQIANG ACTIVATED : | |
| CARBON USA, LLC, NINGXIA GUANGHUA : **Consol. Court No. 22-00017** | |
| CHERISHMET ACTIVATED CARBON CO., : | |
| LTD., and DATONG MUNICIPAL YUNGUANG : | |
| ACTIVATED CARBON CO., LTD., : | |
| : | |
| Consolidated Plaintiffs, : | |
| : | |
| v. : | |
| : | |
| UNITED STATES, : | |
| : | |
| Defendant, : | |
| : | |
| and : | |
| : | |
| CALGON CARBON CORPORATION and : | |
| NORIT AMERICAS, INC., : | |
| : | |
| Defendant-Intervenors. : | |
| _____x | |

<u>**CONSOLIDATED PLAINTIFFS' REPLY TO DEFENDANT AND DEFENDANT-
INTERVENORS' RESPONSES TO CONSOLIDATED PLAINTIFFS' RULE 56.2
MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Francis J. Sailer
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Consolidated Plaintiffs Datong*
*Juqiang Activated Carbon Co., Ltd., Datong*
*Juqiang Activated Carbon USA, LLC,*
*Ningxia Guanghua Cherishmet Activated*
*Carbon Co., Ltd., and Datong Municipal*
*Yunguang Activated Carbon Co., Ltd.*

Dated: March 24, 2023

## <u>TABLE OF CONTENTS</u>

**TABLE OF AUTHORITIES** ................................................................................................. ii

**I.      COMMERCE UNLAWFULLY SELECTED FINANCIAL STATEMENTS**............ 1
    **A.      Malaysia is Not the Only Significant Producer of Comparable Merchandise** ....... 2
    **B.      Commerce Improperly Used Financial Statements of Century and Bravo**............ 4

**II.     COMMERCE UNLAWFULLY VALUED CARBONIZED MATERIAL** ................. 7

**III.    COMMERCE UNLAWFULLY VALUED COAL TAR** ............................................ 14
    **A.      Defendants Fail to Support the Anomalously Higher AUV in Malaysian HTS
        2706.00 Import Data**.......................................................................................... 14
    **B.      Commerce Unlawfully Avoided the Market Report as a Benchmark or SV Source**
        ........................................................................................................................ 19

**CONCLUSION** ......................................................................................................... 22

i

## **TABLE OF AUTHORITIES**

**Cases**

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 236 F.Supp.3d 1352 (CIT 2017) ........................................................................................................ 13

*Ancientree Cabinet Co. v. United States*, 532 F.Supp.3d 1241 (CIT 2021) ................................ 18

*Calgon Carbon Corp. v. United States*, 443 F.Supp.3d 1334 (CIT 2020)............................... 6, 17

*Carbon Activated Tianjin Co. v. United States*, 503 F.Supp.3d 1278 (CIT 2021) ....................... 2

*Carbon Activated Tianjin Co. v. United States*, 586 F.Supp.3d 1360 (CIT 2022) ...................... 11

*Goldlink Indus. Co. v. United States*, 431 F.Supp.2d 1323 (CIT 2006) ........................................ 7

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States,* 29 CIT 288 (2005) ................... 22

*Jacobi Carbons AB v. United States*, 365 F.Supp.3d 1323 (CIT 2019) .................................... 2, 4

*Jacobi Carbons AB v. United States*, 365 F.Supp.3d 1344 (CIT 2019) .................................... 2, 4

*Jacobi Carbons AB v. United States*, 422 F.Supp.3d 1308 (CIT 2019) ........................................ 2

*Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992 (Fed. Cir. 2015) ....................... 8, 9, 11

*Parkdale Int'l v. United States*, 475 F.3d 1375 (Fed. Cir. 2007)................................................... 7

*Peer Bearing Co.-Changshan v. United States*, 752 F.Supp.2d 1353 (CIT 2011) ....................... 5

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014) ..................... 13

*Queen's Flowers de Colom. v. United States,* 21 CIT 968 (1997) ................................................. 9

*QVD Food Co. v. United States*, 721 F.Supp.2d 1311 (CIT 2010) ............................................. 13

*Risen Energy Co. v. United States*, 447 F.Supp.3d 1332 (CIT 2020)........................................... 18

*Shantou Red Garden Foodstuff Co. v. United St*ates, 815 F.Supp.2d 1311 (CIT 2012) ............. 20

*SKF USA, Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)........................................... 3, 5, 6

**Statutes**

19 U.S.C § 1677b.................................................................................................................... 4, 7

**Regulations**

19 C.F.R. § 351.408 ..................................................................................... 14

**Administrative Decisions & Publications**

*Activated Carbon from China*, 77 Fed. Reg. 67,337 (Nov. 9, 2012) (final results) ...................... 9

*Activated Carbon from China*, 84 Fed. Reg. 27,758 (June 14, 2019) (preliminary results).......... 4

*Activated Carbon from China*, 86 Fed. Reg. 73,731 (Dec. 22, 2021) ........................... 1, 8, 14, 22

*Antidumping Duties; Countervailing Duties,* 61 Fed. Reg. 7,308 (Feb. 27, 1996) ..................... 21

*Antidumping Duties; Countervailing Duties,* 62 Fed. Reg. 27,296 (May 19, 1997).................... 21

*Frozen Fish Fillets from Vietnam*, 75 Fed. Reg. 38,985 (July 7, 2010) (final results)................ 20

*Frozen Fish Fillets from Vietnam*, 85 Fed. Reg. 23,756 (Apr. 29, 2020) (final results) ............. 19

*Laminated Woven Sacks from China*, 73 Fed. Reg. 35,639 (June 24, 2008)............................... 19

*Mattresses from China*, 84 Fed. Reg. 56,761 (Oct. 23, 2019) (final determination)................... 19

*Prestressed Concrete Steel Rail Tie Wire from China*, 79 Fed. Reg. 25,572 (May 5, 2014)
    (final determination) ................................................................................. 20

**Other Authorities**

Commerce Policy Bulletin No. 04.1 (Mar. 1, 2004).................................................. 2, 4

