Slip Op. 23-109

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD. AND CARBON ACTIVATED CORPORATION, | |
| Plaintiffs, | |
| and | |
| CALGON CARBON CORPORATION, NORIT AMERICAS, INC., AND DATONG JUQIANG ACTIVATED CARBON CO., LTD., ET AL., | |
| Consolidated Plaintiffs, | Before: Mark A. Barnett, Chief Judge |
| | Consol. Court No. 22-00017 |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| CALGON CARBON CORPORATION, NORIT AMERICAS, INC., CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, AND DATONG JUQIANG ACTIVATED CARBON CO., LTD., ET AL., | |
| Defendant-Intervenors. | |

## OPINION

[Sustaining the U.S. Department of Commerce's final results in the thirteenth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China]

Dated: July 21, 2023

John M. Peterson, Richard F. O'Neill, and Patrick B. Klein, Neville Peterson LLP, of New York, NY, for Plaintiffs/Defendant-Intervenors Carbon Activated Tianjin Co., Ltd., and Carbon Activated Corporation.

Francis J. Sailer, Dharmendra N. Choudhary, and Jordan C. Kahn, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Consolidated Plaintiffs/Defendant-Intervenors Datong Juqiang Activated Carbon Co., Ltd., Datong Juqiang Activated Carbon USA, LLC, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., and Datong Municipal Yunguang Activated Carbon Co., Ltd.

John M. Herrmann, Julia A. Kuelzow, R. Alan Luberda, and Melissa M. Brewer, Kelley Drye & Warren LLP, of Washington, DC, for Consolidated Plaintiffs/Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc.

Antonia R. Soares, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Patricia M. McCarthy, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Ashlande Gelin, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Barnett, Chief Judge: This consolidated matter is before the court following the

U.S. Department of Commerce's ("Commerce" or "the agency") final results in the

thirteenth administrative review ("AR13") of the antidumping duty order on certain

activated carbon from the People's Republic of China ("China") for the period of review

("POR") April 1, 2019, through March 31, 2020.  *See Certain Activated Carbon From the*

*People's Republic of China*, 86 Fed. Reg. 73,731 (Dep't Commerce Dec. 28, 2021)

(final results of antidumping duty admin. review; and final determination of no

shipments; 2019–2020) ("*Final Results*"), ECF No. 16-2, and accompanying Issues and Decision Mem., A-570-904 (Dec. 17, 2021) ("I&D Mem."), ECF No. 16-3.[1]

There are three sets of challenges to the *Final Results*.  Plaintiffs Carbon Activated Tianjin Co., Ltd., and Carbon Activated Corporation (collectively, "Carbon Activated") challenge Commerce's selection of surrogate values for carbonized material, coal tar, hydrochloric acid, and steam, selection of surrogate financial ratios, and valuation of ocean freight.  *See* Confid. [Carbon Activated's] Mem. of Law. in Supp. of Pl.'s Rule 56.2 Mot. for J. of the Agency R. ("Pls.' Rule 56.2 Mem."), ECF No. 33-1; Reply Br. in Supp. of Pls.' [Carbon Activated's] Rule 56.2 Mot. for J. on the Agency R. ("Pls.' Reply"), ECF No. 45.

Consolidated Plaintiffs Datong Juqiang Activated Carbon Co., Ltd., Datong Juqiang Activated Carbon USA, LLC, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., and Datong Municipal Yunguang Activated Carbon Co., Ltd. (collectively, "DJAC," and together with Carbon Activated, "Respondents") also challenge Commerce's selection of surrogate values for carbonized materials and coal tar, as well as Commerce's selection of surrogate financial ratios.  *See* Confid. Mem. of Law in Supp. of Consol. Pls.' Mot. for J. on the Agency R. Pursuant to USCIT Rule 56.2 ("DJAC's Rule 56.2 Mem."), ECF No. 30; Consol. Pls.' Reply to Def. and Def.-Ints.'

---

[1] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 16-5, and a Confidential Administrative Record ("CR"), ECF No. 16-4.  Parties filed joint appendices containing record documents cited in their briefs.  *See* Public J.A. ("PJA"), ECF No. 47; Confid. J.A. ("CJA"), ECF No. 48.  Parties subsequently filed supplemental joint appendices with record documents not contained in the CJA or PJA.  *See* Public Resp. to Ct.'s Req., ECF No. 50; Confid. Resp. to Ct.'s Req. ("Suppl. CJA"), ECF No. 51.

Resps. to Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R ("DJAC's Reply"), ECF No. 46.

Consolidated Plaintiffs Calgon Carbon Corporation and Norit Americas, Inc. (together, "Calgon" or "Petitioners") challenge Commerce's selection of the surrogate value for bituminous coal and Commerce's reliance on the consumption of bituminous coal as reported by DJAC.  *See* Confid. Consol. Pls.' Rule 56.2 Mem. of Law in Supp. of Mot. for J. on the Agency R. ("Calgon's Rule 56.2 Mem."), ECF No. 32-1; Confid. Consol. Pls.' Reply to Def.'s and Def.-Ints.' Resps. to Consol. Pls.' Mot. for J. on the Agency R. ("Calgon's Reply"), ECF No. 43.

Defendant United States ("the Government") filed a response supporting the *Final Results*.  *See* Def.'s Resp. to Rule 56.2 Mots. for J. on the Agency R. ("Def.'s Resp."), ECF No. 36.  DJAC, as defendant-intervenors in a member case, and Calgon, as defendant-intervenors in the lead case, also filed responses supporting certain elements of the *Final Results*.  *See* Consol. Def.-Int. DJAC's Resp. to Consol. Pl. Pet'rs' Mot. for J. on the Agency R. Pursuant to USCIT Rule 56.2 ("DJAC's Resp."), ECF No. 38; Def.-Ints.' Resp. Br. ("Calgon's Resp."), ECF No. 37.[2]

## JURISDICTION AND STANDARD OF REVIEW

This court has jurisdiction pursuant to section 516A(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018)[3] and 28 U.S.C. § 1581(c).

---

[2] Although Carbon Activated intervened as a defendant-intervenor in a member case, it did not file a response brief in the lead case.  *See* Docket.

[3] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition, unless otherwise stated.

The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

BACKGROUND

## I.   Administrative Proceedings

On June 18, 2020, Commerce initiated AR13 of the antidumping duty order on certain activated carbon from China.  *See Initiation of Antidumping and Countervailing Duty Admin. Reviews*, 85 Fed. Reg. 35,068, 35,070–71 (Dep't Commerce June 8, 2020), PR 61, PJA Tab 3.  Commerce selected Carbon Activated and DJAC as "mandatory respondents" for individual examination in AR13 because "they were the two largest exporters of the subject merchandise, by volume, during the POR."  Prelim. Decision Mem. ("Prelim. Mem.") at 2, PR 270, PJA Tab 20.

Because Commerce considers China to be a nonmarket economy ("NME") country for purposes of the antidumping laws, *see id*. at 4, the agency determines normal value by valuing the factors of production used in producing subject merchandise, general expenses, profit, and "the cost of containers, coverings, and other expenses" in a surrogate market economy country.  19 U.S.C. § 1677b(c)(1).  Commerce identified six potential surrogate countries: Brazil, Malaysia, Mexico, Romania, Russia, and Turkey.  Prelim. Mem. at 11.  On January 19, 2021, Commerce invited interested parties to comment on Commerce's list of economically comparable countries, surrogate country selection, and surrogate value data.  *Id*. at 10.  Respondents and Petitioners submitted comments regarding the surrogate country selection process; Petitioners recommended that "Commerce select Malaysia and/or

Mexico as either the primary and/or secondary [surrogate country]," while Respondents "did not make an explicit recommendation" as to what country should be the primary surrogate country and submitted data from a variety of countries to value the factors of production. *Id*. at 12.

For the *Preliminary Results*, Commerce selected Malaysia as the primary surrogate country because Malaysia was at the same level of economic development as China, was a significant producer of comparable merchandise, and had reliable and usable data to value all factors of production and to calculate surrogate financial ratios. *Id*. at 17. For the *Final Results*, Commerce again selected Malaysia as the primary surrogate country. *See, e.g.*, I&D Mem. at 34 (identifying Malaysia as the primary surrogate country in the context of Commerce's selection of surrogate financial statements).

Carbon Activated, DJAC, and Calgon subsequently challenged various aspects of the *Final Results*.

## II.     Legal Background

An antidumping duty is "the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise." 19 U.S.C. § 1673. When, as here, "the subject merchandise is exported from a nonmarket economy country," Commerce determines "normal value" by valuing the "factors of production"[4]

---

[4] The "factors of production" include but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3).

used in producing the subject merchandise, and "an amount for general expenses and

profit plus the cost of containers, coverings, and other expenses" in a surrogate market

economy country.  *Id*. § 1677b(c)(1).