Consolidated Plaintiffs Datong Juqiang Activated Carbon Co., Ltd. ("DJAC"), DJAC's U.S. affiliate Datong Juqiang Activated Carbon USA, LLC, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., and Datong Municipal Yunguang Activated Carbon Co., Ltd. (collectively, "Consolidated Plaintiffs") reply to Defendant United States' Response (Dec. 16, 2022), ECF 36 ("Def. Br."), and Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc.'s (collectively, "Petitioners") Response (Jan. 20, 2023), ECF 37 ("Pet. Br."), opposing Consolidated Plaintiffs' Rule 56.2 Motion for Judgment on the Administrative Record (Sept. 7, 2022), ECF 30-31 ("C-P Br."). Consolidated Plaintiffs established that the U.S. Department of Commerce ("Commerce" or the "Department") erred in the thirteenth administrative review ("AR13") of the antidumping duty ("AD") order on activated carbon from the People's Republic of China ("China"). *Id*. at 9-48; *Activated Carbon from China*, 86 Fed. Reg. 73,731 (Dec. 22, 2021) (final results), P.R. 314 ("*Final Results*"). And Commerce's legal errors in AR13 are not undermined by the arguments of Defendant and Petitioners (collectively, "Defendants"), as detailed below.

## I.      COMMERCE UNLAWFULLY SELECTED FINANCIAL STATEMENTS

Consolidated Plaintiffs demonstrated that Commerce unlawfully calculated surrogate financial ratios using financial statements from Malaysian companies Century Chemical Works Sdn. Bhd. ("Century") and Bravo Green Sdn. ("Bravo"), neither of which sufficiently itemized costs. C-P Br. at 9-20. Commerce should have instead used financial statements of Romanian company Romcarbon, S.A. – in accordance with its practice as followed in prior reviews, or alternatively, those of the Russian company JSC Sorbent's ("JSC"). *Id*. at 5-6, 20-24. Defendants' responses to salvage Commerce's misguided ratio calculations, as set forth below, are unpersuasive.

1

### A.  Malaysia is Not the Only Significant Producer of Comparable Merchandise

The fundamental error committed by Commerce was its elimination of Romania from contention without considering the data quality it offered, finding only that Malaysia was a producer of comparable merchandise. Issues and Decision Memorandum, P.R. 308 ("IDM"), at 31. Defendants recognize that Commerce merely found Malaysia to be "the sole {Office of Policy ("OP")} List country that was a significant producer in terms of net exports." Def. Br. at 14; Pet. Br. at 13. Yet this Court has repeatedly invalidated this approach, including in the seventh and eighth administrative reviews ("AR7/8") where the surrogate country was selected based on net exports in contradiction of its stated practice: "**Commerce acknowledged its policy of *not* determining significance relative to the comparative production of the potential surrogate countries**." *Jacobi Carbons AB* ("*Jacobi*") *v. United States*, 365 F.Supp.3d 1323, 1332-34 (CIT 2019) (emphases modified); *see Jacobi*, 365 F.Supp.3d 1344, 1352-53 (CIT 2019);[1] Commerce Policy Bulletin No. 04.1 (Mar. 1, 2004) (criterion "**should not be judged against . . . the comparative production** of . . . countries on OP's surrogate country list.") (emphasis added).

Remand is accordingly warranted because Commerce improperly employed net exports as a proxy for significant production in AR13, as this Court ordered in the eleventh administrative review ("AR11"). *Carbon Activated Tianjin Co. v. United States*, 503 F.Supp.3d 1278, 1294-95 (CIT 2021). Defendants unpersuasively distinguish AR11 as an instance where Commerce "rejected Romania as secondary surrogate country" and selected Malaysia "based on

---

[1] Defendant claims that *Jacobi* merely "found Commerce's net-producer analysis required further explanation." Def. Br. at 15. Yet Commerce in those cases switched surrogate countries rather than provide any such explanation, and has not even attempted here to provide any such "further explanation" for its discredited net-export approach. *Id*.; *see Jacobi*, 422 F.Supp.3d 1308, 1310, 1318, 1321 (CIT 2019), IDM Comment 6.

net export quantity" – *i.e.*, the exact same basis employed in AR13. Def. Br. at 15; Pet. Br. at 17; IDM at 31. While Petitioners' claim that such "prior reviews" are "wholly irrelevant," Pet. Br. at 13, they instead confirm the impropriety of Commerce having again impermissibly selected the surrogate country through the same invalidated net exports criterion.

The record evidences that Romania satisfies the criterion, with the Romcarbon statement establishing total annual production of identical and comparable merchandise valued at more than $US38 million. C-P Br. at 12; Initial SV Submission Exhibit 14B. Defendant ignores this fact altogether, *see* Def. Br. at 12-16, while Petitioners quibble with the calculation that involves products beyond activated carbon. Pet. Br. at 12. This calculation includes products "which share a similar use with – and therefore are comparable to – activated carbon." C-P Br. at 12. Yet most critically, it is undisputed that Romcarbon is engaged in the production of activated carbon, which comprised only 7% of domestic production. First SV Comments by DJAC and CA Tianjin (Mar. 4, 2021), P.R. 114-76 ("Initial SV Submission"), Exhibit 14B at 2-4/42. Indeed, Commerce expressly used this fact to find that Romania was a significant producer of activated carbon on remand in AR11:

> While Romcarbon's principal activities are the manufacture of polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters and protective materials, **its financial statements indicate that its profit center no.2 includes an "Active Coal Workshop," which is dedicated to the production of activated carbon.** Therefore, for both Malaysia and Romania, the financial statements on the record provide evidence of domestic production of comparable merchandise under section 773(c)(4) of the Act.

*Carbon Activated Tianjin Co. v. United States*, Court No. 20-7, Final Results of Redetermination Remand (CIT July 1, 2021), ECF 68-1, at 13-14 (emphasis added) (footnote omitted).