Section 1677b(c)(1) requires Commerce to value the factors of production "based

on the best available information regarding the values of such factors in a[n appropriate]

market economy country or countries."  *Id*.  In deciding what is an "appropriate" market

economy country, Commerce must utilize, "to the extent possible, the prices or costs of

factors of production" in a market economy country that is at "a level of economic

development comparable to that of the [NME] country," and is a "significant producer[]

of comparable merchandise."  *Id*. § 1677b(c)(4).

Commerce normally will value all factors of production in a single surrogate

country, 19 C.F.R. § 351.408(c)(2), referred to as the primary surrogate country, *Jiaxing*

*Brother Fastener Co. v. United States* ("*Jiaxing II*"), 822 F.3d 1289, 1294 & n.3 (Fed.

Cir. 2016).  To select a primary surrogate country, Commerce has adopted a four-step

approach.  *See* Import Admin., U.S. Dep't of Commerce, Non–Market Economy

Surrogate Country Selection Process, Policy Bulletin 04.1 (2004),

https://enforcement.trade.gov/policy/bull04-1.html (last visited July 21, 2023) ("Policy

Bulletin 04.1").  First, the Office of Policy assembles a list of potential surrogate

countries that are at a comparable level of economic development to the NME country

based on per capita gross national income as reported by the World Bank (the "OP

List").  *Id*. at 2.  Potential surrogate countries are "not ranked" and are "considered

equivalent in terms of economic comparability."  *Id*.  Second, among the potential

surrogate countries, Commerce identifies countries that produce comparable

merchandise.  *Id*.  Third, Commerce determines whether any of the potential surrogates

that produce comparable merchandise are significant producers of comparable

merchandise.  *Id*. at 3.  Whether production is "significant" is generally determined in

relation to "world production of, and trade in, comparable merchandise."  *Id*.  Finally, if

more than one country satisfies the first three criteria, Commerce selects the country

with the best surrogate value data as the primary surrogate country.  *Id*. at 4; *see also*

*Jiaxing II*, 822 F.3d at 1293 (citation omitted) (describing the four-step process).

Commerce will "only resort to a second surrogate country if data from the primary

surrogate country are unavailable or unreliable."  *Jiaxing Brother Fastener Co. v. United*

*States* ("*Jiaxing I*"), 38 CIT 1404, 1412, 11 F. Supp. 3d 1326, 1332–33 (2014), *aff'd*

*Jiaxing II*, 822 F.3d at 1289.

Commerce, in selecting surrogate values, "generally selects, to the extent

practicable, surrogate values that are publicly available, are product-specific, reflect a

broad market average, and are contemporaneous with the period of review."  *Jiaxing II*,

822 F.3d at 1293 (citing *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378,

1386 (Fed. Cir. 2014)); 19 C.F.R. 351.408(c)(1), (4) (directing Commerce to select

"publicly available," "non-proprietary information" to value factors of production and

"manufacturing overhead, general expenses, and profit").  Commerce also prefers

surrogate values that are input-specific and tax- and duty-exclusive.  *See* Policy Bulletin

04.1 at 4.

There is no hierarchy for applying the surrogate value selection criteria.  *See, e.g., United Steel & Fasteners, Inc. v. United States*, 44 CIT __, __, 469 F. Supp. 3d 1390, 1398–99 (2020); *Hangzhou Spring Washer Co. v. United States*, 29 CIT 657, 672, 387 F. Supp. 2d 1236, 1250–51 (2005) (stating that the court "does not decide . . . whether contemporaneity should be valued over specificity" absent "statutory instruction" to do so).  Commerce therefore has broad discretion to choose which criteria to emphasize in selecting the "best available information" so long as it does so in conformity with the substantial evidence standard.  *QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (citing *Ad Hoc Shrimp Trade Action Comm. v. United States*, 618 F.3d 1316, 1322 (Fed. Cir. 2010)).  Commerce must articulate a "rational and reasonable relationship" between the surrogate value and the factor of production it represents.  *Globe Metallurgical Inc. v. United States*, 28 CIT 1608, 1622, 350 F. Supp. 2d 1148, 1160 (2004).  Due to the discretionary, fact-specific nature of Commerce's determinations, the court does not address "whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information."  *Jiaxing II*, 822 F.3d at 1300–01.

DISCUSSION

I.      **Calculation of Surrogate Financial Ratios**

        a.  **Additional Background**

The administrative record in AR13 contained the financial statements of four companies.  *See* I&D Mem. at 32–33.  Two financial statements were from Malaysian producers of activated carbon, Century Chemical Works Sdn. Bhd. ("Century") and

Bravo Green Sdn. Bhd. ("Bravo Green").  *Id*. at 33.  The record also contained financial

statements from Joint Stock Company Sorbent ("JSC Sorbent"), a Russian producer of

respiratory protection products and activated carbon, and S.C. Romcarbon S.A.

("Romcarbon"), a Romanian producer of polyethylene, polypropylene, polyvinyl chloride,

polystyrene processing, filters and protective materials.  *Id*.

      For the *Final Results*, Commerce determined that the financial ratios of Century

and Bravo Green were the best available information for the purpose of calculating

surrogate financial ratios for multiple reasons.  *See id*. at 35.  First, Commerce

determined that Malaysia was the only country on the OP List that was a significant

producer of comparable merchandise because it was the only "net exporter" of subject

merchandise.  *Id*. at 32–33.  Second, Commerce determined that while Century and

Bravo Green's principal business activity was the manufacture and sale of activated

carbon, Romcarbon's financial statements indicated that its principal business activity

was unrelated to the manufacture or sale of activated carbon, and it was "difficult to

ascertain what portion of JSC Sorbent's portfolio relate[d] to [other business activities]

and what portion relate[d] to the production of activated carbon."  *Id*. at 33.  Finally,

Commerce explained that having found Malaysia to be the primary surrogate country,

Century and Bravo Green's financial statements were preferable because of the

agency's preference for valuing all factors of production in one surrogate country and

Malaysia was the only country that provided multiple usable financial statements.[5] *Id*. at

34.

### b. Parties Contentions

Respondents challenge Commerce's calculation of surrogate financial ratios

using the financial statements of Century and Bravo Green.  *See* Pls.' Rule 56.2 Mem.

at 8–26; Pls.' Reply at 3–12; DJAC's Rule 56.2 Mem. at 9–24; DJAC's Reply at 1–7.

Respondents first contend that Commerce unlawfully calculated surrogate financial

ratios because agency policy prohibits Commerce from applying fixed criteria, such as

whether a country is a "net exporter" of subject merchandise, in determining whether a

surrogate country is a "significant producer" of subject merchandise.  *See* Pls.' Rule

56.2 Mem. at 11–17; Pls.' Reply at 5–8; DJAC's Rule 56.2 Mem. at 9–11; DJAC's Reply

at 2–4.  Respondents further contend that (i) Romania is a "significant producer" of

subject merchandise, Pls.' Rule 56.2 Mem. at 17–21; DJAC's Rule 56.2 Mem. at 11–16,

(ii) the Malaysian financial statements do not provide reliable financial ratios, Pls.' Rule

56.2 Mem. at 21–24; Pls.' Reply at 8–10; DJAC's Rule 56.2 Mem. at 16–20; DJAC's

Reply at 4–6, and (iii) the Romcarbon and JSC financial statements are superior to

---

[5] Commerce explained that the agency has a "long-standing preference to use multiple
companies' financial statements whenever practicable because 'using the greatest
number of financial statements will yield the most representative data from the relevant
manufacturing sector to calculate accurate surrogate financial ratios.'"  I&D Mem. at 32
& n.216 (quoting Issues and Decision Mem. for Wooden Bedroom Furniture from China,
A-570-890 (Aug. 8, 2007) at 86,
https://access.trade.gov/Resources/frn/summary/prc/E7-16584-1.pdf (last visited July
21, 2023).

those of Century and Bravo Green, Pls.' Rule 56.2 Mem. at 24–26; Pls.' Reply at 10–11;

DJAC's Rule 56.2 Mem. at 20–24; DJAC's Reply at 6–7.

The Government and Calgon contend that Commerce's selection of financial

statements to calculate surrogate financial ratios is supported by substantial evidence.

*See* Def.'s Resp. at 12–22; Calgon's Resp. at 9–17.  The Government and Calgon first

argue that Commerce lawfully determined that Malaysia was the only significant

producer of subject merchandise, *see* Def.'s Resp. at 12–16; Calgon's Resp. at 10–13,

and, thus, the financial statements of Century and Bravo Green represented the best

available information to calculate the financial ratios.  *See* Def.'s Resp. at 16–17;

Calgon's Resp. at 14–17.