Neither Defendants nor Commerce address, let alone provide an adequate explanation for, the diametrically opposite conclusions with respect to Romania based on the same evidence between AR11 and AR13. *SKF USA, Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001)

("agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently"); C-P Br. at 15-16; IDM at 33 n.227 (merely noting a contradictory finding based on the same evidence). Such elimination of Romania further violates the statutory directive that this criterion be satisfied only "to the extent possible" and its own policy that "particular emphasis" on this criterion is only "warranted" for "unusual or unique" products – of which activated carbon is not one. 19 U.S.C § 1677b(c)(4); Policy 04.1; C-P Br. at 10-15. Commerce erroneously employs a binary approach that selects only the country with the most production, "**avoiding any requisite contextual analysis**." *Jacobi*, 365 F.Supp.3d at 1332 (emphasis added); *Jacobi*, 365 F.Supp.3d at 1353 (emphasis added). This Court should again invalidate this administrative short-cut as it did in AR7/8 and AR11.

### B.  Commerce Improperly Used Financial Statements of Century and Bravo

Commerce improperly calculated surrogate financial ratios using financial statements of Century and Bravo. As an initial matter, as Defendant emphasizes, Commerce's decision relies on Malaysia being "the only country among the OP List countries determined to be a significant producer of comparable merchandise." Def. Br. at 21; IDM at 34. This patently erroneous finding cannot be supported. Section I.A, *supra*. Moreover, these statements are insufficiently disaggregated since they contain basket category cost line items. C-P Br. at 18-20. Commerce practice is to reject such flawed financial statements. *Id*. at 20. Indeed, Commerce in AR11 rejected Malaysian statements including Century because "**they lack usable financial data** in that neither of them have separate line items breaking down the cost of raw materials and energy." *Activated Carbon from China*, 84 Fed. Reg. 27,758 (June 14, 2019) (preliminary results), Preliminary Decision Memorandum, at 15-16 (emphasis added).

There is no basis to distinguish AR11 from AR13, and the efforts to do so fail. Defendant echoes Commerce's finding that, "upon further consideration, . . . the Malaysian statements . . . provide sufficient information to calculate surrogate financial ratios." Def. Br. at 21; IDM at 34-35. This falls far short of providing the requisite adequate explanation "for treating similar situations differently." *SKF*, 263 F.3d at 1382. Petitioners emphasize that unlike AR11, "{h}ere, the Department rejected Romania as a surrogate country," Pet. Br. at 17, but that discredited circular finding cannot support Commerce's ratio calculations. Section I, *supra*.

Defendant unpersuasively echoes Commerce's single country preference as a basis to use the Malaysian financial statements. Def. Br. at 21; IDM at 31. However, Commerce's "preference for using data from a single country might support a choice between data sets that, upon a fair comparison, are otherwise seen to be **fairly equal**." *Peer Bearing Co.-Changshan v. United States*, 752 F.Supp.2d 1353, 1373 (CIT 2011) (emphasis added). Commerce routinely uses a superior data quality financial from a secondary surrogate country when the primary surrogate country financial data are potentially distorted and unreliable. C-P Br. at 23. Indeed, Commerce used Romcarbon for this very reason in both AR11 and the tenth administrative review ("AR10"). *Id*. at 5. This Court in AR10 specifically rejected Petitioners' challenge to Romcarbon based on the very same Commerce basis now heralded by Defendants to support its surrogate selection, *i.e*., that "Romcarbon's production experience is not as similar to the mandatory respondents' production experience," IDM at 33; Def. Br. at 20:

> Commerce acknowledged that the Romcarbon financial statement is from a producer whose "principal manufacturing activities are polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters, and protective materials," but found that **Romcarbon produces some activated carbon**." . . . Calgon argues that "Romcarbon is not a significant producer of merchandise identical to or comparable to activated carbon." . . . But Calgon fails to identify a standard for determining the reliability of financial statements based on the level of production of the same or comparable merchandise. Moreover, **Commerce**

> **recognized that Romcarbon's principal manufacturing activities related to other types of materials, but that it produced some activated carbon**.

*Calgon Carbon Corp. v. United States*, 443 F.Supp.3d 1334, 1352 (CIT 2020) (emphases added).

The fundamental error with respect to Commerce's selection of Malaysian financial statements in AR13 is its preference for Romcarbon over Malaysian financial statements in prior reviews despite each of the newfound bases to support selection having been present in those prior reviews. This includes not only the fact that Romcarbon engages in additional production activities, but also that Malaysia offers multiple contemporaneous publicly available statements. IDM at 33-35. Defendant reiterates these points, Def. Br. at 17, but fails to address Romcarbon's use in prior reviews despite those same considerations being present. Petitioners emphasize the general proposition that each review stands alone. D-I Br. at 16. Yet it is axiomatic that Commerce acts arbitrarily without providing an adequate explanation "for treating similar situations differently." *SKF*, 263 F.3d at 1382. Here, the best that Commerce could say is that, "upon further consideration," the opposite conclusion is warranted concerning the same facts. IDM at 34-35. Commerce's "considerable discretion" for surrogate valuation, Def. Br. at 11, does not extend to instances such as AR13 where it contradicts its prior actions with findings that could have been made on those records.

Commerce therefore should have used Romcarbon to value surrogate ratios in AR13, as it did in prior reviews. The Romcarbon financial data are provided with extensive discrete breakouts and separate itemization that yield the most accurate ratios. C-P Br. at 21; First SV Comments by DJAC and CA Tianjin (Mar. 4, 2021), P.R. 114-75 ("Respondents' First SV Submission"), Exhibit 14A-B. Commerce, while acknowledging that "Malaysian statements are not as detailed as Commerce prefers" nonetheless mis-frames the issue as whether "these financial statements provide sufficient information to calculate surrogate ratios." IDM at 34-35.

It is well established that "an overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." *Parkdale Int'l v. United States*, 475 F.3d 1375, 1380 (Fed. Cir. 2007). There are a host of infirmities with the manner in which Commerce allocated the insufficiently disaggregated Malaysian data that created the potential for distorted ratios. C-P Br. at 21-23. While Defendants downplay these concerns as speculative, Def. Br. at 19; D-I Br. at 15, they ignore the longstanding Commerce practice that prefers disaggregated financial data for the very purpose to ensure the accuracy of ratio calculations.