### c.  Analysis

As an initial matter, Respondents contend that Commerce's selection of financial

statements was flawed based on the agency's finding that only Malaysia was a

"significant producer" of comparable merchandise.  *See* Pls.' Rule 56.2 Mem. at 11–21;

DJAC's Rule 56.2 Mem. at 9–16.  Respondents allege that in determining what country

was a "significant producer," Commerce limited its analysis to whether a country was a

"net exporter," and failed to consider the data quality of proposed surrogate values from

OP List countries.  *See* Pls.' Rule 56.2 Mem. at 11-17; DJAC's Rule 56.2 Mem. at 9–11.

As noted above, in valuing factors of production, Commerce is directed to use,

"to the extent possible," data from an economically comparable market economy

country that is a "significant producer[ ] of comparable merchandise."  19 U.S.C.

§ 1677b(c)(4).  "Significant producer" is not defined in the relevant statute or

Commerce's regulations.  *See* Policy Bulletin 04.1 at 1.  Because the term is not

defined, Commerce looks to the legislative history and Policy Bulletin 04.1 for guidance.

*See, e.g.*, I&D Mem. at 31.  Policy Bulletin 04.1 states that in determining whether a

country is a "significant producer" of comparable merchandise, "that country should not

be judged against the [non-market economy] country's production level or the

comparative production of . . . [OP List countries]."  Policy Bulletin 04.1 at 3.  Instead,

the determination of whether a country is a "significant producer" "should be made

consistent with the characteristics of world production of, and trade, in comparable

merchandise."  *Id.*  Policy Bulletin 04.1 also lists examples of production levels that

would make a country a "significant producer," including being a "significant net

exporter."  *Id*. at 1 (discussing H.R. Rep. No. 100-576, at 590 (1988) (Conf. Rep.)).

Policy Bulletin 04.1 makes clear that "the standard for 'significant producer' will vary

from case to case" and that "fixed standards . . . have not been adopted."  *Id*. at 3.

Commerce's determination that Malaysia was the only "significant producer" of

subject merchandise is supported by substantial evidence.  Commerce stated that

Malaysia was the only significant producer of comparable merchandise because it was

the only OP List country that was a "net exporter," a metric that is both supported by

Commerce's policy and indicative of Malaysia having produced sufficient activated

carbon to ensure that it exported more than it imported.  *See* I&D Mem. at 32–33; *see*

*also* Policy Bulletin 04.1.  In addition to this metric, Commerce relied on financial

statements on the record to determine whether OP List countries were "significant

producers."  I&D Mem. at 33; *see also* Prelim. Mem. at 16 (explaining that the

statements "provide[] more direct evidence of production of identical, and therefore, comparable merchandise").  Commerce compared those financial statements to that of Romcarbon, which indicated that activated carbon was not Romcarbon's principal manufacturing activity and thus not evidence of "significant production" of activated carbon in Romania.  *See* I&D Mem. at 33.

Respondents argue that in the eleventh administrative review of activated carbon from China ("AR11"), the court invalidated Commerce's finding that Romania was not a significant producer of subject merchandise.  *See* Pls.' Rule 56.2 Mem. at 19–20; DJAC Rule 56.2 Mem. at 15–16; *see also Carbon Activated Tianjin Co. v. United States* ("*Carbon Activated AR11*"), 45 CIT __, __, 503 F. Supp. 3d 1278, 1286 (2021). However, in that case, the court faulted Commerce for failing to explain its analysis or reference the value of any country's exports after finding that no country on the OP List was a net exporter by volume.  *Carbon Activated AR11*, 503 F. Supp. 3d at 1286.  Here, however, Commerce has determined that Malaysia is a net exporter both in terms of quantity and value.  *See* I&D Mem. at 32.

Furthermore, in the *Final Results*, Commerce did not rely solely on the fact that Malaysia was the only significant producer of activated carbon to support its selection of Century's and Bravo Green's financial statements.  Instead, despite continuing to find that Romania was not a significant producer of activated carbon, Commerce compared Romcarbon's financial statements to those of Century and Bravo Green.  *Id*. at 33–35. Commerce acknowledged that the Malaysian financial statements were "not as detailed" as the agency preferred but explained that the financial statements still "provide[d]

sufficient information to calculate surrogate ratios for factory overhead costs, [selling, general, and administrative] expenses and profit." *Id*. at 35.  Commerce explained that any lesser detail was outweighed by the fact that Century and Bravo Green's principal business activity was the manufacture and sale of subject merchandise; by Commerce's preference to use financial statements from the primary surrogate country; and by Commerce's preference to use financial statements from a country with multiple usable financial statements on the record.  *See id*. at 34.

While Respondents would have preferred a different outcome to Commerce's analysis, that is not a basis for the court to reject the agency's conclusion. Respondents simply restate their arguments without identifying any gaps in Commerce's consideration of the issues.  Because Commerce adequately explained its selection of Century and Bravo Green's financial statements as discussed above, the court finds that Commerce's decision on this issue is supported by substantial evidence.

## II.   Valuation of Carbonized Material

### a.  Additional Background

For the *Final Results*, Commerce valued coal-based carbonized material using Malaysian data under HTS 4402.90.1000, which covers "coconut shell charcoal."[6]  I&D Mem. at 38.  Respondents argued before Commerce that the agency should instead value coal-based carbonized material using Turkish data under HTS 4402.90, covering "Wood Charcoal (Including Shell or Nut Charcoal), Excluding that of Bamboo." *Id*. at 35.

---

[6] Specifically, HTS 4402.90.1000 covers "Wood Charcoal (Including Shell or Nut Charcoal, Other Than of Bamboo: Of Coconut Shell)."  I&D Mem. at 38.

Commerce, however, concluded that the Malaysia data under HTS 4402.90.1000 was the best available information on the record because, like the coal-based carbonized material used by Respondents, coconut shell charcoal is steam activated and has significantly fewer micropores than wood-based carbonized materials.  Id. at 38–39. Furthermore, Commerce noted that the record indicated that Respondents did not use carbonized material made from wood or nut charcoal to produce subject merchandise. *Id*. at 39.

### b.  Parties' Contentions

Respondents contend that Commerce erred in selecting Malaysian coconut shell charcoal data for use as the surrogate value for carbonized materials because (i) the data was non-contemporaneous with the POR; (ii) the record indicated that "coal-based carbonized material" is distinct from coconut shell material and "possesses characteristics that place it between coconut shell charcoal and wood-based charcoal"; and because the court rejected Commerce's use of this data in the twelfth administrative review on certain activated carbon from China ("AR12").  *See* Pls.' Rule 56.2 Mem. at 26–32; Pls.' Reply at 12–15; DJAC's Rule 56.2 Mem. at 25-34; DJAC's Reply at 7–14.  Respondents contend that Commerce should have instead selected Turkish import data for HTS subheading 4402.90 as the surrogate value for carbonized materials.  Pls.' Rule 56.2 Mem. at 32–33; DJAC's Rule 56.2 Mem. at 34-37.

The Government and Calgon contend that substantial evidence supports Commerce's use of Malaysian import data under HTS 4402.90.1000 to calculate the

surrogate value for carbonized material.  *See* Def.'s Resp. at 22–25; Calgon's Resp. at 17–24.

### c.  Analysis

As an initial matter, "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."  *Jiaxing II*, 822 F.3d at 1299 (quoting *Qingdao Sea-Line*, 766 F.3d at 1387). Thus, the court's treatment of Commerce's selection of Malaysian coconut shell charcoal import data in AR12 does not necessarily mean that Commerce improperly selected that data in AR13.[7]

In *Carbon Activated Tianjin Co. v. United States* ("*Carbon Activated AR12*"), 46 CIT __, 586 F. Supp. 3d 1360 (2022), the court faulted Commerce for selecting coconut shell charcoal to value carbonized material because although Commerce found that the respondent's suppliers did not purchase carbonized material made from wood or nut charcoal, Commerce failed to make an analogous finding as to whether respondent's suppliers purchased carbonized material made from coconut shell charcoal.  *Id*. at 1379.  The court concluded that "[a]bsent evidence [of use of] coconut shell charcoal, Commerce's selection of [coconut shell charcoal] over [other wood charcoal] was unsupported by substantial evidence."  *Id*.