In sum, the insufficiently disaggregated Malaysian financial data that Commerce used to calculate ratios in AR13 cannot constitute the "best available information" required by statute. 19 U.S.C. § 1677b(c)(4). Given the potential for distortion identified by Commerce in its agency practice – including prior reviews of this ADD order, where it eliminated such Malaysian financial statements – there is no basis upon which "a reasonable mind could conclude that Commerce chose the best available information" to calculate financial ratios in AR13. *Goldlink Indus. Co. v. United States*, 431 F.Supp.2d 1323, 1327 (CIT 2006). This determination unlawfully relies upon eliminating Romania from contention based on a flawed net export analysis, Section I.A, *supra*, and an unexplained contradictory conclusion based on the same evidence. That any ratios could somehow be calculated from the Malaysian data does not make them the best available information; as in prior reviews, Romcarbon provides the clearly superior financial data, resulting in most accurate ratios. Alternatively, Commerce could have lawfully used the sufficiently disaggregated JSC data that are far more detailed than the Malaysian data employed in AR13. C-P Br. at 24.

## II.   COMMERCE UNLAWFULLY VALUED CARBONIZED MATERIAL

Consolidated Plaintiffs established that Commerce's valuation of coal-based carbonized materials ("coal-carbmat") exclusively under Malaysian Harmonized Tariff Schedule ("HTS")

4402.90.1000 (coconut-shell charcoal) unlawfully ignored HTS 4402.90.9000 (wood charcoal).

C-P Br. at 32-34. Indeed, use of HTS 4402.90.9000 is mandated by on-point precedent affirming

Commerce's choice of basket category HTS 4402 (averaging coconut-shell and wood charcoal

values), given that between wood charcoal and coconut shell charcoal, the latter was not more

comparable to coal-based carbonized material. *Id*. at 33 (citing *Jacobi Carbons AB v. United*

*States*, 619 Fed. Appx. 992 (Fed. Cir. 2015) (nonprecedential)). Consolidated Plaintiffs also

established that in contrast to the surrogate value ("SV") reported in the non-contemporaneous

Malaysian HTS 4402.90.1000, Turkish HTS 4402.90 (based on averaging contemporaneous

coconut-shell and wood charcoal values) yields the most reliable and representative SV for the

coal-carbmat input. *Id*. at 34-37. Defendants' responses are unpersuasive and fail to distinguish

either the pertinent facts regarding comparability of wood-charcoal with coal-carbmat or the

applicable precedent supporting the choice of HTS 4402.90.

    First, Defendant supports HTS 4402.90.1000 echoing the *Final Results* rationale that

"coconut-shell carbonized material and coal-based carbonized material are similar because both

are steam-activated, whereas wood-based carbonized materials are generally chemically-

activated" and "that this difference in activation process impacts the ultimate physical structure

of the carbonized material." Def. Br. at 22. Yet Consolidated Plaintiffs established that this

finding is undermined by evidence showing that wood-based activated carbon is also produced

by steam activation. C-P Br. at 28; Final SV Comments by DJAC and CA Tianjin (May 19,

2021), P.R. 230-42 ("Respondents' Final SV Submission"), Exhibit 1-K. Defendant's alibi that

"this quotation is taken from the website of one of the mandatory respondents" and, therefore, "is

insufficient to support a determination that would require Commerce to use wood-based

carbonized material to value the mandatory respondent's coal tar {*sic*}," Def. Br. at 24, fails for

several reasons outlined below.

1. Defendant does not challenge the credibility of this public information on an activated carbon producer's website. Rather, relying on "*NSK Corp.*, 716 F.3d at 1366 ('Although there is evidence that detracts from the {agency's} ultimate conclusion . . . , we cannot say that this conflicting evidence casts such doubt on the {agency's} conclusion')," Defendant pointedly concedes that wood-charcoal can be steam activated, yet unpersuasively argues to keep wood-charcoal HTS 4402.90.9000 out of the mix, without explaining how such exclusion avoids distorting the resulting SV for coal-carbmat input.

2. The scope (which covers only steam-activated carbon) – read with the CONNUM Field 3.1 Physical Material, CARBONU, Codes 06 (wood) & 09 (char/charcoal) – unambiguously establishes that wood-charcoal can be steam-activated to produce subject merchandise. IDM at 2-3; DJAC Section C Questionnaire Response (Sep. 10, 2020) ("CQR"), C.R. 33-35, P.R. 81, at 6.

3. Commerce's AR13 findings are directly contradicted by its the fourth administrative review ("AR4") findings that "evidence on the use of wood, and not wood charcoal, to produce chemically activated carbon is irrelevant to the use of wood feedstock {*i.e.*, wood-charcoal} for producing steam activated carbon." *Activated Carbon from China*, 77 Fed. Reg. 67,337 (Nov. 9, 2012) (final results), IDM Comment IC(C). *See, e.g., Queen's Flowers de Colom. v. United States,* 21 CIT 968, 976-77 (1997) ("It is 'a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure'").

4. The U.S. Court of Appeals for the Federal Circuit ("CAFC"), while affirming Commerce's choice of HTS 4402 (averaging both coconut-shell charcoal and wood-charcoal) in AR4, expressly endorsed that: (a) wood-charcoal could be used to produce subject merchandise, and (b) between wood-charcoal and coconut-shell charcoal, the latter was not more comparable to coal-carbmat. C-P Br. at 33; *Jacobi*, 619 Fed.Appx. at 999. As such, the CAFC already foreclosed any possibility that chemical activation of wood had any impact on the comparability of wood-charcoal coal-carbmat, and consequently, inclusion of wood-charcoal prices in the valuation of coal-carbmat.

5. Assuming *arguendo* that "wood-based carbonized materials are generally chemically-activated," (besides being steam activated), IDM at 38, Defendant fails to explain how the chemical-activation, being a subsequent processing step, can affect the antecedent raw material – wood-based carbonized materials – so as to render it as non-comparable vis-à-vis coal-carbmat.