Here, unlike in the original determination in AR12, Commerce provided a reasoned explanation as to why coconut shell charcoal was a more appropriate proxy

---

[7] Furthermore, the court sustained Commerce's use of import data under HTS 4402.90.1000 to value carbonized materials on remand.  *See Carbon Activated Tianjin Co. v. United States*, Slip Op. 23-66, 2023 WL 3151091, at *4–5 (CIT Apr. 28, 2023).

for the coal-based carbonized material used by respondents than wood charcoal.  *See* I&D Mem. at 38–39.  First, the record indicates that "both coconut shell- and coal-based carbonized material are steam activated[,] whereas wood-based carbonized material is generally chemically activated," impacting "the ultimate physical structure of the carbonized material."  *Id.* at 38.  Second, the record showed that coconut shell- and coal-based carbonized materials had a different level of filtration than wood-based activated carbon.  *See id.* at 39 (noting that coconut shell- and coal-based carbonized materials have a "'substantial' amount of micropore surface area," while wood-based activated carbon has significantly fewer micropores and consists mostly of mesopores and macropores).[8]  Furthermore, Commerce explained that while its selected data was non-contemporaneous with the POR, the agency "favor[ed] specificity over

---

[8] Respondents also contend that the agency overstated similarities between coconut shell- and coal-based carbonized materials and failed to consider record evidence contradicting the agency's findings.  Respondents argue that "wood based activated carbon . . . is produced by either steam or phosphoric acid activation," DJAC's Rule 56.2 Mem. at 28 (quoting Final Surrogate Value Cmts. by DJAC and CA Tianjin (May 19, 2021) ("Final SV Submission"), Ex. 1-K, PR 230–42, PJA Tab 16); that "coconut shell [charcoal]. . . contains 50 percent more micro-pores than bituminous coal," *id.* (quoting Final SV Submission, Ex. 1-E); and that such evidence refutes Commerce's findings regarding the differences in the activation of, and filtration levels, of coconut shell-, coal-, and wood-based carbon materials, *see id.* at 27–28; *see also* Pls.' Rule 56.2 Mem. (arguing that there is overlap among the properties of wood-, coal- and coconut-based carbonized materials).  While a reasonable case might be made that HTS 4402.90 provided the best surrogate value for carbonized material because the physical characteristics of coal-based carbonized material placed it somewhere between coconut shell charcoal and wood-based charcoal, Commerce made a reasonable case that coconut shell charcoal and coal based carbonized material were more similar because both were steam activated (as opposed to chemically-activated) and had higher filtration levels than wood-based charcoal.  *See* I&D Mem. at 38–39.  The fact that it is possible to "draw[ ] two inconsistent conclusions from the evidence" does not mean that Commerce's determination is unsupported by substantial evidence. *Consolo v. Fed'l Maritime Comm'n*, 383 U.S. 607, 620 (1966).

contemporaneity" in AR13 based on its finding that HTS 4402.90.1000 was the most

appropriate proxy to value the carbonized material used by Respondents.  *See id.* at

40.[9]  Because Commerce adequately explained its reliance on Malaysian import data

under HTS 4402.90.1000 to value carbonized material, the court finds Commerce's

determination on this issue is supported by substantial evidence.

### III.     Valuation of Coal Tar

#### a.  Additional Background

For the *Preliminary Results*, Commerce valued coal tar using Malaysian HTS

subheading 2706.00[10] covering "Mineral Tars, Including Reconstituted Tars."  *See* I&D

Mem. at 26.

In its supplemental questionnaire response, DJAC included a test report showing

that the predominant constituent of the coal tar utilized by its supplier was pitch, valued

under Malaysian HTS subheading 2708.10 (Pitch from Coal and Other Mineral Tars).

*See* Suppl. Section D Questionnaire Resp. (May 21, 2021) ("Suppl. SDQR"), Ex. SD-33,

CR 146–73, PR 243–56, CJA Tab 17.  The average unit value ("AUV") for coal tar was

around $1.56/kg, while the AUV for pitch was around $1.00/kg.[11]  *See* Surrogate Values

---

[9] Finally, Respondents contend that Commerce should have used data from a second
surrogate country, Turkey, because of the lack of usable contemporaneous data from
Malaysia.  *See* Pl.'s Rule 56.2 Mem. at 26–27, 32–33; DJAC's Rule 56.2 Mem. at 34–
37.  Having found that Commerce's selection of Malaysian data is supported by
substantial evidence, there is no basis for the court to require the inclusion of additional
surrogate values from outside the primary surrogate country.
[10] The court refers to HTS 2706.00 herein as "coal tar."
[11] Prices calculated using a conversion rate of 1 Malaysian Ringgit to $0.24 U.S. dollars.
*See* DJAC's Rule 56.2 Mem. (citing to Case Br. of [Respondents] (Sept. 27, 2021)
("Respondents' Case Br.") at 52 no.94, CR 214–215, PR 295–96, CJA Tab 28.

for the Prelim. Results (June 18, 2021) ("Prelim. SV Mem.") at 4, PR 273–74, PJA Tab
21.

Respondents requested that Commerce instead use the Malaysian domestic
market price of $0.216/kg to value coal tar.  *See* Case Br. of [Respondents]
Respondents' Case Br. at 61–62.  Respondents' argued that the Malaysian import data
for coal tar was unreliable because (1) it is uncommon for value-added products to be
sold at less than the price of raw material, (2) an occurrence of this unlikely scenario in
the Malaysian import data was likely caused by the predominance of Spanish imports
as an overall percentage of Malaysian coal tar import data, and (3) the domestic price of
coal tar was so much lower than the import price of coal tar that it would not make
economic sense to consume imported coal tar.  *See* Respondents' Case Br. at 57–60.

Commerce continued to value coal tar using import data under Malaysian HTS
subheading 2706.00 for the *Final Results*.  I&D Mem. at 26–27.  Commerce disagreed
with Respondents that the AUV for Malaysian HTS 2706.00, being higher than that of
Malaysian HTS 2708.10, distorted its reliability as a surrogate value, stating that "there
may be factors involved with pricing apart from the cost of manufacturing that impact a
product's value" that could "cause a product with less 'value-added' like coal tar to be
more expensive than another product."  *Id.* at 26.  Commerce stated that Respondents
failed to provide specific evidence explaining "why the pattern of Spanish imports into
Malaysia under HTS 2706.00 [were] priced higher than those under HTS 2708.10" and,
thus, had failed to show that Malaysian HTS 2706.00 import data were unreliable.  *Id.* at
26–27.  Finally, Commerce explained that it could not verify the alternative surrogate

value data provided by Respondents because it came from a private market report and the report did not explain the methodology used to obtain the reported prices.  *Id*. at 27. As a result, Commerce concluded that it could not "determine how representative the prices are of a broad market average or if they are tax- and duty-exclusive."  *Id*.

### b.  Parties' Contentions

Respondents argue that Malaysian HTS subheading 2706.00 import data is unreliable because the AUV for HTS subheading 2706.00 significantly exceeded the AUV of a higher value-added product, pitch.  Pls.' Rule 56.2 Mem. at 33–35; Pls.' Reply at 15–17; DJAC's Rule 56.2 Mem. at 39–45; DJAC's Reply at 14–17.  Respondents argue that Commerce failed to respond to arguments they advanced in the administrative proceedings, failed to account for contrary record evidence regarding the aberrancy of the AUV for Malaysian HTS 2706.00, and improperly refused to benchmark Malaysian coal tar and pitch AUVs with the domestic market price data of those products in Malaysia and other market economy countries.  Pls.' Rule 56.2 Mem. at 33–37; DJAC's Reply at 17–22.

The Government and Calgon contend that Commerce lawfully determined that Malaysian import data under HTS subheading 2706.00 are the best available information on the record to value coal tar.  *See* Def.'s Resp. at 29; Calgon's Resp. at 25–27.  The Government contends that there is no record evidence demonstrating that the data are aberrant based on the AUV of coal tar being higher than that of pitch, or that the majority of imports of coal tar and pitch having originated from Spain rendered the data unreliable.  *See* Def.'s Resp. at 29–31.  Finally, the Government contends that

Commerce lawfully refused to benchmark Malaysian coal tar and pitch AUVs with the

domestic market price data of these products in Malaysia, Russia, and other market

economies because the record lacked publicly-available domestic prices to use as a

comparison with import AUVs.  *See id*. at 31–33.