Second, Defendant also underscores Commerce's findings of similarity between the

coconut-shell carbonized materials and coal-carbmat in terms of their proportion of micropore

surface areas. Def. Br. at 23. In this regard, Defendant does not dispute that coconut shell contains 50% more micropores than bituminous coal, detracting from Commerce's findings, C-P Br. at 28, but nonetheless counters – citing Respondents' Case Brief – that "'{t}hough less efficient than coconut-based activated carbon, charcoal activated carbon filtration still provides a *substantial micro pore surface area*.'" Def. Br. at 24 (emphasis added) (citing Respondents' Case Brief (Sept. 27, 2021), C.R. 214, P.R. 295, at 40). Defendant misunderstands our argument, which simply highlights a wide chasm of micropore areas – 50% – thereby detracting from the claimed physical structure equivalence of the two carbonized materials. Tellingly, Defendants completely fail to rebut highly authoritative U.S. International Trade Commission reports "confirm{ing} that coconut and coal-based activated carbons have 'different physical structures' and 'there is very little interchangeability' between the two products," based on their different hardness levels and pore sizes. C-P Br. at 29. Likewise, they also fail to rebut that "the two products have 'different markets' and there is a demonstrated 'lack of customer overlap.'" *Id.*

Third, Defendant's attempts to distinguish wood-charcoal from coal-carbmat based on the number of micropores, Def. Br. at 23, are unavailing given that the two products are comparable in terms of iodine number, C-P Br. at 30, which is a functionally significant physical characteristic – providing the measurement of iodine solution adsorbed by the activated carbon – reported in Field 3.8 of the CONNUM build-up. DJAC CQR at 8. This fact establishes the functional equivalence between wood-charcoal and coal-carbmat.

Fourth, Defendant advances a muddled and conflicting rebuttal regarding the lack of evidence showing consumption of coconut-charcoal by respondents (countering Petitioners' arguments regarding no consumption of wood-charcoal), which was supported by this Court's opinion in the preceding, twelfth administrative review, *Carbon Activated Tianjin Co. v. United*

*States*, 586 F.Supp.3d 1360 (CIT 2022). According to Defendant, "Commerce was not required to make a finding that the mandatory respondents purchased carbonized material made from coconut shell charcoal in order to use HTS 4402.90.9000." Def. Br. at 23. This makes no sense.

Fifth, Defendant argues to disregard the non-contemporaneity of HTS 4402.90.1000 SV, reasoning that: "Commerce properly exercised its discretion to weigh specificity over contemporaneity {because}. . . coconut shell charcoal under Malaysian HTS 4402.90.1000 is the most similar to respondents' coal-based charcoal and, thus, a more specific surrogate value than the broader category of wood charcoal under HTS 4402.90." Def. Br. at 25. This argument is contradicted by record evidence establishing that the broader category HTS 4402.90 is more specific to and representative of coal-carbmat. C-P Br. at 28-37.

Sixth, Defendant's cliched argument of single country preference to support Malaysian HTS 4402.90.1000, Def. Br. at 26, 29, fails, absent demonstration that this sub-heading is either "better than" or "fairly equal" to HTS 4402.90 in terms of product-specificity, as settled judicial precedent require. C-P Br. at 34. Moreover, Defendant's argument that unlike Malaysia, the record proffers only one Turkish SV, *i.e.*, carbonized materials, is an irrelevant consideration. Def. Br. at 26.

Seventh, Defendant unpersuasively attempts to diminish the CAFC's endorsement of Commerce's AR4 selection of HTS 4402, citing to a statement that: "'{t}here are no express findings or comparisons between wood charcoal and coconut shell charcoal, and this record does not establish any such conclusions.'" Def. Br. at 26 (quoting *Jacobi*, 619 Fed. Appx. at 999). Contrary to Defendant's arguments, this record, unlike previous records, compares wood, coal, and coconut based activated carbon on several parameters – surface area, iodine, methylene blue, moisture, density, hardness, ash, porosity, wettability, heavy metals, application, etc. Case Brief

at 37-44, Attachment 3.

For instance, ECOLOGIX ENVIRONMENTAL SYSTEMS compares the following salient

properties amongst the three activated carbons:

| Property | Wood-Activated Carbon | Coal-Activated Carbon | Coconut-Activated Carbon |
|---|---|---|---|
| Surface Area (m2/g) Minimum | 1000 | | 850-1350 |
| Iodine (mg/g) Minimum | 1000 | 800-1100 | 800-1300 |
| Methylene Blue (ml) Minimum | 180 | 100-230 | 100-230 |
| Moisture (%) | 10 | 2-5 | 3-10 |

Respondents' Final SV Submission, Exhibits 1D, 1F, 1L.

Likewise, producer Kalpaka Chemicals' website evidences the following comparative

properties:

| Property | Wood-Activated Carbon | Coal-Activated Carbon | Coconut-Activated Carbon |
|---|---|---|---|
| Density | 0.48 to 0.58 GM/CC (Very High) | 0.38 TO 0.48 GM/CC (High) | 0.25 TO 0.30 GM/CC (Low) |
| Hardness | 98 % min (Very high) | 90 – 95 % (High) | 85% min (Low) |
| Ash | Very low - 3% max | High  - 10% max | Very High - 15% max |
| Porosity | More Micropores | More mesopores and Less Micropores | More mesopores and Macropores |
| Wettability | Very High | Normal | Low |

Respondents' Final SV Submission, Exhibit 1C; Case Brief, Attachment 3.

The above two charts vividly show that the three types of activated carbons are part of the

same continuum. In turn, the respective underlying carbonized materials are likewise

comparable. These evidentiary facts undermine Defendant's arguments to reject DJAC's

contention "that coal-based carbonized material possesses characteristics that place it between

coconut shell charcoal and wood-based charcoal." Def. Br. at 27.

12

The above facts also fill the evidentiary void that the CAFC pointed to when endorsing HTS 4402 even absent such evidence.

Eighth, Defendant attempts to undermine DJAC's benchmarking of coal-carbmat by the price of its raw material, bituminous coal, claiming that for determining aberration, only "historical import data for the potential surrogate countries" or "data from the same HTS category for the primary surrogate country over multiple years" could be considered. Def. Br. at 28. This absolutist argument is contradicted by agency precedent employing raw material prices in aberrational SV analyses. For instance, in *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, Commerce rejected a SV "for rice husk, a waste byproduct of rice, given that no record evidence suggests that rice husk can trade for more than rice." 236 F.Supp.3d 1352, 1357 (CIT 2017).