### c.  Analysis

Respondents advance the same arguments they raised before Commerce in

support of the contention that Malaysian import data under HTS subheading 2706.00

were aberrant and should not have been used to value coal tar.  *See* Pls.' Rule 56.2

Mem. at 33–37; DJAC's Rule 56.2 Mem. at 39–45; DJAC's Reply at 14–18.  The court

finds that Commerce supported its reliance on Malaysian import data under HTS

2706.00 with substantial evidence.  As Commerce explained, Respondents failed to

identify record support for their arguments.  I&D Mem. at 26–27.  With respect to the

argument that the Malaysian data was aberrant because the AUV of the value-added

product, pitch, was lower than that of coal tar, a raw material, Respondents did not

provide evidence to support their inference that the higher value-added product

necessarily should be priced higher on the same per weight basis.  As Commerce

noted, there could be multiple factors affecting the pricing of coal tar and pitch imports

that would lead to these pricing trends, such as lower demand for the value-added

product or the nature of the further processing (e.g., combining the input with other low-

value, high-weight inputs).  *See id.* at 26.

Respondents' arguments that the Malaysian coal tar import data are tainted by

the predominance of Spanish imports as an overall percentage of Malaysian import data

simply shifts this price relationship issue to the Spanish data, but again, as Commerce

found, Respondents failed to provide evidentiary support for their assertion that the

Spanish data were aberrant.  *See id.* at 26–27.  First, the import prices for Spanish coal

tar and pitch do not appear to be outliers as the import price for both are lower than the

overall Malaysian import prices for coal tar and pitch.  *See* Respondents' Case Br. at

58.  Second, as discussed above, there are many factors that may impact domestic

prices in such a way that a value-added product sells at a lower per weight price than

the raw material used in its manufacture.  The data on which Respondents rely provide

a potential example of such a factor.  During the POR, Spain imported nearly five times

as much coal tar as it exported.  *See* Final SV Submission, Ex. 2-M.  Such an

imbalance could indicate that there is little domestic production of coal tar in Spain.

Furthermore, Respondents' contention that the Spanish data was aberrant because

coal tar was traded in the Spanish market at a third of the price at which it was exported

to Malaysia, *see* DJAC's Rule 56.2 Mem. at 41–42, is not supported by the data.  While

the AUVs of Spanish exports vary significantly from country to country, there is no

evidence that exports to Malaysia were priced significantly higher than those to other

countries.[12]  *See* Final SV Submission, Ex. 2-M.  Finally, Commerce supported its

determination by comparing Malaysian import data for coal tar to that of the import data

---

[12] The AUV for exports of Spanish coal tar typically fell between $1.00/kg and $1.20/kg,
whereas Spanish exports to Malaysia fell squarely within that range ($1.034/kg).  *See*
Final SV Submission, Ex. 2-M.  The primary data point impacting driving down Spain's
total AUV for coal tar during the POR was its exports to Denmark, which were priced
significantly lower than those to other countries ($0.35/kg) and accounted for over two-
thirds of total Spanish exports of coal tar.  *See id*.

for coal tar from other OP List countries, finding that the Malaysian prices were not

aberrant because the Malaysian prices were approximately 46 percent of the highest

import price for other OP List countries.  I&D Mem. at 27.

Respondents suggest that Commerce should have benchmarked Malaysian coal

tar and pitch import prices against the domestic market prices in Malaysia, and that

Commerce unlawfully rejected the domestic pricing data contained in the Coal Tar and

Coal Tar Pitch Market Report ("Market Report") Respondents submitted.  Pls.' Rule 56.2

Mem. at 36; DJAC's Rule 56.2 Mem. at 42–46.  While Respondents assert that the

Market Report was publicly available, Respondents have not identified record evidence

to support that assertion, nor did the court's independent review of the record uncover

such evidence.  Respondents contend that Commerce should have relied on the Market

Report because "[t]he record is devoid of any evidence suggesting the Market Report is

not freely available" and "[t]he Market Report is evidently not a price quote."  DJAC's

Rule 56.2 Mem. at 19–20; see also Pls.' Rule 56.2 Mem. at 36.  However, it is

incumbent upon an interested party, and not Commerce, to create the record, s*ee*

*Qingdao Sea-Line*, 766 F.3d at 1386, and absent record evidence detracting from

Commerce's decision to disregard the Market Report, Commerce's determination to rely

on Malaysian HTS 2706.00 is supported by substantial evidence.

IV.   **Valuation Of Hydrochloric Acid**

a.  **Additional Background**

To value hydrochloric acid,[13] Commerce selected Malaysian import data for HTS 2806.10 which covers "hydrogen chloride (hydrochloric acid)," *see* I&D Mem. at 45, and which constitutes a basket category including both anhydrous hydrogen chloride and aqueous hydrochloric acid, *see* Pls.' Rule 56.2 Mem. at 38.  Commerce explained that, because Malaysia is the primary surrogate country, its "regulatory preference for valuing all [surrogate values] from one surrogate country" meant that its "first preference in selecting [surrogate value] data . . . is to utilize publicly available prices within Malaysia." *Id*.  Commerce, therefore, declined Respondents' request to rely on Brazilian import data under HTS subheading 2806.10.20.  *Id*. at 45–46.

In response to Respondents' argument that Malaysian HTS 2806.10 was not specific to Carbon Activated's inputs, which consisted only of aqueous HCl, Commerce explained that record evidence "only demonstrate[d] the purity level of HCl . . . for a portion of the total quantity of HCl used in production."  *Id*. at 46 & n.307 (citing Carbon Activated's Suppl. Section D Questionnaire Resp. (May 13, 2021), Ex. SD-10.1 ("Aug. 2019 Test Report"), CR 92, PR 220, Suppl. CJA Tab 2).  Commerce also noted that the record contained "certain information related to HCl" but that Respondents had "failed to provide an explanation as to how these documents tie to the [surrogate value] and actual consumption of the HCl . . . reported for the POR."  *Id*. at 46

---

[13] "HCl" is the chemical formula for hydrogen chloride; the parties have used this formula interchangeably with the terms hydrochloric acid and hydrogen chloride.

### b.  Parties' Contentions

Carbon Activated contends that substantial evidence does not support Commerce's use of Malaysian HTS subheading 2806.10 to value the HCl used by Carbon Activated.  Pls.' Rule 56.2 Mem. at 37–39; Pls.' Reply at 17–18.  Carbon Activated contends that HTS subheading 2806.10, which covers two forms of HCl, (i) anhydrous or liquid HCl (without added water) and (ii) aqueous HCl (with added water), was not specific to the diluted aqueous HCl Carbon Activated used, Pls.' Rule 56.2 Mem. at 38, and, thus, Commerce should have valued its HCl inputs using import data under Brazilian HTS subheading 2806.10.20, *id*. at 39.

The Government contends that Carbon Activated failed to substantiate its use of aqueous HCl and that Commerce's selection of the Malaysian data is otherwise supported by substantial evidence.  Def.'s Resp. at 33–35.

### c.  Analysis

It is Respondents' burden to build a record that supports their desired outcome. *See QVD Food Co*., 658 F.3d at 1324.  Here, Commerce's determination that Carbon Activated failed to demonstrate the aqueous nature of all their HCl inputs is supported by substantial evidence.  *See* I&D Mem. at 46.

In support of their contention that they used only aqueous HCl in the production of subject merchandise, Carbon Activated cites to a document of limited utility.  *See* Pls.' Rule 56.2 Mem. at 38 (citing Aug. 2019 Test Report).  The document, which is not fully translated, contains two pages, one of which is titled "HCl (Liquid) Test Report," and includes the terms "date," "concentration," and "inspector."  Aug. 2019 Test Report.

Carbon Activated claims that "HCl with purity levels less than 100 [percent] are considered aqueous solutions," and that the test report demonstrates that the concentration level of the HCl supplied to Carbon Activated was aqueous.  Pls.' Rule 56.2 Mem. at 38.

As Commerce explained, the test report only demonstrated the purity level of HCl for a portion of Carbon Activated's purchases over a limited period of time.  I&D Mem. at 46.  It is reasonable for Commerce to require parties to demonstrate the purity level for all purchased HCl; parties cannot submit limited information to Commerce and expect the agency to extrapolate that data to all missing data to the benefit of the party.

Furthermore, Commerce explained that Respondents had failed to provide an explanation as to how other record documents, including information relating to HCl published by PubChem and a safety datasheet from Woodman Hill Ltd., tied to the surrogate value and actual consumption of HCl reported for the POR.  I&D Mem. at 46 & n. 308 (citing DJAC and Carbon Activated Surrogate Value Comments (Mar. 4, 2021) ("Respondent SV Cmts."), Exs. 6D, 6E, PR114–76, PJA Tab 11).  Nor does Carbon Activated attempt to demonstrate the relevance of these documents before the court (except to demonstrate the existence of two forms of HCl).  Pls.' Rule 56.2 Mem. at 38. The existence of two forms of HCl fails to establish that the substance reported in the test report "HCl (Liquid)" constitutes aqueous HCl; while the test report indicates the "concentration" of HCl, it does not explain that the only contaminant diluting its purity was water.  *See* Aug. 2019 Test Report.