Ninth, the judicial precedent that Defendant relies upon to argue that "Commerce has the discretion to select non-contemporaneous data" are distinguishable. Def. Br. at 28. In *Qingdao Sea-Line Trading Co. v. United States*, based on its bulb size, "garlic bulbs {were} in the grade Super A category" {whereas} "{t}he APMC Bulletin, . . . did not report any prices for grade Super A bulbs for the period of review." 766 F.3d 1378, 1381 (Fed. Cir. 2014). Likewise, in *QVD Food Co. v. United States*, "{t}he 2000–2001 {data} was reliable, but not contemporaneous" whereas "{t}he 2006–2007 data was contemporaneous {but} was too unreliable." 721 F.Supp.2d 1311, 1317-18 (CIT 2010). In contrast, the non-contemporaneous Malaysian HTS 4402.90.1000 SV from the twelfth administrative review ("AR12") that Commerce used for coconut shell charcoal is qualitatively inferior because it is less specific as compared to the contemporaneous Turkish HTS 4402.90 SV.

Tenth, Defendant touts the agency's cliched single country "regulatory preference under 19 C.F.R. § 351.408(c)(2)." Def. Br. at 29. However, this preference is conditional, not absolute. 19 C.F.R. § 351.408(c)(2) ("normally") and is not triggered where, as here, the Malaysian SV is less specific compared to the Turkish SV.

Therefore, on this record, the CAFC's AR4 decision compels a hybrid valuation of coal-carbmat by weight-averaging coconut-charcoal and wood-charcoal under Turkish HTS 4402.90.

### III.   COMMERCE UNLAWFULLY VALUED COAL TAR

Consolidated Plaintiffs demonstrated that Commerce unlawfully valued coal tar using an anomalous and potentially distorted Malaysian HTS 2706.00 import data. C-P Br. at 37-45. Conversely, Consolidated Plaintiffs established that the Malaysian average domestic market price for coal tar and partially distilled pitch (a.k.a. partially distilled tar) or, alternatively, the Russian HTS 2706.00 import average unit value ("AUV") proffered the most reliable SV data for this input. *Id*. at 45-48. Defendants' unpersuasively attempt to defend the Malaysian HTS 2706.00 AUV, and to impeach the Malaysian domestic price and Russian import AUV; those Commerce choices are unsupported by substantial evidence, as set forth below.

### A. Defendants Fail to Support the Anomalously Higher AUV in Malaysian HTS 2706.00 Import Data

First, echoing the *Final Results*, Defendant touts "Commerce's regulatory preference to value all factors of production in a single surrogate country" to support the Malaysian HTS 2706.00 import AUV. Def. Br. 29. This argument should be outrightly rejected because it unlawfully inverts the **sequential analysis** of statutory factors mandated by Commerce's stated policy to select the best available information to value a factor of production ("FOP"). Under this sequential analysis, "data quality is a critical consideration affecting surrogate country selection." Commerce Policy Bulletin 04.1 (Mar 1, 2004), at 4. Pursuant to this agency policy,

Commerce in a letter to all interested parties, solicited "information regarding data availability and quality of the data available within that single country for the **major factors of production** used to produce the merchandise" in order to select the primary surrogate country. Commerce Letter (Jan. 19, 2021), P.R. 93, at 1 (emphasis added). Coal tar is undisputedly a major FOP. As such, a comparative analysis of coal tar SV data across all six potential surrogate countries listed in Commerce's letter is a necessary precondition before selecting the primary surrogate country. Contrary to Defendant's arguments, Commerce's preemptive selection of Malaysia as a primary surrogate country is unlawful as it contradicts its own policy and stated practice to first select the best available SV data for key FOPs from any one of the listed countries, and then select the primary surrogate country – not the other way round. Consequently, Defendant's primary surrogate country-driven argument is devoid of merit.

Second, Defendant warps the issue responding to Consolidated-Plaintiffs' demonstration that Malaysian coal tar HTS 2706.00 AUV of $1.56/Kg (*i.e.*, $1,560/MT) was anomalous and unreliable, being significantly higher than Malaysian pitch HTS 2708.10 AUV of $1.00/Kg (*i.e.*, $1,000/MT). C-P Br. at 39-41. According to Defendant: "as Commerce explained, even if it were true that the AUV of pitch should be higher" than AUV of coal tar. Def. Br. at 30. However, the issue that Consolidated-Plaintiffs framed and Commerce addressed is exactly the opposite: as to what "may cause a product with less 'value-added' like coal tar to be more expensive than another product," which Commerce speculated could be due to unspecified non-manufacturing cost factors. IDM at 26. Accordingly, Commerce's analysis was in response to Consolidated-Plaintiffs' demonstration of a counterintuitive price relationship, *i.e.*, how could the price of a raw material, coal tar exceed the price of finished product, pitch – not the other way round. Indeed, record evidence establishes that this inverted pricing is anomalous. Independent price

data published in Global Coal Tar and Coal Tar Pitch Market Analysis & Forecast 2017-2027

("Market Report"), which Commerce improperly avoided, Section III.B, *infra*, shows that during

the POR, all over the world, domestic market pitch prices were consistently higher than the coal

tar prices. Respondents' Final SV Submission Exhibit 2N. Specifically, pitch prices globally

varied in the range of $324.4/MT to $726.8/MT. *Id*. at 60, 76. In Malaysia, pitch prices ranged

from $418.7/MT to $530.5/MT. *Id*. at 68. These data show that the Malaysian HTS 2708.10

AUV of $1,000/MT was already well above the highest global market price of pitch

($726.8/MT). Therefore, contrary to Defendant's articulation of the issue, Consolidated-

Plaintiffs' argument was not directed to the Malaysian import AUV of value-added pitch (which

already was significantly above-market-price); it was rather directed against the inexplicably

higher Malaysian import AUV of coal tar (relative to pitch price) – even though it is a lower

value-added product.