Having reviewed the record evidence and Commerce's explanation, the court finds that Commerce's determination to value HCl using Malaysian import data for HTS subheading 2806.10 is supported by substantial evidence.

### V.   Valuation of Steam

#### a.  Additional Background

Commerce valued steam using Malaysian import data for HTS 2711.11, which covers liquefied natural gas.  I&D Mem. at 48.

#### b.  Parties' Contentions

Carbon Activated contends that HTS subheading 2711.21, covering natural gas in a gaseous state constitutes "the best available information" on the record.  Pls.' Rule 56.2 Mem. at 40–43; Pls.' Reply at 18–19.  Carbon Activated argues that the agency failed to support its selection of HTS 2711.11 given that record evidence shows that Carbon Activated consumed gaseous natural gas and that domestic gaseous natural gas prices in Malaysia were available at "significantly lower prices" during the POR, contradicting the reliability of Malaysian HTS 2711.11 import data.  Pls.' Rule 56.2 Mem. at 40–43.

The Government responds that Malaysian import data for liquefied natural gas was the best available information in the record to value steam because this data was publicly available and from the primary surrogate country.  *See* Def.'s Resp. at 35.  The Government further contends that import data for liquefied natural gas was a more appropriate source to value steam input than import data under Malaysia HTS 2711.21 because the data for liquefied natural gas imports "represent a significantly larger

volume of imports . . . from multiple countries . . . covering the entirety of the period of review whereas the import data under HTS 2711.21 represent a smaller volume of imports from only one country [ ] covering only two months of the period of review." Def.'s Resp. at 35–36.

### c.  Analysis

Carbon Activated first argues that Commerce has "not adequately explained why [liquefied natural gas] is an appropriate substitute over natural gas in the gaseous state," Pls.' Rule 56.2 Mem. at 41, because the agency "failed to explain how the use of [liquefied natural gas] explains the cost incurred by plaintiffs when they did not use a liquid to produce steam, and instead used natural gas in a gaseous state," *id.* at 42. The court has previously rejected the argument that Commerce may not select liquefied natural gas as a surrogate because it is not "specific" to steam, noting that "the energy source input need not be in the same phase (solid, liquid, gaseous) as the steam the energy creates."  *Carbon Activated AR12*, 586 F. Supp. 3d at 1377.  Carbon Activated's argument is no more developed in this case than it was in AR12, and the court remains unconvinced.

Carbon Activated's reliance on *Yantai Oriental* to support the use of domestic gaseous natural gas prices also fails.  *See* Pls.' Rule 56.2 Mem. at 41–42 (citing *Yantai Oriental Juice Co. v. United States*, 26 CIT 605, 617 (2002)).  In *Yantai Oriental*, "Commerce nowhere explain[ed] how the use of seemingly more expensive imported coal data [was] the best available information," 26 CIT at 617, whereas here, Commerce explained that the domestic natural gas prices identified by Respondents were

unreliable and did not represent the best available information, I&D Mem. at 49. As in AR12, Commerce was unable to establish the underlying methodology Respondents used to derive and collect domestic natural gas prices. *See id*.

Furthermore, as Commerce explained, of the six identified sources of data for domestic natural gas prices, only two were partially within the POR, one showing only the price for residential use, and the other only for commercial use. *Id*. Additionally, the data that were partially within the POR were from one company with an unclear geographic scope. *Id*. Commerce thus supported its rejection of the domestic data based on lack of contemporaneity and because it did not "represent a broad market average." *Id*.

Commerce has the discretion to choose which criteria to prioritize in selecting what constitutes the "best information available." *See QVD Food Co.*, 658 F.3d at 1323. The court declines to interfere with Commerce's discretion in selecting among potential surrogate values because the agency has adequately explained its selection of HTS subheading 2711.11 and supported its selection with substantial evidence.

## VI.   Valuation of Ocean Freight

### a.  Additional Background

The administrative record contained two sets of data, one from Maersk and the other from Descartes, for valuing ocean freight expenses. *See* I&D Mem. at 42. Commerce determined that the Maersk data represented the best available information to value Respondents' ocean freight expenses because the data covered the entire POR, whereas the Descartes data covered less than one-half of the POR. *Id*. at 42–43.

Furthermore, Commerce found that the rates contained in the Maersk data represented actual freight charges, whereas the Descartes data contained only "approximations" of freight charges.  *Id.* at 43.

### b.  Parties' Contentions

Carbon Activated contends that Commerce erred in selecting the Maersk data over the Descartes data because the freight charge quotes contained in the Maersk data "are unreliable and do not represent consummated transactions."  Pls.' Rule 56.2 Mem. at 44; Pls.' Reply at 20–21.  The Government responds that substantial evidence supports Commerce's selection of the Maersk data to value ocean freight expenses. Def.'s Resp. at 38.

### c.  Analysis

This issue boils down to a disagreement over the factual information contained on the record.  The Government contends that the Maersk rates represent actual shipping rates, and that the Descartes data covers only part of the POR and are not product specific.  *See* Def.'s Resp. at 38–39.  Carbon Activated, on the other hand, contends that the rates contained in the Maersk data do not represent consummated transactions, and that the Descartes data contain freight charges representing actual transactions covering comparable merchandise for all twelve months of the POR.  Pls.' Rule 56.2 Mem. at 44–46.

The court's review of these data sets indicates that Commerce's selection of the Maersk data is supported by substantial evidence.  First, Carbon Activated has not provided any evidence undermining Commerce's determination that the Maersk data

represented actual tariff rates and not approximations.  Carbon Activated argues that

the language in the Maersk data stating, "[t]his look up is not covered by a service

contract, therefore tariff rates have been applied," indicates that the Maersk data "does

not represent actual shipments, but instead is based upon quotes."  Pls.' Rule 56.2

Mem. at 45; *see also* Pet'rs.' Submission of Surrogate Values (Mar. 4, 2021), Att. 6C,

PR 177–78, CJA Tab 12.  The meaning of this disclaimer in the Maersk data is unclear,

but the court finds that the inclusion of the language "tariff rates have been applied" is

not inconsistent with Commerce's acceptance of them as based on actual

transactions.[14]  Likewise, Carbon Activated's contention that the Maersk data are

unreliable because the prices remained static throughout the POR is without merit.  *See*

Pls.' Rule 56.2 Mem. at 45.  Carbon Activated assumes that ocean freight prices

fluctuate frequently throughout the year but fails to support that assertion with evidence.

Even if the alleged flaws in the Maersk data exist, Carbon Activated has failed to

show that the Descartes data was the best available information to value ocean freight.

Carbon Activated has not provided any evidence to support its contention that the

Descartes data represents actual transactions.  Each of the shipping rates contained in

the Descartes data contain a disclaimer stating that the rates are merely "[e]stimates of

freight charges . . . furnished as a convenience . . . and represent nothing more than an

---

[14] Although Commerce did not address the meaning of this language specifically in the
*Final Results*, Commerce was clear that it found the Maersk data to be based on "actual
consummated transactions."  *See* I&D Mem. at 43.  The court finds that the language
"tariff rates have been applied" is consistent with such a finding by the agency.

approximation of freight charges."[15]  Respondent SV Cmts., Ex. 13B.  *See* I&D Mem. at

42; Respondent SV Cmts., Ex. 13B.  Furthermore, the Descartes data cover only a part

of the POR.  *See* I&D Mem. at 42–43; *see also* Respondent SV Cmts., Exs. 13A, 13B.

For these reasons, Carbon Activated has failed to show that Commerce erred in not

selecting the Descartes data.  Commerce's selection of the Maersk data to value ocean

freight is supported by substantial evidence.

## VII.    Valuation of Bituminous Coal

### a.  Additional Background

For the *Preliminary Results*, Commerce used Malaysian imports under HTS

subheading 2701.12 (Bituminous Coal, Whether or Not Pulverized, But Not

Agglomerated) to value bituminous coal used in the production of activated carbon.  I&D

Mem. at 21.

In their administrative briefing, Respondents contended that Commerce should

value the bituminous coal used by DJAC and its supplier using Malaysian import data

under HTS 2701.19 (Other Coal).  Respondents' Case Br. at 34.   Respondents argued

that because the bituminous coal used by DJAC had a Useful Heat Value ("UHV") of

less than 5,833 kcal/kg, it did not reach the heat value threshold to be classifiable under

---

[15] Commerce also found that the Descartes data was not the best available information
because it was not "product-specific."  For example, while the Descartes data for April
15, 2019, covers activated carbon, it also covers merchandise such as "automobiles &
parts," candles, chairs, Christmas decorations, "tires & tubes," and over one-hundred
other products that are not subject merchandise.  *See* Respondent SV Cmts., Ex. 13B.
It is unclear whether the record indicates that ocean freight rates are dependent upon
the good being transported within a standard container, nevertheless, Commerce's
conclusion that the Descartes data did not represent actual transactions and did not
cover the entire POR is adequate to support its decision to select the Maersk data.