　　　　Third, there has not been a cogent explanation supported by record evidence to the

anomalous coal tar-pitch pricing relationship. Instead, Defendant regurgitates Commerce's

speculative claim that unspecified non-manufacturing cost pricing factors "that impact a

product's value and may cause a product with less 'value-added' like coal tar to be more

expensive than another product." Def. Br. at 30. As such, following Commerce's footsteps,

Defendant too sidesteps explicating those alleged non-manufacturing cost pricing factors and

how they could outweigh a direct economic correlation between the higher cost fully distilled

value added product, pitch, and its lower value added raw material, coal tar.

　　　　Fourth, Defendant's claim that "there is no record evidence to support the premise that

coal tar pitch {price} must be higher" is refuted by record evidence. *Id*. The Market Report

shows that in every country covered in the report, pitch price was, without exception, higher than

the prices of coal tar and partially distilled tar. Respondents' Final SV Submission Exhibit 2N at 42-81. Yet Commerce improperly ignored this Market Report. C-P Br. at 42-44.

Fifth, according to Defendant: "DJAC's contention that distortion was 'likely' caused by coal tar and pitch being conflated with one another, and consequently entered under incorrect HTS subheadings (DJAC Br. at 40) is based on speculation." Def. Br. at 30. Defendant's arguments are directly contradicted by the on-point precedent from AR10 where this Court had cautioned against this precise conflation with commercial parlance terminology:

> {S}ubstantial evidence supports the agency's conclusion that **coal tar and pitch are distinct inputs notwithstanding Respondents' inconsistent use of terminology**. . . .
>
> The court discerns from Commerce's discussion that the **separate inputs of coal tar and pitch reflect what the "inputs actually were,"** . . . **based on pitch content of the input material and not simply the label Respondents attached to the input**.

*Calgon Carbon*, 443 F.Supp.3d at 1343-44 (emphases added) (citations omitted).

Sixth, there has not been an adequate response to Consolidated-Plaintiffs' arguments that the anomalous price relationship between Malaysian HTS 2706.00 and HTS 2708.10 AUVs was affirmed by a common source, Spain, predominantly feeding imports under both the subheadings. C-P Br. at 38-44. Defendant, like Commerce, improperly miscasts blame by claiming that "DJAC and {Plaintiff Carbon Activated (Tianjin) Co., Ltd. ("CAT")} again fail to provide specific evidence supporting their claims." Def. Br. at 30. Defendant unpersuasively advances the cliched sermon that "it is the responsibility of interested parties — not Commerce — to build the factual record supporting its position." *Id*. at 31. By presenting a plethora of evidence – Spanish trade data and global market prices of coal tar and pitch – detracting from the reliability of the Malaysian and its Spanish components AUVs reported in HTS 2706.00 and 2708.10, the initial evidentiary burden was discharged. Yet neither Defendant nor Commerce

addressed this evidentiary demonstration. Instead, the Defendant peremptorily faults and improperly burdens Consolidated-Plaintiffs to provide even more specific and granular evidence to support the self-evident anomalous price relationship.

Defendant on this point misplaces reliance on *Ancientree Cabinet Co. v. United States*, 532 F.Supp.3d 1241, 1254 (CIT 2021), in arguing that "that when there is insufficient evidence to determine certain data aberrational or unreliable, Commerce has no basis for rejecting the data." Def. Br. at 31. Yet in *Ancientree*, "Commerce could not perform the aberrancy or commercial significance analysis because Ancientree failed to provide comparative data to Commerce, and thus failed to satisfy its burden to build the record, leaving Commerce no basis for rejecting the Romanian import quantities as commercially insignificant." 532 F.Supp.3d at 1254. By contrast, the extensive comparative and benchmark data of coal tar and pitch satisfied the respondents' obligation to build the record, which, in turn, obligated Commerce to address the anomalous pricing of coal tar. As such, *Ancientree* does not support Defendant's position.

Seventh, Defendant unpersuasively counters the aberrancy of the Malaysian HTS 2706.00 AUV based on an absence of historical import data. Def. Br. at 31. Yet Defendant cites no precedent that precludes analysis beyond historical import "data from the same HTS category for the primary surrogate country over multiple years on the record" to assess SV unreliability. *Id*. On the contrary, there are myriad ways to assess SV reliability. For instance, Commerce often finds SV unreliability based solely on the disparity between HTS import data and corresponding domestic market prices in the surrogate country. *See, e.g.*, *Risen Energy Co. v. United States*, 447 F.Supp.3d 1332, 1340-41 (CIT 2020). Neither Commerce nor this Court require juxtaposition with the individual POR import-based SV alongside that country's (or other countries') historical and contemporaneous import-based SV, *see id*., disproving Defendant's argument.

18

**B. Commerce Unlawfully Avoided the Market Report as a Benchmark or SV Source**

Defendant argues that Commerce properly rejected the Market Report. First, Defendant echoes Commerce's rationale that the said report was a "private market report" and consequently it "lacked publicly-available domestic prices." Def. Br. at 31-32; IDM at 27. However, the Market Report was purchased from the publisher upon payment of the prescribed fees. The fact that Commerce has a "longstanding practice of relying on data maintained in fee-based sources" like the Market Report, directly contradicts Defendant's argument. *Frozen Fish Fillets from Vietnam*, 85 Fed. Reg. 23,756 (Apr. 29, 2020) (final results), IDM Comment 2C. Commerce in fact "consider{s} the appropriate indication of public availability to be whether any entity can obtain the data," and will consider a subscription service to be publicly available when "{t}here is no evidence on the record indicating that the subscription service is not available to the public at large." *Mattresses from China*, 84 Fed. Reg. 56,761 (Oct. 23, 2019) (final determination), IDM Comment 7; *Laminated Woven Sacks from China*, 73 Fed. Reg. 35,639 (June 24, 2008) (final determination), IDM Comment 15 ("This information satisfies the Department's requirement of public availability because the data has intentionally been made available, through paid subscription or otherwise, to the general public by its publisher. We consider the appropriate indication of public availability to be whether any entity can obtain the data.").