HTS subheading 2701.12, which is defined, in part, by a calorific value limit equal to or greater than 5,833 kcal/kg.  *See id*. at 32–33.  Petitioners argued that Respondents conflated the UHV scale with the Gross Calorific Value ("GCV") scale, which uses higher numbers than the UHV scale, and that using the GCV scale, the bituminous coal used by DJAC and its supplier resulted in a heat value above the 5,833 kcal/kg required for valuation under HTS subheading 2701.12.  *See* Pet'rs' Rebuttal Br. (Oct. 6, 2021) at 25–28, CR 218, PR 303, CJA Tab 31.  Petitioners further argued that the UHV scale was developed for the Indian coal industry only and, thus, is not reflected in the HTS Notes.  *See id.* at 26–27.

For the *Final Results*, Commerce used Malaysian import data under HTS subheading 2701.19 as the surrogate value for bituminous coal.  *See* I&D Mem. at 20. In doing so, Commerce relied on its finding in AR11, in which it determined, on court-ordered remand, that bituminous coal with a calorific value of less than 5,833 kcal/kg should be classified under HTS 2701.19.  *See id.* at 21–22.  Specifically, in AR11, Commerce found that Note 2 to Chapter 27 of the HTS ("Note 2") limits the applicability of HTS subheading 2701.12 to bituminous coal with "a calorific value limit . . . equal to or greater than 5,833 kcal/kg."  *Carbon Activated Tianjin Co. v. United States* ("*Carbon Activated AR11 Remand*"), 45 CIT __, __, 547 F. Supp. 3d 1310, 1314 & n.6 (2021). Here, Commerce found that there was "insufficient record evidence to demonstrate that the heat values discussed in [Note 2] are derived using either the UHV or GCV scale because the notes do not explicitly state one way or the other" and, therefore,

Commerce declined to adopt Petitioners' interpretation of the import statistics.  I&D

Mem. at 21.

> **b.  Parties' Contentions**

Calgon contends that Commerce erred in using Malaysian import data under

HTS subheading 2701.19 to value bituminous coal used by DJAC and its supplier.

Calgon's Rule 56.2 Mem. at 12–18; Calgon's Reply at 2–6.  Calgon challenges the

agency's finding that the record failed to establish which scale was referenced in Note

2.  Calgon's Rule 56.2 Mem. at 13.  Calgon also challenges Commerce's reliance on its

remand determination in AR11 without applying it to the unique facts of AR13.  *Id*. at

17–18; Calgon's Reply at 5–6.  Calgon further argues that Commerce failed to address

evidence detracting from its conclusion that Malaysian import data under HTS 2701.19

was the best information on the record.  Calgon's Reply at 2–5.

The Government responds that Commerce's selection of HTS subheading

2701.19 to value bituminous coal is supported by substantial evidence.  Def.'s Resp. at

40.  The Government contends that record evidence does not indicate whether the UHV

or GCV scale applies in Note 2 or that the UHV scale is specific to the Indian industry.

*Id*. at 41–42.  The Government also maintains that Commerce correctly applied its

AR11 practice of valuing bituminous coal with a known heat value of less than 5,833

kcal/kg under HTS subheading 2701.19 in AR13.  *See id*. at 42–43.  DJAC agrees that

Commerce's selection of HTS 2701.19 to value bituminous coal is supported by

substantial evidence.  *See* DJAC's Resp. at 2–12.

### c.  Analysis

Calgon first contends that Commerce failed to address record evidence that the heat values discussed in Note 2 are derived using either the UHV or GCV scale.  *See* Calgon's Rule 56.2 Mem. at 13.  Calgon argues that, because the formulas for the UHV and GCV tests can result in differing classification of coal, and because the record evidence relating to the UHV scale only applied to the state of coal mining in India, the record indicated that the UHV scale was specific to the Indian coal industry.  *See* Calgon's Rule 56.2 Mem. at 13–15.

Contrary to Calgon's contentions, Commerce did address Calgon's arguments and record evidence detracting from its decision.  Commerce explained that it was following its practice in AR11, in which it determined that, due to the applicability of Note 2, bituminous coal with a heat value below 5,833 kcal/kg should be valued using HTS 2701.19.  I&D Mem. at 21.  Commerce then explained that no record evidence addressed whether the heat values discussed in Note 2 are derived using either the UHV or GCV scales, but acknowledged that, in the past, Commerce used values derived from the UHV scale in its determinations in this proceeding.  *See id.* at 21–22 & n.140 (citing Issues & Decision Mem. for Activated Carbon from China, A-570-904 (Nov. 2, 2012) ("AR4 IDM"), https://access.trade.gov/Resources/frn/summary/prc/2012-27423-1.pdf (last visited July 21, 2023).[16]

---

[16] Calgon argues that Commerce's citation to AR4 IDM is inapposite because, in AR4, Commerce found that the data it selected had a UHV that matched the UHV reported by the respondent, whereas here, record evidence indicates that UHV is not reflected in the Malaysian import statistics to value bituminous coal but is instead a measurement

Calgon next contends that Commerce failed to support its interpretation of HTS subheadings 2701.12 and 2701.19 with substantial evidence.  *See* Calgon's Rule 56.2 Mem. at 16.  Calgon argues that Commerce's specific focus on heat value is flawed because the agency failed to analyze the meaning of the HTS subheadings beyond heat value, as the agency had done in AR11.  *Id.* at 17.  In AR11, however, Commerce analyzed the plain language of HTS subheadings 2701.12 and 2701.19 only to the extent that the record lacked evidence regarding the heat value of certain bituminous coal used by an uncooperative supplier.  *See Carbon Activated AR11 Remand*, 547 F. Supp. 3d at 1316–1318 (noting that without evidence of the heat values of bituminous coal used by the respondent's suppliers, Commerce relied on the plain language of the HTS descriptions to determine the best available surrogate value).  When Commerce had the heat value information, Commerce relied on that information in connection with the HTS descriptions to select the surrogate value for bituminous coal with a known heat value of less than 5,833 kcal/kg.  *See id.* at 1317–18.

Calgon also argues that Commerce's reliance on AR11 does not constitute substantial evidence.  *See* Calgon's Rule 56.2 Mem. at 17.  Calgon argues that the AR13 record contains evidence specifying "that HTS subheading 2701.12 covers 'bituminous coal' including coking and non-coking bituminous coal that are classifiable

---

limited in use to the Indian coal industry.  *See* Calgon's Rule 56.2 Mem. at 15–16. Calgon, however, fails to point to any record evidence indicating that the UHV scale is so limited, and Commerce need not address such undeveloped, unsupported contentions.  *Cf. Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354–57 (Fed. Cir. 2005) (finding that an agency need not address every argument made by parties, but only those involving material issues of law or fact).

under HTS subheading 2701.12.1000 and HTS subheading 2701.12.9000." *Id.* at 17–

18.  The fact that HTS subheading 2701.12 covers both coking and non-coking

bituminous coal does not contradict Commerce's determination.  Commerce agreed

with Calgon's assertion, *see* I&D Mem. at 22; however, Commerce found HTS

subheading 2701.12 to be *overbroad* because DJAC and its supplier used *only* non-

coking bituminous coal, and, when interpreted in conjunction with Note 2, HTS

subheading 2701.19 was more specific, *id*.

      Based on the foregoing, the court finds that Commerce's determination to value

bituminous coal using Malaysian import data under HTS subheading 2701.19 is

supported by substantial evidence.

### VIII.  Commerce's Acceptance of DJAC's Reporting of Bituminous Coal Consumption

#### a.  Additional Background

      Commerce must determine the normal value of subject merchandise by valuing

the factors of production, which include the "quantities of raw materials employed."  19

U.S.C. § 1677b(c)(3)(B).  Accordingly, Commerce requested, and DJAC reported, the

specific quantities of inputs used to produce activated carbon, including bituminous

coal.  *See* DJAC Section D Resp. (Sept. 17, 2020) ("DJAC SDQR"), Ex. D-6, CR 36–41,

PR 84, CJA Tab 5.  DJAC reported both the total quantity of bituminous coal it

consumed during the period of review as well as the total quantity of bituminous coal

consumed to produce merchandise under consideration.  *See* DJAC Suppl. Section D

Resp. (May 21, 2021) ("DJAC Suppl. SDQR") at 11–12, CR 146–73, PR 243–56, CJA

Tab 17 (explaining the reporting method it used in its initial section D questionnaire response); *see also* DJAC SDQR, Ex. D-6.