The record is devoid of any evidence suggesting that the Market Report is not freely available or that is cannot be purchased by any ordinary person by directly approaching the publisher. Thus, record evidence confirms that the Market Report is "publicly available," as that term has been construed by Commerce and reviewing courts, and is as reliable as the summary Global Trade Atlas import data upon which Commerce normally relies as the SV for material inputs. Commerce Preliminary SV Memorandum (June 18, 2021), P.R. 273, at 2-3.

The fact that the Market Report is publicly available allows "both domestic and foreign" parties to "make their evaluations on the same data" and "provides a preliminary reliability check." *Frozen Fish Fillets from Vietnam*, 75 Fed. Reg. 38,985 (July 7, 2010) (final results), IDM Comment 1. Likewise, in AR13, any person including Petitioners could have independently obtained a copy of the Market Report. This fact contradicts Defendant's arguments that the Market report "lacked publicly-available domestic prices." Def. Br. at 31-32.

Petitioners misplace reliance *Prestressed Concrete Steel Rail Tie Wire from China*, 79 Fed. Reg. 25,572 (May 5, 2014) (final determination) ("*PC Wire*"), in arguing that the Market Report "is not publicly available." Pet. Br. at 26. Yet *PC Wire* is readily distinguishable because there, Commerce rejected a price quote reasoning that: (1) "the Department cannot be certain that it could obtain the same price quote" since "price quotes are generally proprietary in nature and, as such, the Department does not know the conditions under which the information is obtained."; (2) "this rate quote appears to indicate that PAF is seeking Silvery Dragon's business and, thus, PAF may have offered Silvery Dragon a special rate in order to obtain its business"; (3) "This information is not publicly available on the PAF website." *PC Wire*, 79 Fed. Reg. 25,572, IDM Comment 6.

The Market Report is evidently not a price quote and therefore not proprietary in nature. There is also no record evidence or argument suggesting that the publisher of Market Report was seeking DJAC's or CAT's business. Accordingly, unlike a price quote, the Market Report is both publicly available and free from any conflicts of interest. Therefore, there are no reliability concerns surrounding the Market Report and the data it contains. Finally, this Court has clarified that website publication is not required for information to be publicly available. *Shantou Red Garden Foodstuff Co. v. United States*, 815 F.Supp.2d 1311, 1330 (CIT 2012).

The fact that the Market Report was not yet on a website does prevent its data from being publicly available. According to Commerce's regulatory interpretation of the applicable regulation, data need not be published in order to be "public" as is its SV preference. *Antidumping Duties; Countervailing Duties,* 61 Fed. Reg. 7,308, 7,344 (Feb. 27, 1996) (the regulation "drops the preference for published information, limiting the preference to publicly available information."); *see Antidumping Duties; Countervailing Duties,* 62 Fed. Reg. 27,296, 27,367 (May 19, 1997) ("the Department elected to codify a preference for publicly available information rather than publicly available published information."). In sum, Defendants' arguments that the Market Report is not publicly available are without merit.

Second, Defendant unpersuasively responds to Consolidated-Plaintiffs' demonstration that, contrary to Commerce's findings, the Market Report indeed provided a methodology for data collection. C-P Br. at 43. Defendant's retort is that "the information from the Market Report that DJAC cites does not pertain specifically to the methodology used to obtain the prices being reported" and "the cited pages are very general and across various industries." Def. Br. at 32-33. The Market Report, however, is a comprehensive document on the coal tar and pitch used in several industries including chemicals. Apart from pricing, it encompasses several other critical pieces of industry information. The data collection methodology section applies to all information (including price data) contained in this report. Respondents' Final SV Submission Exhibit 2N at 13-14. Defendant fails to provide any precedent to support its claimed necessity for a data source to have stand-alone section concerning its methodology for price data collection. As such, Defendant's argument concerning price collection methodology is without merit.

Third, Defendant echoes Commerce's skepticism whether the Market Report price data "are tax-and-duty exclusive." Def. Br. at 33; IDM at 27. In so doing, Defendant fails to address

the judicial precedent that Consolidated-Plaintiffs cited allaying such concerns because, absent indication of taxes/duties, reported prices are deemed to exclusive of those taxes/duties. C-P Br. at 44. Therefore, this claim is not a basis supporting Commerce's rejection of the Market Report.

Finally, Defendant claims that "Commerce lawfully concluded that DJAC's and CAT's reliance on Malaysian domestic prices and Russian import data were flawed because the data they rely on comes from the same private market report that . . . does not explain how it obtained the reported prices or if those prices are tax- and duty-exclusive." Def. Br. at 33. Based on Consolidated-Plaintiffs' demonstration that the Market Report is publicly available, supported by a price data collection methodology, and having price data deemed tax and duty exclusive, the Malaysian and Russian domestic market prices of coal tar reported therein afford reliable benchmark prices and SVs. C-P Br. at 45-48. Specifically, the Malaysian domestic market coal tar average price at $216.3/MT constitutes the best SV data to value coal tar input, available from the primary surrogate country. *Id*. at 46. Alternatively, per this Court's precedent, Russian domestic market coal tar average price of $325/MT lends support to the Russian HTS 2706.00 AUV of $172/MT. *Id*. at 47-48 (citing *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States,* 29 CIT 288, 300 (2005)).

## **CONCLUSION**

For the foregoing reasons and those in their Opening Brief, Consolidated Plaintiffs respectfully request that this Court remand the *Final Results* for Commerce reconsideration consistent with the arguments set forth above.

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Francis J. Sailer
Dharmendra N. Choudhary
Jordan C. Kahn

22

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Consolidated Plaintiffs Datong
Juqiang Activated Carbon Co., Ltd., Datong
Juqiang Activated Carbon USA, LLC,
Ningxia Guanghua Cherishmet Activated
Carbon Co., Ltd., and Datong Municipal
Yunguang Activated Carbon Co., Ltd.*

Dated: March 24, 2023

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Consolidated Plaintiffs' Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 6,677 words, less than the 7,000 word limit.

/s/ Jordan C. Kahn\_\_\_

*Counsel for Consolidated Plaintiffs Datong Juqiang Activated Carbon Co., Ltd., Datong Juqiang Activated Carbon USA, LLC, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., and Datong Municipal Yunguang Activated Carbon Co., Ltd.*

Dated: March 24, 2023