Petitioners asserted that there was a discrepancy between the two consumption figures as reported by DJAC.  *See* Pet'rs' Cmts. Concerning Section D Questionnaire Resp. of DJAC (Dec. 4, 2020) at 9–10, CR 55, PR 90, CJA Tab 7.  Commerce instructed DJAC to reconcile that difference.  *See* Letter from [Commerce] to DJAC, Suppl. [Section D] Questionnaire (Apr. 20, 2021) at 7–8, CR 66, PR 193, CJA Tab 14.

DJAC responded that the difference amounted to the difference between the quantity of bituminous coal consumed in the production of merchandise under consideration and "total consumption quantity of bituminous coal during the POR, irrespective of the end-product."  DJAC Suppl. SDQR at 11.  In other words, some of the bituminous coal DJAC consumed during the POR was consumed in the production of non-subject merchandise.  *See id.*  Specifically, DJAC explained that the difference could be accounted for by (1) self-produced normal-ash carbonized material DJAC sold during the POR; (2) the closing inventory of self-produced normal-ash carbonized material during the POR; (3) the opening balance amount of self-produced low-ash carbonized material; and (4) the quantity of Screenings 2 produced.  *Id*. at 11–12.  DJAC provided an equation (essentially, the sum of items 1, 2, and 4, less item 3) showing that the quantity of bituminous coal attributed to the four categories of materials listed above was equal to the difference between the total consumption of bituminous coal, irrespective of end-product, and the total quantity of bituminous coal used in the production of merchandise under consideration.  *See id*.  Calgon, however, argued that

DJAC incorrectly subtracted the closing POR inventory of normal-ash carbonized

material from the calculation of standard consumption of bituminous coal, and

incorrectly added the opening balance of low-ash carbonized material.  *See* Pet'rs'

Cmts. on Continuing Deficiencies in DJAC's Resp. to the Dep't's Suppl. Section D

Questionnaire (June 4, 2021) at 9–12, CR 181, PR 266, CJA Tab 19.

      For the *Preliminary Results*, Commerce accepted DJAC's explanation, made no

adjustments to DJAC's reporting of bituminous coal, and did not address Calgon's

arguments that DJAC's reporting was incorrect.  *See generally* Prelim. Mem.; Prelim.

Results Margin Calculation for [DJAC] (June 18, 2021), CR 194, PR 276, CJA Tab 22.

Commerce did, however, issue a second supplemental cost questionnaire to DJAC prior

to issuance of the *Final Results* in which the agency requested that DJAC "revise [its]

calculation of the standard bituminous coal consumption during the POR such that it

excludes the opening POR inventory balance of . . . low-ash carbonized material and

includes the closing POR inventory balance of . . . normal-ash carbonized material."

*See* Section C Third Suppl. Questionnaire, and Section D Second Suppl. Questionnaire

(July 19, 2021) ("2nd Suppl. SDQR") at 6–7, CR 200, PR 283, CJA Tab 25.  In

response, DJAC explained its position that no adjustment to its calculation methodology

was necessary.  *See* DJAC 3rd Suppl. Sec. C and 2nd Suppl. Sec. D. Resp. (Aug. 11,

2021) ("DJAC 2nd Suppl. SDQR") at 11, PR 291, CR 206–212, CJA Tab 27.

      For the *Final Results*, Commerce accepted DJAC's reporting of bituminous coal

consumption, despite DJAC not making any change to its treatment of opening and

closing inventories as a result of the agency's July 19 supplemental questionnaire.  *See*

I&D Mem. at 9–11.  Commerce concluded that DJAC's calculation methodology

properly accounted for opening and closing inventories of low-ash and normal-ash

carbonized materials.  *See id*. at 10–11.

### b.  Parties' Contentions

Calgon contends that Commerce misunderstood DJAC's calculation of its

bituminous coal consumption.  Calgon's Rule 56.2 Mem. at 24–28; Calgon's Reply at 7–

11.  Specifically, Calgon alleges that, contrary to Commerce's instructions, DJAC's

calculation did not exclude its opening inventory of bituminous coal from its

consumption calculation of bituminous coal.  *See* Calgon's Rule 56.2 Mem. at 26–27;

Calgon's Reply at 8–11.  Calgon further contends that this misunderstanding "renders

the agency's findings inconsistent with the approach relied on by [the agency] in

[AR12]," in which Commerce excluded the opening inventory balance of carbonized

material from DJAC's bituminous coal consumption calculation.  Calgon's Rule 56.2

Mem. at 28–30.

The Government and DJAC contend that DJAC's reporting of its bituminous coal

consumption was consistent with the prior review and that Commerce's reliance on

DJAC's reporting is supported by substantial evidence.  Def.'s Resp. at 45–46; DJAC's

Resp. at 12–23.

### c.  Analysis

DJAC reported both the total consumption of bituminous coal used in the

production of merchandise under consideration and the total consumption of bituminous

coal irrespective of end-product.  *See* DJAC SDQR, Ex. D-6; DJAC Suppl. SDQR at 11;

DJAC 2nd Suppl. SDQR, Ex. 2SD-Q13 at Ex. D-6.2.1–6.2.2.  Because these quantities

did not match, Commerce asked DJAC to reconcile the difference.  *See* DJAC Suppl.

SDQR at 11.  DJAC provided a narrative explanation for the difference between these

totals as well as detailed calculations supporting its explanation.  *See id.* at 11–12.  The

Government and DJAC contend that Commerce's acceptance of DJAC's reported

consumption of bituminous coal is supported by substantial evidence, while Calgon

contends that, because Commerce misunderstood DJAC's calculations, the *Final*

*Results* must be remanded.

        The court has reviewed the record information and Calgon's claim and finds that

Commerce's acceptance of DJAC's consumption of bituminous coal is supported by

substantial evidence.  The crux of Calgon's contention is that, in reporting its total

bituminous coal consumption, DJAC should have excluded the opening inventory of

self-produced carbonized material and included the closing inventory of self-produced

carbonized materials.[17]  *See* Calgon's Rule 56.2 Mem. at 26–27.  Calgon's argument is

without merit.  Calgon asserts that the difference between the two consumption figures

"is a negative number," such that DJAC in fact "subtracted closing inventory" and

"added opening inventory."  *Id*. at 27 (emphasis omitted).  DJAC's treatment of each

adjustment demonstrates that DJAC properly excluded its opening inventory and

---

[17] Calgon argues that DJAC's calculations in this review are inconsistent with its
calculations in AR 12.  *See* Calgon's Rule 56.2 Mem. at 28–30; Calgon's Reply at 7–11.
However, Calgon did not provide any record evidence demonstrating that DJAC's
calculations in AR13 are different than the calculations made in AR12, and the
calculations made in AR12 are not part of the record of the *Final Results* before the
court.

included its closing inventory in order to reconcile the difference between the two

bituminous coal consumption figures.  *See* DJAC Suppl. SDQR at 12.[18]

The court's review of the record indicates that DJAC's treatment of opening and

closing inventories of carbonized materials aligns with DJAC's explanation of its

calculations, Commerce's understanding of the calculations, *and* the calculation method

that Calgon contends should have been followed.  In particular, the difference between

DJAC's total consumption of bituminous coal during the period of review and its

consumption of bituminous coal used to produce merchandise under consideration is

fully accounted for by DJAC's production of non-subject merchandise and the difference

between the starting and ending inventories of what might be considered work-in-

process.  Calgon fails to point to any record evidence to the contrary, nor do they

provide any explanation as to how DJAC's calculations were incorrect or failed to

reconcile fully its consumption of bituminous coal during the POR.  Accordingly,

Commerce's determination with respect to this issue will be sustained.

---

[18] As DJAC explained, the difference between the two consumption figures was equal to the sum of its self-produced normal-ash carbonized materials, the closing inventory of self-produced normal ash carbonized material, and Screenings 2, *minus* the opening balance of self-produced low-ash carbonized materials.  *See* DJAC Suppl. SDQR at 12.  Furthermore, the exhibit to DJAC's initial section D questionnaire response illustrates that DJAC appropriately accounted for its opening and closing inventories of self-produced carbonized materials in its calculations.  *See* DJAC SDQR, Ex. D-12.6.

Consol. Court No. 22-00017                                            Page 44

### CONCLUSION

For the foregoing reasons, the court will sustain Commerce's *Final Results*.

Judgment will enter accordingly.


/s/      Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated:      July 21, 2023
New York, New York